UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

11 CIV 8066

OKLAHOMA POLICE PENSION AND
RETIREMENT SYSTEM,

CASE NO. _____

Plaintiff,

- against-

**CLASS ACTION COMPLAINT**

RECEIVED

U.S.D.S.D.N.Y.
CASHIERS

U.S. BANK NATIONAL ASSOCIATION
(as Trustee Under Various Pooling and
Servicing Agreements),

**JURY TRIAL DEMANDED**

Defendant.

## SUMMARY OF THE ACTION

1.      Plaintiff Oklahoma Police Pension and Retirement System ("Oklahoma

Police"), brings this class action against Defendant U.S. Bank National Association ("U.S.

Bank") in its capacity as the trustee for two trusts in which Plaintiff invested (collectively the

"Covered Trusts"), that own residential mortgage loans that were bundled together and sold to

investors as Bear Stearns mortgage backed certificates (the "Bear Stearns Certificates").  The

Covered Trusts are Bear Stearns ARM Trust 2005-10 ("BS ARM 2005-10") and Bear Stearns

ARM Trust 2005-12 ("BS ARM 2005-12").   Plaintiff purchased and sold Bear Stearns

Certificates at a loss, and, along with other similarly situated investors (collectively, the

"Certificate holders"), was a beneficiary of the Covered Trusts that held the mortgage loans.  A

list of Plaintiff's investments in the Covered Trusts is attached as Exhibit A.

2.      As the Trustee for the Covered Trusts, U.S. Bank owed the Certificate holders

certain contractual duties, as well as duties imposed by the federal Trust Indenture Act of 1939

(the "TIA"), 15 U.S.C. §77aaa, *et seq.*, with respect to the mortgage loans held by the Covered

Trusts. These duties were spelled out in governing agreements, identified as Pooling and Servicing Agreements ("PSA") for the Covered Trusts, which were incorporated by reference into the Certificates U.S. Bank signed. The PSAs for the Covered Trusts are substantially similar, and a copy of one of the PSAs, for BS ARM 2005-12, is attached as Exhibit B. The PSA is incorporated by reference into this Complaint as if set forth fully herein.

3.      The PSA provides in Section 2.01 ("Conveyance of Mortgage Loans to Trustee") that all the rights, title and interest in the mortgage loans owned by the Covered Trusts were to be conveyed to U.S. Bank, as the trustee for the Covered Trusts, for the benefit of the Certificate holders. (PSA, §2.01(a)). This included, among other things, full ownership rights to the mortgage loans, and rights under the PSA and the Mortgage Loan Purchase Agreement ("MLPA") against EMC Mortgage Corporation ("EMC"), a subsidiary of Bear Stearns, that sponsored the Covered Trusts – EMC, along with Bear Stearns, was acquired by JPMorgan Chase in a fire sale in 2008. Notably, U.S. Bank had the right and obligation to require EMC to cure defaults in the mortgage loan files and breaches of the material representations and warranties that EMC made regarding the mortgage loans, by, among other things, forcing EMC to repurchase or substitute any of the defective or non-conforming mortgage loans in the Covered Trusts. *Id.*

4.      To ensure that the rights, title and interest in the mortgage loans were perfected and properly conveyed to U.S. Bank, the PSA provided in Section 2.02 ("Acceptance of Mortgage Loans by Trustee") that U.S. Bank, acting on its own or through an agent, had a duty:

- to take physical possession of the mortgage loan file and all of the key documents for each of the mortgage loans included in the Covered Trusts and to "hold" them for the benefit of the Certificate holders (PSA, Section 2.02(a)-(b));

- to "review" each of the mortgage loan files for each of the mortgage loans in the Covered Trusts to ensure that all of the key documents for the loans were

included in the files and that those documents were not defective or incomplete, in particular because they failed to properly transfer, endorse and assign each mortgage and note to U.S. Bank (*id*.);

- to complete an "Interim Certification" within 90 days of the securitization's closing, and a "Final Certification" within 180 days of the closing, for the benefit of the Certificate holders, certifying that U.S. Bank had reviewed all of the loan files for each of the mortgage loans in the Covered Trusts and had taken physical possession of the mortgage loan files, with the exception of certain mortgage loans that had missing, defective or incomplete loan files (*id*.);

- to promptly "notify" EMC of those mortgage loans that had missing, defective or incomplete documents in their loan files, as uncovered by the reviews for the Interim Certification and the Final Certification (*id*.); and

- to "enforce," within 90 days after notifying EMC of those mortgage loans that had missing, defective or incomplete loan files, EMC's obligation to (i) cure those defects, (ii) substitute the defective mortgage loans with non-defective loans, or (iii) repurchase the defective loans.  (*Id*.).

Significantly, both Covered Trusts closed on December 30, 2005, which means that U.S. Bank had the obligation to complete the foregoing duties several years ago.

5.      U.S. Bank's statutory and contractual duty to take physical possession of the key documents in the mortgage loan files – such as the original mortgage note, original recorded mortgage and security instrument for the mortgage loan, and the endorsements and assignments of the mortgage note and mortgage loan – and to review the mortgage loan files to ensure that there were no mortgage loans with defective loan files, endorsements and/or assignments, was of critical importance to Certificate holders for two reasons.

6.      ***First***, if certain key documents that were required to be included in each mortgage's loan files were not properly transferred and endorsed over to U.S. Bank in its capacity as trustee for the Covered Trusts – in particular the original mortgage note or the security instrument for the mortgage loan – then the Covered Trusts would not have a legal ownership interest in the mortgage loans.  This would mean that U.S. Bank could not enforce

collection in the case of nonpayment of the loans by bringing a foreclosure action against the borrower.  Further, in the event that an entity (such as EMC) that attempted to transfer the mortgage loans to the Trustee went into bankruptcy, the mortgage loans would become part of that entity's bankruptcy estate and would be removed from the Trust corpus, because the transfer was never effectuated (*i.e.*, the mortgage loans would not be "bankruptcy remote").

7. ***Second***, the PSA required EMC to cure the defective loans and defects in the loan files, and, if it could not do so, to repurchase the defective loans or substitute them with other loans that did not present any problems.  (PSA, §2.02(a)-(b)).  If EMC refused to cure the deficiencies or to repurchase or substitute the defective loans, it was in default of the PSA and U.S. Bank would be required to enforce all of its rights under the PSA, as a prudent person would, on behalf of Certificate holders.

8. The PSA required U.S. Bank to review the mortgage loan files, to notify EMC of those mortgage loans that had missing, defective or incomplete loan files, and to create a "Final Certification" stating that it had taken physical possession of all of the other mortgage loan files and that they were complete and contained no irregularities, to ensure that Certificate holders received consideration for purchasing the Certificates – or, simply put, received securities that were, in fact, "mortgage-backed."

9. As described more fully below, however, U.S. Bank regularly disregarded its contractual and statutory duties to review the loan files to ensure that there were no missing, defective or incomplete documents, to enforce its obligations to ensure that defective loans were removed from the mortgage pools supporting the Certificates.  Representative samples of assignments, mortgages and deeds of trust (which are used in non-judicial foreclosure states and are a security similar to a mortgage) for the mortgage loans in the Covered Trusts that were

drawn from various states' public land records (as set forth in Exhibit C), show that the assignments and transfers of the mortgage loans to the Trustee had not occurred and/or were not recorded at the time that the Covered Trusts closed. This defect should have been obvious to U.S. Bank when it conducted its reviews of the mortgage loan files. Indeed, it appears from these public files that the assignments into the Covered Trusts at the time of the securitizations were commonly endorsed in blank, and that the interim transfers of the mortgage loans from the originators to the securitization seller, then to the securitization depositor, and finally to the Trustee, did not occur at all.

10. U.S. Bank's failure to review the loan files for missing documents and irregularities, and then ensure that identified defects were corrected, and that the mortgage loans were properly transferred and assigned, was not a mere technicality. As explained by Georgetown Law School Professor Adam Levitin, in his testimony before the House Financial Services Committee in November 2010, there are "profound" implications if a trustee such as U.S. Bank fails to ensure that the mortgage loan files in a securitization are not defective and that the underlying mortgage loans were not improperly transferred to the securitization Trust:

> If mortgages were not properly transferred in the securitization process, then mortgage-backed securities would in fact not be backed by any mortgages whatsoever. The chain of title concerns stem from transactions that make assumptions about the resolution of unsettled law. If those legal issues are resolved differently, then there would be a failure of the transfer of mortgages into securitization trusts.
>
> *       *       *
>
> Recently, arguments have been raised in foreclosure litigation about whether the notes and mortgages were in fact properly transferred to the securitization trusts. This is a critical issue because the trust has standing to foreclose if, and only if it is the mortgagee. If the notes and mortgages were not transferred to the trust, then the trust lacks standing to foreclose.

* * *

> *If the notes and mortgages were not properly transferred to the trusts, then the mortgage-backed securities that the investors purchased were in fact non-mortgage-backed securities. In such a case, investors would have a claim for the rescission of the MBS, meaning that the securitization would be unwound, with investors receiving back their original payments at par (possibly with interest at the judgment rate).* Rescission would mean that the securitization sponsor would have the notes and mortgages on its books, meaning that the losses on the loans would be the securitization sponsor's, not the MBS investors'.

(Emphasis added).

11.     As reflected in a November 16, 2010 Report of the Congressional Oversight Panel, the concerns that Professor Levitin raised about the enforceability of undocumented or improperly assigned or transferred mortgage loans are not theoretical – several states have acted to invalidate or at least significantly delay and increase the costs of foreclosures of defectively securitized loans:

- In New York, the court system now requires that those initiating residential foreclosure actions must file a new affirmation to certify that an appropriate employee has personally reviewed the documents and papers filed in the case and confirmed both the factual accuracy of these court filings and the accuracy of the notarizations contained therein.

- In California, a non-judicial foreclosure state, the attorney general sent a letter to JPMorgan Chase demanding that the firm stop all foreclosures unless it could demonstrate that all foreclosures had been conducted in accordance with California law. The attorney general also called on all other lenders to halt foreclosures unless they can demonstrate compliance with California law.

- In Arizona, which is also a non-judicial foreclosure state, the attorney general sent letters on October 7, 2010 to several servicers implicated in the robo-signing scandals to demand a description of their practices and any remedial actions taken to address potential paperwork irregularities. The attorney general wrote that if any employees or agents used any of the questionable practices in connection with conducting a trustee's sale or a foreclosure in Arizona, such use would likely constitute a violation of the Arizona Consumer Fraud Act, and the attorney general would have to take appropriate action.

- In Ohio, in addition to his lawsuit against GMAC, the attorney general filed an *amicus curiae* brief in an individual foreclosure case asking the court to consider evidence that GMAC committed fraud that tainted the entire judicial process and to consider sanctioning GMAC.  The attorney general also sent a letter to 133 Ohio judges asking them for information on any cases involving the robo-signer Xee Moua.  In addition, he asked Wells Fargo Bank to vacate any foreclosure judgments in Ohio based on documents that were signed by robo-signers and to stop the sales of repossessed properties.

- In The District of Columbia, Attorney General Peter Nickles announced on October 27, 2010 that foreclosures cannot proceed in the District of Columbia unless a mortgage deed and all assignments of the deed are recorded in public land records, and that foreclosures relying on MERS would not satisfy the requirement.  MERS responded the next day by issuing a statement that their procedures conform to the laws of the District of Columbia and encouraged their members to contact them if they experience problems with their foreclosures.

- In Connecticut, the attorney general started investigating GMAC/Ally and demanded that the company halt all foreclosures.  He also asked the company to provide specific information relating to its foreclosure practices.  In addition, the attorney general asked the state Judicial Department on October 1, 2010 to freeze all home foreclosures for 60 days to allow time to institute measures to assure the integrity of document filings.  The Judicial Department refused this request.

12.    A November 2010 report by Legal Services of New Jersey to the New Jersey Supreme Court, which resulted in amendments to the Court's rules, a notice to the Bar and order to show cause to the state's leading mortgage servicers, including Chase Home Finance, linked widespread abuses in the state's foreclosure practices to improper short cuts commonly taken in the transfer and assignment of securitized mortgage loans, such as those which occurred in this case.  As the report found, "Lenders no longer routinely execute or record Assignments of Mortgage when a loan is transferred because they regard it as unnecessary unless there is a default and too costly and time consuming to do in every case."  One of the typical abuses identified in the report was used extensively for the Covered Trusts – assignments that were signed and notarized in blank.

13.     U.S. Bank is familiar with the damages that arise when mortgage loans are not adequately transferred to securitization Trusts.  In an action to quiet title on foreclosed property that U.S. Bank brought as Trustee for another Bear Stearns MBS Trust, which is similar to the Covered Trusts, the Supreme Court of Massachusetts held that a PSA that did not specifically identify the mortgage loans transferred to the Trust did not, in fact, transfer the mortgage loans to the Trust, and that written assignments of individual mortgage loans where the identification of the "assignee" did not specify U.S. Bank but was instead left blank also failed to transfer the mortgage loans to the Trust.  *U.S. Bank Nat'l Assoc. v. Ibanez*, 941 N.E. 2d 40, 53 (Mass. 2011) ("We have long held that a conveyance of real property, such as a mortgage, that does not name the assignee conveys nothing and is void; we do not regard an assignment of land in blank as giving legal title in land to the bearer of the assignment").

14.     In sum, there is reliable evidence showing that, when the securitizations were initiated, EMC routinely failed to transfer the original mortgage notes and mortgages to U.S. Bank in its capacity as trustee for the Covered Trusts.  Thus, U.S. Bank breached its contractual and statutory duties as the trustee of the Covered Trusts: to take physical possession of the mortgage loans; to review the loan files; to identify improperly documented loans; to notify EMC of defective loans and ensure that EMC cure, substitute or repurchase those loans; to certify that the remaining loan files for the mortgage loans in the Covered Trusts contained complete and accurate documentation; to ensure that the mortgage loan notes and collateral had been properly endorsed, assigned over to U.S. Bank as the trustee for the Covered Trusts, and publicly recorded; and to perfect the Trusts' ownership interests in the underlying mortgage loans as provided in the PSA.

15.     In addition, various government investigations, along with lawsuits brought by insurers of Bear Stearns' MBS Trusts, have shown that Bear Stearns routinely breached the representations and warranties it made regarding the mortgage loans it securitized.  When U.S. Bank learned of these violations, U.S. Bank had the duty to notify Certificate holders of them. Moreover, once there were events of default and/or the rights of Certificate holders to full and timely payment of their principal and interest were impaired, U.S. Bank had the duty to act as a prudent person to exercise all of its powers under the PSA to protect Certificate holders.

16.     The mortgage loans in the Covered Trusts have experienced high levels of payment delinquencies, delays in foreclosure actions and credit losses which would not have occurred but for the negligence of U.S. Bank and its failure to perform its responsibilities under the PSA and TIA.  By failing to perform its duties, U.S. Bank has caused Certificate holders to suffer millions of dollars in losses.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 for violations of the TIA and supplemental jurisdiction over the contract claims.  It also has jurisdiction pursuant to 28 U.S.C. §1332(d).

18.     Venue is proper in this District because the Covered Trusts were created under, and governed by, New York law, and because U.S. Bank has an office, and does business, in New York County.

## PARTIES

19.     Plaintiff Oklahoma Police Pension and Retirement System is a state governmental pension fund authorized by statute under the laws of Oklahoma with the mission of providing retirement benefits to its members and their beneficiaries.  Oklahoma

Police relies heavily upon the performance of its investments to fund benefits.  It invested in and sold Bear Stearns Certificates as provided in Exhibit A.

20.     Defendant U.S. Bank National Association is a national banking association organized and existing under the laws of the United States.  U.S. Bank does business throughout the United States and its principal office in New York State is in New York County.  For each of the Covered Trusts, U.S. Bank signed certificates incorporating the PSA.  As the trustee for the Covered Trusts, U.S. Bank owed the Certificate holders certain statutory and contractual duties with respect to the mortgage loans owned by the Covered Trusts, which duties U.S. Bank violated.

## FACTUAL ALLEGATIONS

### I.     The Securitization Process For The Bear Stearns Certificates

21.     Bear Stearns, acting on its own and through its network of corporate affiliates, managed the securitization of the mortgage loans in the Covered Trusts, and in countless other MBS trusts.  Mortgage securitizations involve the conversion of illiquid whole loans into bond-like instruments, the certificates, that trade over the counter in capital markets.

22.     The first step in creating the certificates is the origination of mortgages to borrowers purchasing homes.  Through its corporate affiliates, Bear Stearns Residential Mortgage Corporation and EMC Residential Corporation, Bear Stearns originated mortgages.  In addition, Bear Stearns purchased mortgages that had been originated by other large third-party lenders – including SunTrust Mortgage, Inc., and American Home Mortgage Investment Corp. – some of which received financing from Bear Stearns to originate mortgages.

23.     Second, Bear Stearns grouped the mortgages that it had originated and purchased into a large pool, which it transferred, or sold, to a "Depositor."  EMC often served the role of

"Seller" (to the Depositor) for Bear Stearns, and did so for the Covered Trusts. The Depositor was generally a shell entity owned or controlled by Bear Stearns, like the Depositor for the Covered Trusts, Structured Asset Mortgage Investments II Inc. ("SAMI II"). Depositors exist primarily to provide an intermediary between the Seller and the Trust in the chain of title to the mortgage loans because – if the Seller goes into bankruptcy, as many did and EMC nearly did – the bankruptcy estate can rescind direct transfers made by the Seller. Thus, the Seller and the Depositor enter into a Mortgage Loan Purchase Agreement ("MLPA"), which governs the mechanics of the transfer, and states that the mortgage loan files must be complete and may not have defective documents, such as imperfect assignments or endorsements. In the MLPA, the Seller also: (i) makes representations and warranties concerning the quality of the mortgages in the mortgage pool, (ii) promises to cure, substitute or repurchase mortgages that do not comply with those representations and warranties, or that do not have a valid transfer, and (iii) states that the Trustee will ultimately have the right to enforce those representations and promises.

24.     ***Third***, the Depositor transferred the pool of mortgages to the Trustee, for the benefit of the Trust and the Certificate holders, and in exchange the Trustee transferred the Certificates to the Depositor. As discussed in greater detail below, the PSA governs this transfer and the operation of the Trust. The PSA imposes certain duties on the Trustee, in addition to those duties imposed by the TIA and New York law. It also establishes the Trust as a Real Estate Mortgage Investment Conduit ("REMIC") under the Internal Revenue Code, which enables the Trust to avoid tax liability on income generated from the underlying mortgage loans, if the Trust gains valid title over the underlying mortgage loans within three months of its creation and if certain other criteria are met. Qualifying as a REMIC is critical to the Trust's

ability to make the payments promised to Certificate holders.  (In addition, the PSA refers to and incorporates the MLPA, which is attached as Exhibit J to the PSA).

25.     **Fourth**, the Depositor sold the Certificates to an underwriter, typically another Bear Stearns entity, such as Bear, Stearns & Co.  The Depositor remits the money from that sale to the Seller, which may use it to originate or purchase more mortgages.  Meanwhile, the underwriter markets and sells the Certificates to investors.  At this point in the securitization process, the Depositor is also sometimes referred to as the Issuer of the Certificates, and the Seller is also sometimes referred to as their Sponsor.

26.     Certificates entitle their holders to the cash flows generated from the Trust's pool of mortgage loans.  The Trust, or securitization transaction, is structured such that the risk of loss is divided among different levels, or "tranches."  Each tranche of the Trust has a different level of credit risk and reward (the interest or yield), including different levels of credit enhancement. Senior tranches, that have priority to payment in the event the Trust suffers losses, have lower interest rates than junior tranches, and different Certificates correspond to those different tranches.  One form of credit enhancement is overcollateralization, which means that the total principal balance of the mortgage loans in the Trust exceeds the aggregate amount of securities issued and sold by the Trust.  Another example of credit enhancement is excess interest, which means that the amount of interest collected on the underlying mortgage loans for each payment period is expected to be greater than the interest distributable to the Certificate holders and the expenses payable by the Trust during that period.  Because the tranches have different priorities of claim to the cash flow generated by the underlying pool of mortgages, they have different credit ratings and they sell at different prices.

27.     Following the sale of the Certificates, the Master Servicer and Securities Administrator is responsible for the collection of payments from the underlying mortgagors, including through foreclosure if necessary.  Those payments are then sent to the Trustee for the Covered Trusts so that they can be distributed to the Certificate holders in accordance with the tranche structure.

28.     Thus, the value of a mortgage-backed security, and its credit rating, depend primarily on the underlying mortgage borrowers' ability and willingness to make their scheduled principal and interest payments and, secondarily, to the extent that borrowers default on their payments, on the Trust's ability to foreclose on the collateral and recover the unpaid loan balance.  If the loans underlying a Certificate suffer payment defaults in excess of the assumptions built into the security's rating, or the underlying properties' mortgages cannot be effectively foreclosed and the properties sold at sufficient prices following default, the securities will be re-rated and Certificate holders will suffer greater than expected losses in the value of their Certificates.

## II.     Widespread Problems Plague Mortgage-Backed Securities

29.     In November 2010, the Congressional Oversight Panel, which was established as part of the Emergency Economic Stabilization Act of 2008, issued a Report entitled "Examining the Consequences of Mortgage Irregularities for Financial Stability and Foreclosure."  It recounts widespread foreclosure abuses over the last several years – often in connection with mortgages that have been securitized – and the numerous Federal and State investigations that have detailed this problem.  Many of those abuses, such as forged or back-dated mortgage assignments, or the "robo-signing" of false affidavits used in foreclosure actions, arise from failures in the process of documenting and transferring mortgage loans from the originators, to the interim entities in the

securitization process, and ultimately into the securitization trusts. As the Report explains, irregularities in the chain of title between the originator and the Trust can have significant legal consequences that damage the Trusts and Certificate holders.

30.     Every county in the country maintains records of who owns land within its borders, of transfers of ownership in real property, and of related mortgages or deeds of trust. In order to protect ownership interests, take clear title to property, and adjust claims among competing creditors filing liens against the property, fully executed, original documents must be recorded in a county recording office, establishing the source and timing of a person's ownership interests in that property. These documents must include a description of both the property and the parties that transfer the property.

31.     When an individual purchases a home using a mortgage loan, at least the following documents are created: (i) a promissory note establishing the mortgagor's personal liability ("Mortgage Note"), (ii) a mortgage evidencing the lender's interest in the underlying collateral ("Mortgage" or "Deed of Trust"), and (iii) if the mortgage is transferred, proper assignments of the Mortgage Note and the Mortgage. Without the Mortgage Note, a Mortgage secures no debt; while without the Mortgage, the Mortgage Note is simply an unsecured debt obligation.

32.     As a general matter, there are several methods in which a Mortgage Note can be transferred, including: (i) via a contract and sale, which is governed by the common law of contracts, or (ii) if a Mortgage Note is considered a negotiable instrument (which is not clear as a matter of law), it could be negotiated via Article 3 of the Uniform Commercial Code ("UCC") – Article 3 requires endorsement and the physical delivery of the note. However, under New York law, which applies to the Covered Trusts, the agreement that governs a transfer of debt can

establish heightened requirements that must be complied with in order to affect the transfer.  As discussed below, the PSA governs the transfer of the Mortgage Loans (including the Mortgage Note) from the Depositor to the Trustee; and the MLPA governs their transfer from the Seller to the Depositor.  These agreements purport to treat Mortgage Notes as negotiable instruments, but also impose heightened requirements that must be satisfied to complete their transfer.  The Mortgage itself is a transfer of an interest in real property, and must be assigned and recorded in accordance with the law of the place where the property is located.  States generally require a signed writing in order to transfer an interest in real property.

33.     If the Mortgage Note and Mortgage are not properly transferred to the Trust, then the Trust cannot foreclose on a borrower that falls into default.  This is because only the person who (currently) holds both documents has standing to enforce the mortgage in a foreclosure action.  It is therefore significant that a number of Courts have refused to recognize written assignments of the individual notes or mortgages to a securitization trust that occur only after a foreclosure proceeding has begun.

34.     Additionally, if the transfer of a Mortgage is not recorded with the proper county authority, the holder of the Mortgage may then lose its place as the first lien on the underlying property.  This means that if there are junior mortgagees or other creditors who have properly recorded their liens, they will have the right to payment from a sale of the underlying property before the Trust can recover from the foreclosure sale.  As such, even if a note is properly transferred, it has value only if the corresponding mortgage has been properly recorded.

35.     Bear Stearns MBS Trusts similar to those at issue here have been unable to foreclose on Mortgages due to irregularities in the chain of title.  U.S. Bank is well aware of this problem.  In a high profile decision, the Massachusetts Supreme Court ruled that U.S. Bank,

acting as Trustee for a Bear Stearns MBS Trust, could not quiet title to property foreclosed in a non-judicial foreclosure and sale because the Trustee had not properly foreclosed on the defaulted loan. *Ibanez*, 941 N.E. 2d at 53. Significantly, in upholding the trial court's decision from March 2009, the Massachusetts Supreme Court held that U.S. Bank had not properly foreclosed because it did not "provide a complete chain of assignments" linking its ownership of the mortgage loan to the lender that originated the mortgage loan. It also held that an "assignment[] in blank" of the mortgage, which identifies the assignor but not the assignee, is invalid, because "a conveyance of real property, such as a mortgage, that does not name the assignee conveys nothing and is void."

36.     Moreover, as the November 2010 Congressional Oversight Report describes, several other states have similarly acted to prohibit, or limit, the foreclosure of mortgages with irregularities that are similar to the irregularities in mortgage loans underlying the Covered Trusts:

- In New York, the court system now requires that those initiating residential foreclosure actions must file a new affirmation to certify that an appropriate employee has personally reviewed the documents and papers filed in the case and confirmed both the factual accuracy of these court filings and the accuracy of the notarizations contained therein.

- In California, a non-judicial foreclosure state, the attorney general sent a letter to JPMorgan Chase demanding that the firm stop all foreclosures unless it could demonstrate that all foreclosures had been conducted in accordance with California law. The attorney general also called on all other lenders to halt foreclosures unless they can demonstrate compliance with California law.

- In Arizona, which is also a non-judicial foreclosure state, the attorney general sent letters on October 7, 2010 to several servicers implicated in the robo-signing scandals to demand a description of their practices and any remedial actions taken to address potential paperwork irregularities. The attorney general wrote that if any employees or agents used any of the questionable practices in connection with conducting a trustee's sale or a foreclosure in Arizona, such use would likely constitute a violation of the Arizona Consumer Fraud Act, and the attorney general would have to take appropriate action.

- In Ohio, in addition to his lawsuit against GMAC, the attorney general filed an *amicus curiae* brief in an individual foreclosure case asking the court to consider evidence that GMAC committed fraud that tainted the entire judicial process and to consider sanctioning GMAC.  The attorney general also sent a letter to 133 Ohio judges asking them for information on any cases involving the robo-signer Xee Moua.  In addition, he asked Wells Fargo Bank to vacate any foreclosure judgments in Ohio based on documents that were signed by robo-signers and to stop the sales of repossessed properties.

- In The District of Columbia, Attorney General Peter Nickles announced on October 27, 2010 that foreclosures cannot proceed in the District of Columbia unless a mortgage deed and all assignments of the deed are recorded in public land records, and that foreclosures relying on MERS would not satisfy the requirement.  MERS responded the next day by issuing a statement that their procedures conform to the laws of the District of Columbia and encouraged their members to contact them if they experience problems with their foreclosures.

- In Connecticut, the attorney general started investigating GMAC/Ally and demanded that the company halt all foreclosures.  He also asked the company to provide specific information relating to its foreclosure practices.  In addition, the attorney general asked the state Judicial Department on October 1, 2010 to freeze all home foreclosures for 60 days to allow time to institute measures to assure the integrity of document filings.  The Judicial Department refused this request.

37.     Similarly, as a result of a November 2010 report by New Jersey Legal Services to the New Jersey Supreme Court documenting irregularities in foreclosure proceedings – which was supported by extensive depositions and documentary evidence, including from lawyers and other participants in the foreclosure of securitized loans – New Jersey issued an Administrative Order amending its Court rules, provided a warning to the foreclosure Bar and issued an order to show cause to the major servicers of securitized mortgage loans including Chase Home Finance (which had acquired EMC in 2008).  This report explained that many of the foreclosure abuses, such as robo-signing and the use of false affidavits, occurred to compensate for legal defects in the chain of assignments of securitized mortgage loans to their Trusts, and generally arose as the securitization participants cut corners to save costs.  As the report explained:

A foreclosing plaintiff must show (1) that it holds the note, and (2) that the mortgage was either made to it or assigned to it in writing.  N.J.S.A. 46:9-9. **Lenders no longer routinely execute or record Assignments of Mortgage when a loan is transferred because they regard it as unnecessary unless there is a default and too costly and time consuming to do in every case.**  See Exhibit Q in which a foreclosure attorney explains in a submission to the Court that; "The assignee performs its due diligence, bulk transfer agreements are executed, money is wired, and on a date certain the proverbial 'switch is flipped' wherein the assignee takes over regardless of the execution of a formal, legal assignment for each and every loan.  By way of example, one large national mortgage servicer recently purchased 1.3 million loans from another large servicer.  Even if it took one minute per assignment to execute (which itself is a stretch) it would take over ten years to execute all the resulting assignments is [sic] same were executed at the rate of 40 hours per week."  **So typically at the time the lender makes a decision to foreclose it is not the record mortgagee.  To correct that defect, the attorney for the foreclosing mortgagee or the servicer of the loan will create an Assignment of Mortgage for the purposes of litigation which is in turn signed by a robo-signer.  Documents recorded with a public official are self executing and have special evidential status and therefore are especially pernicious.  Usually the assignment purports not only to assign the mortgage but also the note or underlying obligation.   The assignment of the note nearly always contradicts other documents which indicate that the note was transferred at different times and in different manners or not at all.**

(Emphasis added).

38.     One of the flawed practices for assigning mortgages cited by the New Jersey Legal Services report was where assignments appeared to have been executed and notarized in blank -- a practice that appears to have been common for the transfer into the Covered Trusts.

39.     Finally an April 2011 joint report entitled "Interagency Review of Foreclosure Policies and Practices" issued by the Federal Reserve, the FDIC, the Office of Thrift Supervision and the Office of the Comptroller further confirmed these abuses.  For this report, federal regulators reviewed a sampling of the mortgage loan files belonging to 14 mortgage loan servicers that had signed consent orders with the federal regulators in April 2011.  Wells Fargo – which services the mortgage loans in the Covered Trusts for the Bear Stearns Certificates – was

one of the mortgage servicers included in the review.  U.S. Bank, which acted as servicer for MBS trusts similar to those at issue here, was also included in the review.

40.     In the report, the regulators stated: "The Federal Reserve System, the Office of the Comptroller (OCC), the Federal Deposit Insurance Corporation (FDIC), and the Office of Thrift Supervision (OTS), referred to as the agencies, conducted on-site reviews of foreclosure processing at 14 federally regulated mortgage servicers during the fourth quarter of 2010." Significantly, in the report, the regulators stated that its review of the mortgage servicers' loan files showed that there may be "***disputes over note ownership or authority to foreclose***." Report, at 6 (emphasis added).  The regulators also noted "***concerns about the prevalence of irregularities in the documentation of ownership [that] may cause uncertainties for investors of securitized mortgages***." *Id.* (emphasis added).

III.    **Bear Stearns Mortgage-Backed Securities Are Particularly Toxic**

41.     In the years following Bear Stearns' collapse, public and private investigations, along with numerous reports in newspapers, have made clear that the mortgage loans Bear Stearns securitized were of particularly low quality, often with significant violations of the underwriting representations and warranties that Bear Stearns made.  The Bear Stearns MBS Trusts consequently suffered high credit losses.

42.     Insurers, which guaranteed payments for Certificate holders of certain Bear Stearns MBS Trusts, have brought multiple cases against Bear Stearns.  These insurers were induced to provide coverage based on representations and warranties – that were substantially similar to the representations and warranties in the PSAs and MLPAs – that Bear Stearns made to them regarding the quality of the underlying loans.  Due to the insurers' contracts with Bear Stearns, they were in some cases able to gain access to particular mortgage loan files and to

review whether the mortgage loans complied with Bear Stearns' underwriting representations and warranties.  All of the insurers found alarmingly high breach rates – in the order of 90% of the mortgage loans per trust failing to comply with the representations and warranties.  These loan defects are described at length in *Ambac Assurance Corp. v. EMC Mortgage Corp.*, No. 1:08-cv-09464-RMB (S.D.N.Y.); *Syncora Guarantee Inc. v. EMC Mortgage Corp.*, No. 1:09-cv-03106-PAC (S.D.N.Y.); *Assured Guarantee Corp. v. EMC Mortgage Corp.*, No. 1:10-cv-05367-NRB (S.D.N.Y.).

43.     Many other suits brought by investors, including investors affiliated with the Federal Government, also allege based on investigations and extensive analysis that Bear Stearns MBS Trusts commonly breached their representations and warranties at the same incredibly high percentages described above.  *E.g. Federal Home Loan Bank of Seattle v. Bear Stearns & Co., Inc., et al.*, No. 2:10-cv-00151-RSM (W.D. Wa.) (since remanded back to state court); *Federal Home Loan Bank of San Francisco v. Credit Suisse (USA) LLC, et al.*, No. CGC.10.497840 (Cal. Super.) (naming various Bear Stearns entities as Defendants); *Allstate Bank, et al. v. JPMorgan Chase Bank, N.A.*, No. 650398/2011 (N.Y. Sup. Ct.) (same).

44.     Discovery that Ambac conducted in its suit against EMC, including lengthy testimony from knowledgeable witnesses (which is disclosed in detail in its amended complaint), confirms the abysmally poor quality of Bear Stearns MBS securitizations.  Among other things, the discovery demonstrates that: Bear Stearns' internal audits found that it conducted inadequate due diligence on the loans it securitized; Bear Stearns routinely included mortgage loans in securitizations that external due diligence firms had identified as being defective; and Bear Stearns rushed to securitize new mortgage loans within the first 90 days after they were originated, so that the loans had no opportunity to default before being securitized.  Most

shockingly, Bear Stearns routinely identified defects in loans that it securitized, forced settlements from the loans' originators based on those defects, and then sold the defective loans to securitization Trusts while hiding both the defects and settlement payments.

45.     Testimony before Congress from Clayton Holdings ("Clayton"), one of the due diligence firms that Bear Stearns used to review the mortgage loans it securitized, further confirms the poor quality of mortgage loans transferred by Bear Stearns into its MBS Trusts. Clayton reported that, based on its review of mortgage loans that Bear Stearns securitized between the First Quarter 2006 and the Second Quarter 2007, 17% of the mortgage loans it reviewed for Bear Stearns were defective, and Bear Stearns nevertheless included 42% of those defective loans in its securitizations.  That is particularly remarkable, because the evidence in the amended *Ambac* complaint makes clear that as Bear Stearns' awareness of the poor quality of its mortgage loans increased, Bear Stearns gave Clayton smaller and smaller amounts of loans to sample, and instructed Clayton to conduct an increasingly cursory review.

46.     Given this information, it is no surprise that another Trustee for a Bear Stearns MBS Trust, that is similar to the Covered Trusts, has sued EMC to require it to repurchase defective loans.  *Bear Stearns Mortgage Funding Trust 2007-AR2, by Wells Fargo Bank, N.A. as Trustee v. EMC Mortgage LLC*, No. 6861, 2011 WL 4102212, (Del. Ch. Ct. Sept. 13, 2011). Despite U.S. Bank's own knowledge of widespread defaults, U.S. Bank has not, however, acted in accordance with its obligations under the PSA and TIA, as a prudent person would, to similarly protect the interests of Certificate holders in the Covered Trusts.

**IV.     U.S. Bank's Role As Trustee For The Covered Trusts**

A.     The Trustee's Duties And Obligations Under The PSA

47.     U.S. Bank's duties and obligations as the Trustee for the Covered Trusts are set forth in the PSA.  The PSA is the operative agreement that governs the parties' respective rights and responsibilities in connection with the Covered Trusts.   The TIA, however, provides minimum federal protections to investors which are deemed to be incorporated into every qualified trust indenture, including the PSAs for the Covered Trusts.  U.S. Bank entered into the PSA with: (1) EMC, in its capacity as the "Seller" of the mortgage loans, (2) SAMI II, as the "Depositor" of the mortgage loans; and (3) Wells Fargo Bank, N.A., as the Master Servicer and Securities Administrator for the mortgage loans.   The Certificates signed by U.S. Bank incorporate the PSA, and Plaintiff and the Class have contract rights under the PSA, as deemed to be modified by the TIA.

48.     The PSA provides in its "Preliminary Statement" that "the Depositor will sell the Mortgage Loans and certain other property to the Trust Fund and receive in consideration therefor Certificates evidencing the entire beneficial ownership interest in the Trust Fund."  The PSA defines "Trust Fund" as:  "The corpus of the trust created by this Agreement, consisting of the Mortgage Loans and the other assets described in Section 2.01(a)."   The PSA defines "Mortgage Loans" as a "mortgage loan transferred and assigned to the Trustee pursuant to Section 2.01 or Section 2.04 and held as a part of the Trust Fund, as identified in the Mortgage Loan Schedule (which shall include, without limitation, each related Mortgage Note, Mortgage and Mortgage File and all rights appertaining thereto)."

      i.      *The Conveyance Of The Mortgage Loans To U.S. Bank And The Duty To Properly Take Title To The Mortgage Loans*

49.     The PSA incorporates and refers to the MLPA, the instrument that governs the transfer of the mortgage loans from the Seller to the Depositor.  Pursuant to the MLPA, the Seller purports to sell the Mortgage Loans to the Depositor, and makes representations and warranties to the Purchaser regarding the Mortgage Loans.  Neither the MLPA nor its attached schedules, however, specifically identifies either the Mortgagors, or the addresses of the mortgage loan collateral to be transferred and assigned to the Depositor.

50.     The PSA establishes the terms of the Mortgage Loans' transfer from the Depositor to the Trustee, on behalf of the Trust and the Certificate holders, but again neither identifies the mortgagors or the addresses of the mortgage loan collateral (so that the PSA itself cannot constitute the written assignment of the loans to the Trust).  Under the PSA, the first part of this transfer involves the Depositor assigning, among other things, its rights under the Mortgage Loans and MLPA to the Trustee, as set forth in Section 2.01(a) ("Conveyance of Mortgage Loans to Trustee"), which provides in relevant part:

> (a)     The Depositor concurrently with the execution and delivery of this Agreement, sells, transfers and assigns to the Trust without recourse all its right, title and interest in and to (i) the Mortgage Loans identified in their respective Mortgage Loan Schedules, including all interest and principal due with respect to the Mortgage Loans . . . (ii) such assets as shall from time to time be credited or are required by the terms of this Agreement to be credited to the Master Servicer Collection Account, . . . (vi) the Mortgage Loan Purchase Agreement to the extent provided in Subsection 2.03(a), (vii) the rights with respect to the Servicing Agreements as assigned to the Trustee on behalf of the Certificateholders by the Assignment Agreements, (viii) such assets as shall from time to time be credited or are required by the terms of this Agreement to be credited to the Distribution Account and (ix) any proceeds of the foregoing.

51.     Significantly, the PSA also requires that the Trustee, through its agent, take physical possession of the Mortgage Files, and that the Mortgage Note and the Mortgage are properly endorsed and assigned to the Trustee.  Section 2.01(b) continues:

> (b)     In connection with the above transfer and assignment, the Depositor hereby delivers to the Custodian [Wells Fargo], as agent for the Trustee, with respect to each Mortgage Loan:
>
>> (i)     the original Mortgage Note, endorsed without recourse (A) to the order of the Trustee, or (B) in the case of a loan registered on the MERS system, in blank, and in each case showing an unbroken chain of endorsements from the originator thereof to the Person endorsing it to the Trustee, or lost note affidavit together with a copy of the related Mortgage Note;
>>
>> (ii)     the original Mortgage and, if the related Mortgage Loan is a [MERS] Loan, noting the presence of the [MERS identification number] and language indicating that such Mortgage Loan is a [MERS] Loan, which shall have been recorded (or if the original is not available, a copy), with evidence of such recording indicated thereon. . . ;
>>
>> (iii)     unless the Mortgage Loan is a [MERS] Loan, a certified copy of the assignment (which may be in the form of a blanket assignment if permitted in the jurisdiction in which the Mortgaged Property is located) to "U.S. Bank National Association, as Trustee", with evidence of recording with respect to each Mortgage Loan in the name of the Trustee thereon. . .

52.     In addition, Section 2.02 of the PSA ("Acceptance of Mortgage Loans by Trustee") reinforces that U.S. Bank must take physical possession of the mortgage loans and the accompanying loan files for the exclusive use and benefit of all current and future Certificate holders.  It provides:

> (a)     The Trustee acknowledges the sale, transfer and assignment of the Trust Fund to it by the Depositor and receipt of, subject to further review and the exceptions which may be noted pursuant to the procedures described below, and declares that it holds, the documents (or certified copies thereof) delivered to the Custodian, as its agent, pursuant to Section 2.01, and declares that it will continue to hold those documents and any amendments, replacements or supplements thereto and all other assets of the

Trust Fund delivered to it as Trustee in trust for the use and benefit of all present and future Holders of the Certificates.

ii.     *The Duty To Review The Mortgage Loan Files And Identify Files With Missing, Defective Or Incomplete Documents*

53.     U.S. Bank also had a contractual obligation under the PSA to review the loan files for each of the mortgage loans and to certify that the documentation for each of the loans was accurate and complete.  This duty overlaps with and forms part of the requirements that the Trustee must satisfy to properly take title to the Mortgage Loans.

54.     Accordingly, Section 2.02(a) required U.S. Bank to create an "Interim Certification" as follows:

> No later than 90 days after the Closing Date (or with respect to any Substitute Mortgage Loan, within five Business Days after the receipt by the Trustee or Custodian thereof), the Trustee agrees, for the benefit of the Certificateholders, to review or cause to be reviewed by the Custodian on its behalf (under the Custodial Agreement), each Mortgage File delivered to it and to execute and deliver, or cause to be executed and delivered, to the Depositor and the Trustee an Interim Certification.  In conducting such review, the Trustee or Custodian will ascertain whether all required documents have been executed and received, and based on the related Mortgage Loan Schedule, whether those documents relate, determined on the basis of the Mortgagor name, original principal balance and loan number, to the Mortgage Loans it has received, as identified in the related Mortgage Loan Schedule.

55.     Similarly, Section 2.02(b) required U.S. Bank to make the following "Final Certification":

> No later than 180 days after the Closing Date (or with respect to any Substitute Mortgage Loan, within five Business Days after the receipt by the Trustee or Custodian thereof), the Trustee or the Custodian, as its agent, will review, for the benefit of the Certificateholders, the Mortgage Files delivered to it and will execute and deliver or cause to be executed and delivered to the Depositor and the Trustee a Final Certification.  In conducting such review, the Trustee or the Custodian, as its agent, will ascertain whether an original of each document required to be

25

recorded has been returned from the recording office with evidence of recording thereon or a certified copy has been obtained from the recording office.

iii.    *The Duty To Enforce The Seller's Obligation To Cure, Substitute Or Repurchase Mortgage Loans With Incomplete Or Defective Loan Files*

56.    Significantly, the PSA required U.S. Bank to remove all Mortgage Loans that did not have complete Mortgage Files, including on account of inadequate assignments or endorsements, from the Trust Fund.   Section 2.02(a) states that, as part of the Interim Certification:

> If the Trustee or the Custodian, as its agent, finds any document constituting part of the Mortgage File has not been executed or received, or to be unrelated determined on the basis of the Mortgagor name, original principal balance and loan number, to the Mortgage Loans identified in Exhibit B, or to appear defective on its face (a "Material Defect"), the Trustee or the Custodian, as its agent, shall promptly notify the Seller.  In accordance with the Mortgage Loan Purchase Agreement, the Seller shall correct or cure any such defect within ninety (90) days from the date of notice from the Trustee or the Custodian, as its agent, of the defect and if the Seller fails to correct or cure the defect within such period, and such defect materially and adversely affects the interests of the Certificateholders in the related Mortgage Loan, the Trustee shall enforce the Seller's obligation under the Mortgage Loan Purchase Agreement, within 90 days from the Trustee's or the Custodian's notification, provide a Substitute Mortgage Loan (if within two years of the Closing Date) or purchase such Mortgage Loan at the Repurchase Price. . . .

57.    Emphasizing the importance of this requirement, Section 2.02(b) reinforces that duty in connection with the Final Certification, and states:

> If the Trustee or the Custodian, as its agent, finds a Material Defect, the Trustee or the Custodian, as its agent, shall promptly notify the Seller . . . .   In accordance with the Mortgage Loan Purchase Agreement, the Seller shall correct or cure any such defect within 90 days from the date of notice from the Trustee or the Custodian, as its agent, of the Material Defect and if the Seller is unable to cure such defect within such period, and if such defect materially   and   adversely   affects   the   interests   of   the

> Certificateholders in the related Mortgage Loan, the Trustee shall enforce the Seller's obligation under the Mortgage Loan Purchase Agreement, within 90 days from the Trustee's Custodian's notification, provide a Substitute Mortgage Loan (if within two years of the Closing Date) or purchase such Mortgage Loan at the Repurchase Price . . . .

58.     The foregoing requirements also mean that the transfer of all the Mortgage Loans in the Covered Trusts to U.S. Bank had to be complete within approximately one year of the Covered Trusts' Closing Date in order for their transfer to be valid.

59.     Significantly, pursuant to Section 2.03 ("Assignment of Interest in the Mortgage Loan Purchase Agreement"), the Trustee also has the duty to enforce the Seller's obligation to cure, substitute or repurchase defective Mortgage Loans at any point that a breach of the Seller's representations and warranties is discovered.

B.     The Trustee's Duties And Obligations Under The TIA

60.     The TIA imposes two sets of duties and obligations on U.S. Bank as Trustee of the Covered Trusts -- one set "prior to default," and the other set "in case of default."

61.     Prior to default, a trustee must perform "such duties as are specifically set out in [the] indenture," *i.e.*, the instrument governing the trust.  15 U.S.C. §77ooo(a)(1).  Pursuant to that provision, U.S. Bank had to perform the duties specifically assigned to it under the PSA, including those duties described above.

62.     Also, prior to default, a trustee must "examine the evidence furnished to it [by obligors of the indenture, certifying, among other things, their compliance with conditions and covenants provided for in the indenture,] to determine whether or not such evidence conforms to the requirements of the indenture."  15 U.S.C. §77ooo(a) (citing 15 U.S.C. §77nnn).  Thus U.S. Bank had to, among other things, examine the evidence that Wells Fargo, as Master Servicer, provided to the Covered Trusts, certifying its compliance with the covenants it made under the

PSA, and U.S. Bank also had to determine whether that evidence conformed to the requirements of the PSA.

63.     In addition, a trustee must "give to the indenture security holders. . . notice of all defaults known to the trustee, within ninety days after the occurrence thereof. . . ."  15 U.S.C. §77ooo(b) (citing 15 U.S.C. §77mmm(c)).  U.S. Bank consequently had to inform Certificate holders of breaches of the PSA within ninety days after their occurrence.

64.     In case of default, a trustee must exercise "such of the rights and powers vested in it by such indenture, and to use the same degree of care and skill in their exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs."  15 U.S.C. §77ooo(c).  As such, after an event of default under the PSA, U.S. Bank is liable for failing to exercise its rights and powers under the PSA as a prudent person.

**V.     The Covered Trusts Have Severe Losses**

65.     Both of the Covered Trusts have performed very poorly.  BS ARM 2005-10 has more than $53 million in realized losses, and over 10% of the remaining balance of its Mortgage Loans are 90 days or more delinquent, which means that they are also likely to result in substantial realized losses in the future.

66.     Likewise, BS ARM 2005-12 has more than $46 million in realized losses, and over 26% of the remaining balance of its Mortgage Loans are 90 days or more delinquent, and are likely to result in substantial realized losses in the future.

67.     These high losses and delinquency rates indicate that many of the underlying Mortgage Loans in the Covered Trusts are not of the quality that Bear Stearns represented and warranted they would be.  Indeed, they are consistent with the public evidence discussed above

noting the poor quality of Bear Stearns MBS Trusts.  Nonetheless, not a single Mortgage Loan in the Covered Trusts has been repurchased by the Seller.

## VI.    Mortgage Loans Were Not Properly Transferred To The Covered Trusts

68.    A review of the public land records for representative samples of foreclosed mortgages that were part of the Covered Trusts confirms widespread irregularities in the transfer of mortgage loans into the Trusts.  To test the Covered Trusts' loans, ten mortgages that were publicly recorded as foreclosed, were drawn at random for both of the Covered Trusts.  This included pulling files from various states that permitted non-judicial foreclosures (such as California, where many of the mortgage loans were originated) and from states allowing judicial foreclosure. The records for every foreclosure reviewed showed that the chain of assignments between the Originator and the Trust for the Mortgage Notes and Mortgages was incomplete and invalid.  Among other things, the assignments to U.S. Bank were only inserted and/or recorded in connection with the foreclosure proceeding, and often after the proceeding had already been instituted.  Thus the Covered Trusts did not take ownership of the Mortgage Loans in a legally cognizable manner, in a manner that would protect the Covered Trusts and the Certificate holders, or in the time period required by the PSA.  A schedule of the defective chain of title and recordings for the foreclosed mortgages sampled is attached as Exhibit C.

69.    This high incidence of mortgage loan irregularities likely explains, in part, why there are so many Mortgage Loans in the Covered Trusts that are 90 days or more delinquent, but not yet foreclosed and sold – neither the Trustee, nor the Master Servicer acting on its behalf, can readily foreclose on those loans, if faced with a borrower's objection, as in *Ibanez*.

## VII.   U.S. Bank Breached Its Contractual And Statutory Duties

A.   <u>U.S. Bank Failed To Ensure Proper Transfer Of The Mortgage Loans To The Covered Trusts</u>

70.   U.S. Bank breached its contractual duties under the PSA, and its obligations under the TIA – first and foremost – by failing to ensure that the Mortgage Loans were properly transferred to the Covered Trusts and that those transfers were properly recorded.   As discussed above, that the assignment process used for the transfer of loans into the Covered Trusts was legally insufficient is demonstrated by cases such as *Ibanez* and the review of mortgage loans that were in the Covered Trusts (Exhibit C).

B.   <u>U.S. Bank Failed To Enforce The Seller's Obligation To Cure, Substitute Or Repurchase Defective Mortgage Loans</u>

71.   U.S. Bank has had considerable knowledge of the defects in the Mortgage Loans, the breaches of EMC's representations and warranties, and the harm that this has caused Certificate holders.   As discussed herein, U.S. Bank knew:

- from at least its review of the Mortgage Loan Files as required by the PSA, and from its attempts to foreclose on Mortgage Loans, that the Mortgage Loans had not been properly transferred to the Covered Trusts;

- from at least its review of the Mortgage Loan Files as required by the PSA, and from its attempts to foreclose on Mortgage Loans, that the Mortgage Loan Files were incomplete;

- from at least the high rate of delinquent and defaulted Mortgage Loans in the Covered Trusts, from the many suits against Bear Stearns detailing the high number of defective loans in Bear Stearns securitizations, and from newspaper articles reporting similar facts, that many of the Mortgage Loans in the Covered Trusts did not comply with Bear Stearns' representations and warranties concerning their underwriting quality; and

- from at least the Covered Trusts' poor performance, and from its attempts to foreclose on Mortgage Loans, that Certificate holders were being harmed by the defects in the Covered Trusts' Mortgage Loans.

72.     Despite all of that, U.S. Bank failed to take any action to protect the Certificate holders, as it was required to do – it did not even enforce its rights to have EMC repurchase a single mortgage loan or notify Certificate holders of the many defaulted obligations.

C.      U.S. Bank Was Negligent When Reviewing Loan Files For Missing, Incomplete And Defective Documentation

73.     U.S. Bank also violated the TIA and breached its contractual duties under the PSA, by performing its contractual duties in a negligent manner.   Particularly, U.S. Bank negligently reviewed the loan files for missing, incomplete and defective documentation.

74.     The fact that there was a missing link in the chain of endorsements from the originator to U.S. Bank, or that there was no duly executed and recorded assignment of a mortgage to U.S. Bank, among other things, would have been obvious to a reasonably competent Trustee performing its contractual duties with due care.   By failing to identify these obvious defects in the documentation of the mortgage loan files, or to require that these defects be corrected, U.S. Bank was grossly negligent and breached its statutory and contractual duties.

D.      U.S. Bank Failed To Exercise Its Rights And To Perform Its Duties In A Manner That Benefited And Effectively Protected Certificate Holders

75.     U.S. Bank is also liable for failing to exercise its powers under the PSA, and to perform its duties, in a manner that benefited and effectively protected Certificate holders.   In addition to the many delinquent and defaulted mortgages in the Covered Trusts, U.S. Bank has had notice of events indicating that EMC has not satisfied its material obligations under the PSAs, and that Wells Fargo, as the Master Servicer, has not required EMC to perform its obligations, and yet U.S. Bank has failed to provide the technical notice of default which it must recognize would require it to exercise additional powers, as Trustee, to protect Certificate holders.   Indeed, U.S. Bank has not even provided notice of the defaults to Certificate holders as

required under the PSAs, so that they could take steps to protect their own interests.  U.S. Bank has thereby effectively denied Certificate holders their expected consideration under the PSAs.

76.     Moreover, by failing to ensure that the Covered Trusts simply have good title to the Mortgage Loans, U.S. Bank has impaired its ability to recover losses for those Mortgage Loans where borrowers have ceased making payments or where they did not comply with the underwriting criteria described in EMC's representations and warranties to begin with.

77.     To the extent that U.S. Bank failed to institute suit against Wells Fargo and/or EMC because such a suit would expose it to liability for its own misconduct under the TIA and PSA, U.S. Bank violated its duty of loyalty as well as due care.

## VIII.   U.S. Bank Is Responsible To Certificate Holders For The Credit Losses In The Trusts

78.     U.S. Bank's failure to enforce the Covered Trusts' repurchase rights, and its violations of its other contractual and statutory duties, along with its negligence, have caused the Certificate holders to suffer millions of dollars in losses on securities that were not, in fact, legally collateralized by mortgage loans.   Indeed, as Georgetown University Law Center Professor Adam J. Levitin, when testifying before the House Financial Services Committee in November 2010, described, the failure to legally transfer the mortgage loans into the Trusts may well mean that U.S. Bank and/or the other parties to the PSA must suffer the losses rather than Certificate holders:

> If mortgages were not properly transferred in the securitization process, then mortgage-backed securities would in fact not be backed by any mortgages whatsoever.  The chain of title concerns stem from transactions that make assumptions about the resolution of unsettled law.  If those legal issues are resolved differently, then there would be a failure of the transfer of mortgages into securitization trusts.

*     *     *

Recently, arguments have been raised in foreclosure litigation about whether the notes and mortgages were in fact properly transferred to the securitization trusts. This is a critical issue because the trust has standing to foreclose if, and only if it is the mortgagee. If the notes and mortgages were not transferred to the trust, then the trust lacks standing to foreclose.

\*       \*       \*

**If the notes and mortgagees were not properly transferred to the trusts, then the mortgage-backed securities that the investors purchased were in fact non-mortgage-backed securities. In such a case, investors would have a claim for the rescission of the MBS, meaning that the securitization would be unwound, with investors receiving back their original payments at par (possibly with interest at the judgment rate). Rescission would mean that the securitization sponsor would have the notes and mortgages on its books, meaning that the losses not the loans would be the securitization sponsor's, not the MBS investors.**

(Emphasis added).

79.     In sum, U.S. Bank's violations of its duties have resulted in Certificate holders unnecessarily suffering millions of dollars of losses because they were dependent on a faithless Trustee to protect their interests. Because a failure to assure that the securities Certificate holders purchased were properly backed by mortgage loans was so fundamental to the certificate purchases, U.S. Bank is liable for rescission, and thus all the losses suffered by Plaintiff.

## IX.     Section 11.04(c) Of The PSA Does Not Apply To This Action

80.     Section 11.04(c) provides certain limitations on the rights of Certificate holders, which are not, however, applicable to this lawsuit. More specifically, it limits the right of Certificate holders to bring a lawsuit relating to the PSA "against the Depositor, the Securities Administrator, the Master Servicer or any successor to any such parties unless," among other things, "the Holders of Certificates evidencing Fractional Undivided Interests aggregating not

less than 51% of the Trust Fund shall have made written request upon the Trustee to institute such action . . . ."

81.     This section makes no mention of lawsuits against the Trustee.  Further, Section 9.01(d) states that "[n]o provision of this Agreement shall be construed to relieve the Trustee or the Securities Administrator from liability for its own negligent action, its own negligent failure to act or its own willful misconduct."

82.     Additionally, Section 11.04(c) is not applicable to this lawsuit because, under the TIA and New York law, "no action" clauses do not apply to actions by Certificate holders against Trustees for their own wrongdoing.  This is not a situation where the Certificate holders are demanding that U.S. Bank initiate a suit in its own name to enforce the rights and obligations under the PSA.  Rather, this is an instance where the Certificate holders are bringing an action *against* U.S. Bank for breaching its statutory and contractual obligations under the PSA, and for acting with gross negligence when performing its duties under the PSA.  Because this is not an "action, suit or proceeding" that U.S. Bank is capable of bringing in its own name as Trustee under the PSA, Section 11.04(c) does not apply and does not bar Plaintiff from proceeding with this lawsuit.

## CLASS ACTION ALLEGATIONS

83.     Plaintiff brings this action as a class action on behalf of a class consisting of all current and former investors who acquired the Bear Stearns Certificates for the Covered Trusts (the "Class") and suffered losses as a result of Defendant's misconduct alleged herein.  Excluded from the Class are Defendant U.S. Bank, EMC, Bear Stearns, JPMorgan Chase, Wells Fargo, any of their related entities or affiliates, their officers and directors, their legal representatives,

successors or assigns and any entity in which Defendant, EMC, Bear Stearns, JPMorgan Chase, or Wells Fargo, has or had a controlling interest.

84.    The members of the Class are so numerous that joinder of all members is impractical.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by U.S. Bank and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

85.    Plaintiff's claims are typical of the claims of the members of the Class as they all purchased Certificates based upon a PSA substantially in the form of Exhibit B, and U.S. Bank's misconduct was substantially the same with respect to all persons investing in the Covered Trusts, causing all members to suffer similar harm as a result.  Thus, all members of the Class are similarly affected by U.S. Bank's statutory and contractual breaches, as well as its negligence, that are complained of herein.

86.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and mortgage-backed securities litigation.

87.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether U.S. Bank breached its contractual duties to Certificate holders under the PSA by systemically failing to properly review the loan files for the mortgage loans and identify mortgage loans for which there was

missing, defective or incomplete documentation, and by failing to require EMC to cure those deficiencies;

- whether U.S. Bank violated the TIA by:

    o prior to default, failing to perform the duties specifically assigned to it under the PSA;

    o prior to default, failing to examine the evidence that EMC provided to the Covered Trusts certifying EMC's compliance with the covenants it made under the PSA, and by failing to determine whether that evidence conformed to the requirements of the PSA;

    o failing to timely inform Certificate holders of breaches of the PSA; and

    o after an event of default, failing to exercise its rights and powers under the PSA as a prudent person;

- whether U.S. Bank was negligent when carrying out its duties and obligations under the PSA; and

- whether and to what extent members of the Class have suffered damages as a result of U.S. Bank's breach of its statutory and contractual duties and the proper measure of damages.

88.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable.  There will be no difficulty in the management of this action as a class action.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**(Violation of the Trust Indenture Act of 1939, 53 Stat. 1171)**

89.  Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

90.  Congress enacted the Trust Indenture Act of 1939 ("TIA"), 53 Stat. 1171, 15 U.S.C. §77aaa, *et seq*., to ensure, among other things, that investors in certificates, bonds, and similar instruments have adequate rights against, and receive adequate performance from, the

responsible trustees.   15 U.S.C. §77bbb.   The PSA governing and establishing each of the Covered Trusts is an "indenture," and U.S. Bank is an "indenture trustee," under the TIA.   15 U.S.C. §77ccc(7), (10).   Moreover, the TIA applies to and is deemed to be incorporated into the PSA, and the related Certificates.   15 U.S.C. §77ddd(a)(1).   U.S. Bank violated multiple provisions of the TIA.

91.   First, the TIA requires that, prior to default, the indenture trustee shall be liable for any duties specifically set out in the indenture.   15 U.S.C. §77ooo(a)(1).   As set forth above, U.S. Bank failed to comply, in good faith, with numerous duties specifically assigned to it by the PSA, including, the duty:

(a)   to take all necessary steps to perfect the ownership rights in the mortgage notes and collateral for the Covered Trusts, and to ensure that other parties to the PSA performed their responsibilities to permit these rights to be perfected;

(b)   to review the loan files to ensure that the mortgage loans were properly documented and that there were no missing, incomplete or defective documents in the loan files, and, where documents were missing, incomplete or defective, to take reasonable acts to cause the other parties to the PSA to correct those irregularities;

(c)   to review the endorsements to the original mortgage note to ensure that there was a complete chain of endorsements from EMC or the originator to U.S. Bank as Trustee for the Covered Trusts, and where endorsements were missing, to take reasonable acts to ensure that the endorsements were obtained;

(d)   to review the loan file to ensure that there was a duly executed assignment of mortgage for each of the mortgage loans in the Covered Trusts, and where assignments

were missing to take reasonable acts to ensure that the necessary assignments were obtained by or from other parties to the PSA; and

(e)      to identify those mortgage loans for which there was missing, defective and/or incomplete documentation, and where defective and/or incomplete documentation was identified to take reasonable acts to ensure that the irregularities were corrected by other parties to the PSA.

By failing to comply with these specific duties, U.S. Bank violated the TIA.

92.      The TIA also requires that, prior to default, U.S. Bank examine the evidence that Wells Fargo provided to the Covered Trusts certifying its compliance with the covenants it made under the PSA, and that U.S. Bank determine whether that evidence conformed to the requirements of the PSA.   15 U.S.C. §77ooo(a) (citing 15 U.S.C. §77nnn).   EMC provided evidence to U.S. Bank that it had complied with its obligations under the PSA, even though it had failed to do so.   In violation of the TIA, U.S. Bank therefore failed to examine that evidence, or failed to examine it with the requisite care, and failed to determine whether that evidence conformed to the requirements of the PSA, or failed to make that determination with the requisite care.

93.      In addition, the TIA requires that U.S. Bank inform Certificate holders of breaches of the PSA within ninety days after their occurrence.   15 U.S.C. §77ooo(b) (citing 15 U.S.C. §77mmm(c)).   Here, there were numerous defaults, including the failure of EMC to cure defects in the mortgage loan files and/or to substitute the defective loans with conforming loans. Given the great importance of those defaults to the Certificate holders' interests, U.S. Bank had no good faith reason for failing to provide notice of those defaults.   Accordingly, by failing to provide such notice, U.S. Bank violated the TIA.

94.     Second, in case of default, the TIA requires that U.S. Bank exercise its rights and powers under the PSA as a prudent person would, under those circumstances, in the conduct of his own affairs.  15 U.S.C. §77ooo(c).  Again, given the obvious importance of the defaults set forth in the preceding paragraph and herein, which impaired the rights of Certificate holders to collect their full principal and interest and which reduced the value of the Certificates, any prudent person under those circumstances would have exercised all of its rights to, among other things, obtain complete mortgage loan files, cure any defects in the mortgage loan files and/or substitute conforming loans, and a prudent person would have exercised those rights promptly. Indeed, with the number of delinquent and defaulting mortgages in the Covered Trusts increasing, as a result, *inter alia*, of such defects, the Certificate holders only could have been protected from the resulting losses through the Trustee's exercise of those rights – which were designed precisely to limit the number of delinquent and defaulting mortgages in the Covered Trusts.  By failing to exercise its rights in those circumstances, U.S. Bank violated the TIA.

95.     Third, the TIA states that, notwithstanding any other provision of the indenture, the right of any holder of any indenture security to receive payment of the principal and interest on the indenture security, on or after the respective due dates, shall not be impaired or affected without the holder's consent.[1]  15 U.S.C. §77ppp(b).  As set forth above, by failing to cause defective mortgage loans to be corrected by other parties to the PSA, U.S. Bank impaired the Certificate holders' ability to collect payments due them under the PSA.  Moreover, after the defaults, U.S. Bank's failure to, among other things, exercise its rights to force the repurchase or substitution of any non-conforming loans also impaired the Certificate holders' ability to collect

---

[1] This section also provides that, notwithstanding any other provision of the indenture, the right of any holder of any indenture security to institute suit for the enforcement of any such payment on or after the respective due dates shall not be impaired or affected without the holder's consent.  15 U.S.C. §77ppp(b).

payments due them.  By creating such impairments, U.S. Bank violated the TIA, and caused losses to Plaintiff and the Class, in connection with their ability to fully collect the principal and interest due under the Certificates, and through the reduction in the value of the Certificates.

96.     U.S. Bank is liable to Plaintiff and the Class for damages incurred as a result of its violations of the TIA.

## SECOND CAUSE OF ACTION

### (Breach of Contract)

97.     Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

98.     As set forth in detail above, the Certificates signed by U.S. Bank incorporated the PSA, and the PSA as a matter of law incorporates the provisions of the TIA.  Under these contracts, and at common law, U.S. Bank owed the Certificate holders a duty to perform certain ministerial acts, including, without limitation:

(a)     to take all necessary steps to perfect the ownership rights in the mortgage notes and collateral for the Covered Trusts, and to ensure that other parties to the PSA performed their responsibilities to permit these rights to be perfected;

(b)     to review the loan files to ensure that the mortgage loans were properly documented and publicly filed, and that there were no missing, incomplete or defective documents in the loan files, and where documents were missing, incomplete and defective to take reasonable acts to cause the other parties to the PSA to correct these mortgage loan irregularities;

(c)     to review the endorsements to the original mortgage notes to ensure that there was a complete chain of endorsements from EMC or the originator to U.S. Bank as

Trustee for the Covered Trusts, and where endorsements were missing, to take reasonable steps to ensure that the endorsements were obtained by or from other parties to the PSA;

(d)     to review the loan files to ensure that there was a duly executed assignment of mortgage for each of the mortgage loans in the Covered Trusts, and where assignments were missing to take reasonable acts to ensure that the necessary assignments were obtained by or from other parties to the PSA;

(e)     to identify those mortgage loans for which there was missing, defective and/or incomplete documentation, and where defective and/or incomplete documentation was identified to take reasonable steps to ensure that the irregularities were corrected by other parties to the PSA, and that the mortgages and assignments were properly filed in the land records.

99.     U.S. Bank's breach of its duties set forth in the PSA as described above, meant that Plaintiff and the Certificate holders did not receive the consideration they bargained for, *i.e.*, they did not receive securities that were collateralized by enforceable mortgage loans.  These violations reduced collections on the mortgage loans in the Covered Trusts, diminished the Certificates' value, and caused Plaintiff's losses on its sales of Certificates, losses that U.S. Bank rather than Certificate holders should bear.

100.    In addition, once an event of default occurred under the PSA, or a default occurred under the TIA, U.S. Bank had the obligation to exercise all rights and powers vested in it by the PSA, and to use the same degree of care and skill in their exercise as a prudent man would, under those circumstances, in the conduct of his own affairs.

101.    The PSA defines an "Event of Default" to include:

> The Master Servicer fails to observe or perform in any material respect any other material covenants and agreements set forth in

this Agreement to be performed by it, which covenants and agreements materially affect the rights of Certificateholders, and such failure continues unremedied for a period of 60 days after the date on which written notice of such failure, properly requiring the same to be remedied, shall have been given to the Master Servicer by the Trustee or to the Master Servicer and the Trustee by the Holders of Certificates evidencing Fractional Undivided Interests aggregating not less than 25% of the Trust Fund.

(PSA §8.01(ii)).

102.   The Master Servicer materially breached the PSA by, among, other things, failing:

(a)   to notify the Trustee and others of breaches of the representations and warranties that applied to the mortgages in the covered trusts;

(b)   to maintain accurate and adequate loan and collateral files in a manner consistent with prudent mortgage servicing standards;

(c)   to demand the that deficient mortgage records be cured;

(d)   to avoid unnecessary servicing fees and overcharging for its services; and

(e)   to place the interests of the Certificate Holders' before its own interests.

103.   U.S. Bank, and its responsible officers, had notice of these and other defaults, through, among other things, foreclosure actions brought on its own behalf, and, more recently, widespread news coverage of foreclosure fraud, including Consent Agreements that it and Wells Fargo entered into with the OCC for their wrongful foreclosure practices.

104.   These Events of Default impaired the rights of Certificate holders to collect their full principal and interest, and reduced the value of the Certificates. Accordingly, under those circumstances, a prudent person would have exercised all of its rights to recover for those Events of Default, and would have done so promptly.   By failing to take such action, U.S. Bank breached the PSA.

105.   U.S. Bank is liable to Plaintiff and the Class for the losses they suffered as a direct result of U.S. Bank's failure to perform its contractual obligations under the PSA.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff prays for relief and judgment, as follows:

A.      Awarding compensatory damages and/or equitable relief in favor of Plaintiff and the Class against U.S. Bank for breaches of its statutory and contractual duties, its gross negligence, and its ordinary negligence, in an amount to be proven at trial, including interest thereon;

B.      Awarding Plaintiff its reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

C.      Such other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

Dated:  November 9, 2011                    SCOTT+SCOTT LLP

David R. Scott (DS 8053)
Beth A. Kaswan (BK 0264)
Max Schwartz (MS 2517)
500 Fifth Avenue, 40th Floor
New York, NY 10110
Telephone:  212-223-6444
Facsimile:  212-223-6334