# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK



| | |
|---|---|
| OKLAHOMA POLICE PENSION AND RETIREMENT SYSTEM, | CASE NO. 11-cv-8066 |
| Plaintiff, | |
| - against- | **CORRECTED SECOND AMENDED CLASS ACTION COMPLAINT** |
| U.S. BANK NATIONAL ASSOCIATION (as Trustee Under Various Pooling and Servicing Agreements), | |
| Defendant. | **JURY TRIAL DEMANDED** |

## SUMMARY OF THE ACTION

1.     Plaintiff Oklahoma Police Pension and Retirement System ("Oklahoma Police"), brings this action, on its own behalf and on behalf of a class, against Defendant U.S. Bank National Association ("U.S. Bank") in its capacity as the trustee for 14 substantially similar trusts (as listed in Exhibit A) in which Plaintiff and class members invested (collectively the "Covered Trusts"), and that own residential Mortgage Loans that were bundled together and sold to investors as Bear Stearns mortgage backed securities (the "Bear Stearns MBS"). The Covered Trusts are all Bear Stearns ARM Trusts or Bear Stearns Alt-A Trusts issued in 2005 or 2006 for which U.S. Bank served as Trustee. A list of Plaintiff's investments in two of the Covered Trusts—Bear Stearns ARM Trust 2005-9 ("BS ARM 2005-9") and Bear Stearns ARM Trust 2005-12 ("BS ARM 2005-12")—is attached as Exhibit B. Plaintiff purchased and sold Bear Stearns MBS at a loss as a result of U.S. Bank's wrongdoing, and, along with the class members (collectively, the "MBS holders"), was a beneficiary of the Covered Trusts that held the Mortgage Loans.

2.     As the Trustee for the Covered Trusts, U.S. Bank owed the MBS holders certain contractual duties, as well as duties imposed by the federal Trust Indenture Act of 1939, as amended, (the "TIA"), 15 U.S.C. §77aaa, *et seq.*, with respect to the Mortgage Loans held by the Covered Trusts.  These duties were spelled out in the Covered Trusts' Governing Agreements, which are substantially similar.  A copy of one of those Governing Agreements, the Pooling and Servicing Agreement ("PSA") for BS ARM 2005-12, is attached as Exhibit C.  The PSA is incorporated by reference into this Complaint as if set forth fully herein.

3.     The purpose of having a Trustee in MBS securitizations such as these is to ensure that there is at least one independent party to the Governing Agreements who, unlike the MBS holders, did not face collective action, informational, or other limitations, and as a result could effectively protect the trusts and their beneficiaries, the MBS holders.  Thus, the Governing Agreements, as modified by the TIA, imposed critical duties on U.S. Bank as Trustee that had a direct impact on the value of the MBS.

4.     In order for the Bear Stearns MBS to, in fact, be backed by Mortgage Loans – *i.e.*, to have any value – the Covered Trusts had to take title to the underlying Mortgage Loans for which they provided due consideration, and which were, in theory, conveyed to them.  The Governing Agreements establish the terms of the conveyance of the Mortgage Loans to the U.S Bank, as Trustee on behalf of the Covered Trusts and the MBS holders, and those terms are intended to ensure that the Trustee, in fact, takes title to the Mortgage Loans.  Among other things, the Governing Agreements require that the Trustee, or its agent, take physical possession of the Mortgage Files, and that the Mortgage Note and the Mortgage are properly endorsed and assigned to U.S. Bank, as Trustee.  To ensure that the Mortgage Loans were properly conveyed to the Covered Trusts, the Governing Agreements also required U.S. Bank or its agent to review

the loan files for each of the Mortgage Loans and to certify that the documentation for each of the loans was accurate and complete.

5.      Just as fundamental in an MBS securitization as the Covered Trusts properly taking title to the Mortgage Loans is the quality of the Mortgage Loans to which the Covered Trusts purportedly receive title.   For that reason, the Governing Agreements contain representations and warranties attesting to the quality of the Mortgage Loans conveyed to the Covered Trusts.  Ratings agencies assess the quality of the MBS based on those representations and warranties, and notably, the ratings agencies must be informed in the event that underlying Mortgage Loans are substituted or repurchased, which would generally only happen if they are in breach of the representations and warranties.  The Governing Agreements therefore require the securitization's Sponsor (or Seller), in this case, EMC Mortgage Corporation ("EMC"), an affiliate of Bear Stearns, to cure, substitute, or repurchase any Mortgage Loans that materially breach those representations and warranties, or that do not have complete Mortgage Files, including on account of inadequate assignments or endorsements.  Significantly, the Governing Agreements also require the Trustee, among others, to enforce EMC's obligation to cure, substitute, or repurchase such Mortgage Loans.

6.      As described more fully below, however, U.S. Bank regularly disregarded its contractual and statutory duties to review the loan files to ensure that there were no missing, defective or incomplete documents, and that defective loans were removed from the mortgage pools supporting the Bear Stearns MBS.  Representative samples, that were drawn from various states' public land records, of assignments, mortgages and deeds of trust (which are used in non-judicial foreclosure states and are a security similar to mortgages) for the Mortgage Loans in two of the Covered Trusts (as set forth in Exhibit D), show that the assignments and transfers of the

Mortgage Loans to U.S. Bank as Trustee had not occurred and/or were not recorded at the time that the Covered Trusts closed.  Likewise, representative samples of assignments for almost all of the other Covered Trusts that were drawn from public databases in Hillsborough County, Palm Beach County and Lee County in Florida (as set forth in Exhibit E), make the same showing.  These defects should have been obvious to U.S. Bank when it conducted its reviews of the Mortgage Loan Files.  Indeed, it appears from these public files that the assignments into the Covered Trusts at the time of the securitizations were commonly endorsed in blank, and that the transfers of the Mortgage Loans from the originators to the securitization seller, then to the securitization depositor, and finally to the Trustee, did not occur at all.

7.     U.S. Bank is familiar with the damage that arises when Mortgage Loans are not adequately transferred to securitization Trusts.  For example, in an action to quiet title on foreclosed property that U.S. Bank brought as Trustee for another Bear Stearns MBS Trust, which is similar to the Covered Trusts, the Supreme Court of Massachusetts held that a PSA that did not specifically identify the Mortgage Loans transferred to the Trust did not, in fact, transfer the Mortgage Loans to the Trust, and that written assignments of individual Mortgage Loans where the identification of the "assignee" did not specify U.S. Bank but was instead left blank also failed to transfer the Mortgage Loans to the Trust.  *U.S. Bank Nat'l Assoc. v. Ibanez*, 941 N.E. 2d 40, 53 (Mass. 2011) ("We have long held that a conveyance of real property, such as a mortgage, that does not name the assignee conveys nothing and is void; we do not regard an assignment of land in blank as giving legal title in land to the bearer of the assignment").

8.     In addition, various government investigations, along with lawsuits brought by insurers of Bear Stearns MBS Trusts, have shown that Bear Stearns (and its affiliate EMC) routinely breached the representations and warranties it made regarding the Mortgage Loans it

securitized.  When U.S. Bank learned of these violations, U.S. Bank had the duty to notify MBS holders of them.  Moreover, once there were events of default and/or the rights of MBS holders to full and timely payment of their principal and interest were impaired, U.S. Bank had the duty to act as a prudent person to exercise all of its powers under the Governing Agreements to protect MBS holders.

9.  U.S. Bank has had considerable knowledge of the defects in the Mortgage Loans, the breaches of EMC's representations and warranties, and the harm that this has caused MBS holders.  As discussed herein, U.S. Bank knew:

- from at least its review of the Mortgage Loan Files as required by the Governing Agreements, and from its attempts to foreclose on Mortgage Loans, that the Mortgage Loans had not been properly transferred to the Covered Trusts;

- from at least its review of the Mortgage Loan Files as required by the Governing Agreements, and from its attempts to foreclose on Mortgage Loans, that the Mortgage Loan Files were incomplete;

- from at least the high rate of delinquent and defaulted Mortgage Loans in the Covered Trusts, from the many suits against Bear Stearns and its affiliates detailing the high number of defective loans in Bear Stearns securitizations, and from newspaper articles reporting similar facts, that many of the Mortgage Loans in the Covered Trusts did not comply with EMC's representations and warranties concerning their underwriting quality; and

- from at least the Covered Trusts' poor performance, and from its attempts to foreclose on Mortgage Loans, that MBS holders were being harmed by the defects in the Covered Trusts' Mortgage Loans.

Despite all of that, U.S. Bank failed to take any action to protect the MBS holders, as it was required to do.

10.  The Mortgage Loans in the Covered Trusts have experienced high levels of payment delinquencies, delays in foreclosure actions and credit losses which would not have occurred but for the negligence of U.S. Bank and its failure to perform its responsibilities under

the Governing Agreements and TIA.  By failing to perform its duties, U.S. Bank has caused

MBS holders to suffer millions of dollars in losses.

## JURISDICTION AND VENUE

11.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 for

violations of the TIA and supplemental jurisdiction over the contract claims.  It also has

jurisdiction pursuant to 28 U.S.C. §1332(a).

12.    Venue is proper in this District because the Covered Trusts were created

under, and governed by, New York law, and because U.S. Bank has an office, and does

business, in New York County.

## PARTIES

13.    Plaintiff Oklahoma Police Pension and Retirement System ("Oklahoma

Police") is a state governmental pension fund authorized by statute under the laws of

Oklahoma with the mission of providing retirement benefits to its members and their

beneficiaries.  Oklahoma Police relies heavily upon the performance of its investments to

fund benefits.  It invested in and sold Bear Stearns MBS as provided in Exhibit B.

14.    Other class members purchased the same or substantially similar Bear Stearns

MBS as Oklahoma Police.  All Bear Stearns MBS purchased by Oklahoma Police and all

other class members have U.S. Bank as Trustee, the same sponsor, the same master servicer,

substantially similar Governing Agreements, and substantially similar underlying and other

characteristics and deficiencies.  U.S. Bank owed Oklahoma Police and all other class

members the same duties, and, as set forth herein, systematically failed to perform those

duties—for all MBS holders in the 14 Trusts.  Accordingly, the systematic violations of its

duties and pattern of wrongdoing by U.S. Bank and the other parties to the Governing

Agreements are part of a common scheme and course of conduct.  Thus, the class' claims against U.S. Bank share the same character as, and are indeed virtually identical to, Oklahoma Police's claims against U.S. Bank, and Oklahoma Police has standing, and is an appropriate class representative, to pursue those claims.

15.     Defendant U.S. Bank National Association is a national banking association organized and existing under the laws of the United States with its main offices located in Minnesota.  U.S. Bank does business throughout the United States and its principal office in New York State is in New York County.  For each of the Covered Trusts, U.S. Bank signed MBS incorporating the Governing Agreements.  As the trustee for the Covered Trusts, U.S. Bank owed the MBS holders certain statutory and contractual duties with respect to the Mortgage Loans owned by the Covered Trusts, which duties U.S. Bank violated.

## FACTUAL ALLEGATIONS

**I.      The Securitization Process For The Bear Stearns MBS**

16.     Bear Stearns, acting on its own and through its network of corporate affiliates, managed the securitization of the Mortgage Loans in the Covered Trusts, and in countless other MBS trusts.  Mortgage securitizations involve the conversion of illiquid whole loans into bond-like instruments, the MBS, that trade over the counter in capital markets.

17.     The first step in creating MBS is the origination of mortgages to borrowers purchasing homes.  Through its corporate affiliates, Bear Stearns Residential Mortgage Corporation and EMC, Bear Stearns originated mortgages.  In addition, Bear Stearns purchased mortgages that had been originated by other large third-party lenders – including Wells Fargo – some of which received financing from Bear Stearns to originate mortgages.

18.     Second, Bear Stearns grouped the mortgages that it had originated and purchased into a large pool, which it transferred, or sold, to a "Depositor."  EMC often served the role of "Seller" (to the Depositor) for Bear Stearns, and did so for the Covered Trusts.  The Depositor was generally a shell entity owned or controlled by Bear Stearns, like Structured Asset Mortgage Investments II Inc. ("SAMI II").  Depositors exist primarily to provide an intermediary between the Seller and the Trust in the chain of title to the Mortgage Loans because – if the Seller goes into bankruptcy, as many did and EMC nearly did – the bankruptcy estate can rescind direct transfers made by the Seller.  Thus, the Seller and the Depositor enter into a Mortgage Loan Purchase Agreement ("MLPA"), which governs the mechanics of the transfer, and states that the Mortgage Loan Files must be complete and may not have defective documents, such as imperfect assignments or endorsements.  In the MLPA, the Seller also: (i) makes representations and warranties concerning the quality of the Mortgage Loans in the mortgage pool, (ii) promises to cure, substitute or repurchase mortgages that do not comply with those representations and warranties, or that do not have a valid transfer, and (iii) states that the Trustee will ultimately have the right to enforce those representations and promises.

19.     Third, the Depositor transferred the pool of mortgages to the Trustee, for the benefit of the Trust and the MBS holders, and in exchange the Trustee transferred the MBS to the Depositor.  As discussed in greater detail below, the Governing Agreements set forth the terms of this transfer and of the operation of the Trust.  The Governing Agreements impose certain duties on the Trustee, in addition to those duties imposed by the TIA and New York law.  They also establish the Trust as a Real Estate Mortgage Investment Conduit ("REMIC") under the Internal Revenue Code, which enables the Trust to avoid tax liability on income generated from the underlying Mortgage Loans – if the Trust gains valid title over the underlying Mortgage

Loans within three months of its creation and if certain other criteria are met.  Qualifying as a REMIC is critical to the Trust's ability to make the payments promised to MBS holders. Importantly, the Governing Agreements also refer to and incorporate the MLPA.

20.     Fourth, the Depositor sold the MBS to an underwriter, typically another Bear Stearns entity, such as Bear, Stearns & Co.  The Depositor remits the money from that sale to the Seller (who may use it to originate or purchase more mortgages).  Meanwhile, the underwriter markets and sells the MBS to investors.  At this point in the securitization process the Seller is also sometimes referred to as the Sponsor.

21.     MBS entitle their holders to the cash flows generated from the Trust's pool of Mortgage Loans.  The Trust, or securitization transaction, is structured such that the risk of loss is divided among different "tranches."  Each tranche of the Trust has a different level of credit risk and reward (the interest or yield), including different levels of credit enhancement.  Senior tranches, that have priority to payment in the event the Trust suffers losses, have lower interest rates than junior tranches, and different MBS correspond to those different tranches.  One form of credit enhancement is overcollateralization, which means that the total principal balance of the Mortgage Loans in the Trust exceeds the aggregate amount of securities issued and sold by the Trust.  Another example of credit enhancement is excess interest, which means that the amount of interest collected on the underlying Mortgage Loans for each payment period is expected to be greater than the interest distributable to the MBS holders and the expenses payable by the Trust during that period.  Because the tranches have different priorities of claim to the cash flow generated by the underlying pool of mortgages, they have different credit ratings and they sell at different prices.

22.     Following the sale of the MBS, the Master Servicer is responsible for the collection of payments from the underlying mortgagors, including through foreclosure if necessary.  Those payments are distributed to the MBS holders in accordance with the tranche structure.

23.     The value of MBS, and their credit rating, depend primarily on the riskiness of the underlying mortgages, which is reflected in the Seller's representations and warranties concerning the quality of loans in the pool, and, secondarily, to the extent that borrowers default on their payments, on the Trust's ability to foreclose on the collateral and recover the unpaid loan balance.  If the loans underlying MBS suffer payment defaults in excess of the assumptions built into their credit enhancement and securities' ratings, or the underlying properties' mortgages cannot be effectively foreclosed and the properties sold at sufficient prices following default, the securities will be re-rated and the value of the MBS will decline.

## II.     U.S. Bank's Duties As Trustee For The Covered Trusts

24.     The purpose of having a Trustee in an MBS securitization is to ensure that there is at least one independent party to the Governing Agreements who, unlike the MBS holders, did not face collective action, informational, or other limitations, and as a result can effectively protect the trusts and the MBS holders.  Thus the Governing Agreements imposed critical duties on U.S. Bank, as Trustee, that had a direct impact on the value of the MBS.

25.     The Covered Trusts' Governing Agreements set forth the Trustee's duties.  Most of the Covered Trusts are governed by a document styled a PSA and certain related agreements that the PSA references and incorporates.  Other of the Covered Trusts are governed by a document styled an Indenture and certain related agreements that the Indenture references and incorporates.  All of the Governing Agreements are substantially similar, and impose the same

duties on the Trustee at issue here.  Accordingly, this Complaint primarily refers to one of the PSAs as a representative example, and attaches that PSA, for BS ARM 2005-12, as Exhibit C hereto.

26.     While the Governing Agreements set forth certain rights and responsibilities in connection with the Covered Trusts, recognizing that previous abuses by trustees had adversely affected the national interest, Congress enacted the TIA to provide minimum federal protections to investors which are deemed to be incorporated into those Governing Agreements.

A.     The Trustee's Duties And Obligations Under The Governing Agreements

i.     *The Trustee's Duty To Properly Take Title To The Mortgage Loans Conveyed To The Trust*

27.     In order for the MBS to, in fact, be backed by Mortgage Loans – *i.e.*, to have any value – the Covered Trusts must take title to the mortgages that are conveyed to them for due consideration.  The Governing Agreements establish the terms of the conveyance of the Mortgage Loans to the Trustee, on behalf of the Trust and the MBS holders, and those terms are intended to ensure that the Trustee, on behalf of the Covered Trusts, in fact, takes title to the Mortgage Loans.

28.     The first part of this conveyance involves the Depositor assigning, among other things, its rights under the MLPA (the document through which the Depositor acquired the Mortgage Loans from the Seller) to the Trustee, as set forth in PSA Section 2.01(a) ("Conveyance of Mortgage Loans to Trustee"), which provides in relevant part:

> The Depositor concurrently with the execution and delivery of this Agreement, sells, transfers and assigns to the Trust without recourse all its right, title and interest in and to (i) the Mortgage Loans identified in their respective Mortgage Loan Schedules, including all interest and principal due with respect to the Mortgage Loans . . . (ii) such assets as shall from time to time be credited or are required by the terms of this Agreement to be

credited to the Master Servicer Collection Account, . . . (vi) the Mortgage Loan Purchase Agreement to the extent provided in Subsection 2.03(a), (vii) the rights with respect to the Servicing Agreements as assigned to the Trustee on behalf of the Certificateholders by the Assignment Agreements, (viii) such assets as shall from time to time be credited or are required by the terms of this Agreement to be credited to the Distribution Account and (ix) any proceeds of the foregoing.

*See also* Indenture § 6.01(b)(i); Sale and Servicing Agreement ("SSA")§ 2.01(a).[1]

29.     Significantly, the Trustee, through its agent, must take physical possession of the

Mortgage Files, including the Mortgage Note and the Mortgage, properly endorsed and assigned

to the Trustee.  As set forth in PSA Section 2.01(b):

In connection with the above transfer and assignment, the Depositor hereby delivers to the Custodian, as agent for the Trustee, with respect to each Mortgage Loan:

(i)     the original Mortgage Note, endorsed without recourse (A) to the order of the Trustee, or (B) in the case of a loan registered on the MERS system, in blank, and in each case showing an unbroken chain of endorsements from the originator thereof to the Person endorsing it to the Trustee, or lost note affidavit together with a copy of the related Mortgage Note;

(ii)     the original Mortgage and, if the related Mortgage Loan is a [MERS] Loan, noting the presence of the [MERS identification number] and language indicating that such Mortgage Loan is a [MERS] Loan, which shall have been recorded (or if the original is not available, a copy), with evidence of such recording indicated thereon. . . ;

(iii)     unless the Mortgage Loan is a [MERS] Loan, a certified copy of the assignment (which may be in the form of a blanket assignment if permitted in the jurisdiction in which the Mortgaged Property is located) to "U.S. Bank National Association, as Trustee", with evidence of recording with respect to each Mortgage Loan in the name of the Trustee thereon. . .

*See also*  Indenture § 6.01(b)(i); SSA § 2.01(b).

---

[1] All cites to the Indenture and its related agreements are to the Indenture and related agreements for Bear Stearns ARM Trust 2005-9, which, as set forth above, are substantially similar to the Governing Agreements for all of the Covered Trusts.

30.     In addition, Section 2.02(a) of the PSA ("Acceptance of Mortgage Loans by Trustee") reinforces that U.S. Bank or its agent must take physical possession of the Mortgage Loans and the accompanying loan files for the exclusive use and benefit of all current and future MBS holders.  It provides:

> The Trustee acknowledges the sale, transfer and assignment of the Trust Fund to it by the Depositor and receipt of, subject to further review and the exceptions which may be noted pursuant to the procedures described below, and declares that it holds, the documents (or certified copies thereof) delivered to the Custodian, as its agent, pursuant to Section 2.01, and declares that it will continue to hold those documents and any amendments, replacements or supplements thereto and all other assets of the Trust Fund delivered to it as Trustee in trust for the use and benefit of all present and future Holders of the Certificates.

*See also* Indenture § 6.01(b)(i); SSA § 2.02(a).

ii.     *The Trustee's Duty To Review The Mortgage Loan Files Conveyed To The Covered Trusts And To Identify Files With Missing, Defective Or Incomplete Documents*

31.     To ensure that the Mortgage Loans were properly conveyed to the Covered Trusts, the Governing Agreements also required U.S. Bank or its agent to review the loan files for each of the Mortgage Loans and to certify that the documentation for each of the loans was accurate and complete.  This duty overlaps with and forms part of the requirements that the Trustee must satisfy to properly take title to the Mortgage Loans.

32.     Accordingly, as set forth in PSA Section 2.02(a), U.S. Bank or its agent had to create an "Interim Certification" as follows:

> No later than 90 days after the Closing Date (or with respect to any Substitute Mortgage Loan, within five Business Days after the receipt by the Trustee or Custodian thereof), the Trustee agrees, for the benefit of the Certificateholders, to review or cause to be reviewed by the Custodian on its behalf (under the Custodial Agreement), each Mortgage File delivered to it and to execute and

> deliver, or cause to be executed and delivered, to the Depositor and the Trustee an Interim Certification.  In conducting such review, the Trustee or Custodian will ascertain whether all required documents have been executed and received, and based on the related Mortgage Loan Schedule, whether those documents relate, determined on the basis of the Mortgagor name, original principal balance and loan number, to the Mortgage Loans it has received, as identified in the related Mortgage Loan Schedule.

*See also* Indenture § 6.01(b)(i); SSA § 2.02(a).

33.   Similarly, as set forth in PSA Section 2.02(b), U.S. Bank had to make the following "Final Certification":

> No later than 180 days after the Closing Date (or with respect to any Substitute Mortgage Loan, within five Business Days after the receipt by the Trustee or Custodian thereof), the Trustee or the Custodian, as its agent, will review, for the benefit of the Certificateholders, the Mortgage Files delivered to it and will execute and deliver or cause to be executed and delivered to the Depositor and the Trustee a Final Certification.  In conducting such review, the Trustee or the Custodian, as its agent, will ascertain whether an original of each document required to be recorded has been returned from the recording office with evidence of recording thereon or a certified copy has been obtained from the recording office.

*See also* Indenture § 6.01(b)(i); SSA § 2.02(b).

iii.   *The Trustee's Duty To Enforce The Seller's Obligation To Cure, Substitute Or Repurchase Mortgage Loans*

34.   Just as fundamental in an MBS securitization as the Covered Trusts properly taking title to the Mortgage Loans is the quality of the Mortgage Loans to which the Covered Trusts purportedly receive title.   For that reason, the Governing Agreements contain representations and warranties attesting to the quality of the Mortgage Loans conveyed to the Covered Trusts.  Ratings agencies assess the quality of the MBS based on those representations and warranties, and notably, the ratings agencies must be informed in the event that underlying

Mortgage Loans are substituted or repurchased, which would generally only happen if they are in breach of the representations and warranties.

35.     The Governing Agreements therefore require the Seller to cure, substitute, or repurchase any Mortgage Loans that materially breach the Seller's representations and warranties concerning the quality of the Mortgage Loans conveyed to the Covered Trusts, or that did not have complete Mortgage Files, including on account of inadequate assignments or endorsements.   Significantly, they also require the Trustee, among others, to enforce that obligation of the Seller's.

36.     This requirement is embodied in several provisions of the Governing Agreements, including Section 2.02(a) of the PSA, which states that, as part of the Interim Certification:

> If the Trustee or the Custodian, as its agent, finds any document constituting part of the Mortgage File has not been executed or received, or to be unrelated determined on the basis of the Mortgagor name, original principal balance and loan number, to the Mortgage Loans identified in Exhibit B, or to appear defective on its face (a "Material Defect"), the Trustee or the Custodian, as its agent, shall promptly notify the Seller.  In accordance with the Mortgage Loan Purchase Agreement, the Seller shall correct or cure any such defect within ninety (90) days from the date of notice from the Trustee or the Custodian, as its agent, of the defect and if the Seller fails to correct or cure the defect within such period, and such defect materially and adversely affects the interests of the Certificateholders in the related Mortgage Loan, the Trustee shall enforce the Seller's obligation under the Mortgage Loan Purchase Agreement, within 90 days from the Trustee's or the Custodian's notification, provide a Substitute Mortgage Loan (if within two years of the Closing Date) or purchase such Mortgage Loan at the Repurchase Price. . . .

*See also* Indenture § 6.01(b)(i); SSA § 2.02(a).

37.     Similarly, section 2.02(b) of the PSA repeats that duty in connection with the Final Certification, and states:

> If the Trustee or the Custodian, as its agent, finds a Material Defect, the Trustee or the Custodian, as its agent, shall promptly notify the Seller . . . .   In accordance with the Mortgage Loan Purchase Agreement, the Seller shall correct or cure any such defect within 90 days from the date of notice from the Trustee or the Custodian, as its agent, of the Material Defect and if the Seller is unable to cure such defect within such period, and if such defect materially and adversely affects the interests of the Certificateholders in the related Mortgage Loan, the Trustee shall enforce the Seller's obligation under the Mortgage Loan Purchase Agreement, within 90 days from the Trustee's Custodian's notification, provide a Substitute Mortgage Loan (if within two years of the Closing Date) or purchase such Mortgage Loan at the Repurchase Price . . . .

*See also* Indenture § 6.01(b)(i); SSA § 2.02(b).

38.     The foregoing requirements also mean that the transfer of all the Mortgage Loans in the Covered Trusts to U.S. Bank had to be complete within approximately one year of the Covered Trusts' Closing Date in order for their transfer to be valid.

39.     Moreover, the Trustee also has the duty to enforce the Seller's obligation to cure, substitute or repurchase defective Mortgage Loans at any point that a breach of the Seller's representations and warranties is discovered.  As set forth in PSA Section 2.03(b) ("Assignment of Interest in the Mortgage Loan Purchase Agreement"):

> If the Depositor, the Securities Administrator or the Trustee discovers a breach of any of the representations and warranties set forth in the Mortgage Loan Purchase Agreement, which breach materially and adversely affects the value of the interests of the Certificateholders or the Trustee in the related Mortgage Loan, the party discovering the breach shall give prompt written notice of the breach to the other parties.   The Seller, within 90 days of its discovery or receipt of notice that such breach has occurred (whichever occurs earlier), shall cure the breach in all material respects or, subject to the Mortgage Loan Purchase Agreement or Section 2.04 of this Agreement, as applicable, shall purchase the Mortgage Loan or any property acquired with respect thereto from the Trustee . . . .

*See also* Indenture § 6.01(b)(i); SSA § 2.03(b).

B.        The Trustee's Duties And Obligations Under The TIA

40.        The TIA imposes two sets of duties and obligations on U.S. Bank as Trustee of the Covered Trusts – one set "prior to default," and the other set "in case of default."

41.        Prior to default, a trustee must perform "such duties as are specifically set out in [the] indenture," *i.e.*, the instrument governing the trust.  15 U.S.C. §77ooo(a)(1).  Pursuant to that provision, U.S. Bank had to perform the duties specifically assigned to it under the Governing Agreements, including those duties described above.

42.        Also, prior to default, a trustee must "examine the evidence furnished to it [by obligors of the indenture, certifying, among other things, their compliance with conditions and covenants provided for in the indenture,] to determine whether or not such evidence conforms to the requirements of the indenture."  15 U.S.C. §77ooo(a) (citing 15 U.S.C. §77nnn).  Thus, U.S. Bank had to, among other things, examine the evidence that the Master Servicer, in this case, Wells Fargo Bank N.A. ("Wells Fargo"), provided to the Covered Trusts, certifying its compliance with the covenants it made under the Governing Agreements, and U.S. Bank also had to determine whether that evidence conformed to the requirements of the Governing Agreements.

43.        In addition, a trustee must "give to the indenture security holders. . . notice of all defaults known to the trustee, within ninety days after the occurrence thereof. . . ."  15 U.S.C. §77ooo(b) (citing 15 U.S.C. §77mmm(c)).  U.S. Bank consequently had to inform MBS holders of breaches of the Governing Agreements within ninety days after their occurrence.

44.        In case of a default, a trustee must exercise "such of the rights and powers vested in it by such indenture, and to use the same degree of care and skill in their exercise, as a prudent

man would exercise or use under the circumstances in the conduct of his own affairs." 15 U.S.C. §77ooo(c).

45.     As set forth below, U.S. Bank is liable to Plaintiff and Class members for failing to exercise its rights and powers under the Governing Agreements as a prudent person notwithstanding numerous events of default by Wells Fargo under the Governing Agreements.

### III.     The Covered Trusts Suffer From Serious Defects

      A.     <u>Serious Defects Plague Bear Stearns MBS Securitizations</u>

46.     In the years following Bear Stearns' collapse, public and private investigations, along with numerous media reports, have made clear that the Mortgage Loans Bear Stearns securitized regularly breached the representations and warranties Bear Stearns (and its affiliate EMC) made to securitization trusts and trustees.  This meant that the Bear Stearns MBS trusts had many low-quality loans, which failed to perform, and consequently suffered high credit losses – losses that could only have been avoided by enforcing the obligation of Bear Stearns (or its affiliate EMC) to repurchase, or provide substitutes for, the non-conforming loans.

47.     Insurers that guaranteed payments for holders of certain Bear Stearns MBS Trusts have brought multiple cases against Bear Stearns and its affiliates, which were prompted by the high rates of defaults in the Trusts.  These insurers were induced to provide coverage based on representations and warranties that Bear Stearns and its affiliates made to them, which were substantially similar to the representations and warranties made to the Covered Trusts.  Due to the insurers' contracts with Bear Stearns, they were in some cases able to gain access to particular Mortgage Loan Files and to review whether the Mortgage Loans complied with Bear Stearns' (or EMC's) underwriting representations and warranties.  All of the insurers found alarmingly high breach rates – on the order of 90% of the Mortgage Loans per trust failing to

comply with the representations and warranties.  These loan defects are described at length in *Ambac Assurance Corp. v. EMC Mortgage Corp.*, No. 1:08-cv-09464-RMB (S.D.N.Y.); *Syncora Guarantee Inc. v. EMC Mortgage Corp.*, No. 1:09-cv-03106-PAC (S.D.N.Y.); *Assured Guarantee Corp. v. EMC Mortgage Corp.*, No. 1:10-cv-05367-NRB (S.D.N.Y.).

48.    Many other suits brought by investors adversely affected by the high default rates in Bear Stearns MBS Trusts, including investors affiliated with the Federal Government, also allege, based on investigations and extensive analysis, that Bear Stearns (and its affiliate EMC) commonly breached its representations and warranties regarding the Mortgage Loans conveyed to the Bear Stearns MBS Trusts at the same incredibly high percentages described above.  *E.g.*, *Federal Home Loan Bank of Seattle v. Bear Stearns & Co., Inc., et al.*, No. 2:10-cv-00151-RSM (W.D. Wa.) (since remanded back to state court); *Federal Home Loan Bank of San Francisco v. Credit Suisse (USA) LLC, et al.*, No. CGC.10.497840 (Cal. Super.) (naming various Bear Stearns entities as Defendants); *Allstate Bank, et al. v. JPMorgan Chase Bank, N.A.*, No. 650398/2011 (N.Y. Sup. Ct.) (same).

49.    Discovery that Ambac conducted in its suit against Bear Stearns and EMC, including lengthy testimony from knowledgeable witnesses (which is disclosed in detail in its amended complaint), explains why Bear Stearns MBS are riddled with low-quality mortgages that breach the representations and warranties made to the securitization trusts and trustees.  Among other things, the discovery demonstrates that the head of Bear Stearns' due diligence department stated in 2007, as he had also done in 2005, that Bear Stearns had to "completely revamp" its due diligence protocols because they were resulting in the securitization of Mortgage Loans that breached those representations and warranties.  Indeed, even when Bear Stearns brought claims against originators for selling it defective Mortgage Loans, Bear Stearns would

still securitize the defective Mortgage Loans in question.  Moreover, Bear Stearns' quality control manager stated that there were no "protocols in place to assess securitization breaches" for those Mortgage Loans until late 2007.  By 2006, Bear Stearns had acquired so many defective Mortgage Loans, that a senior managing director in Bear Stearns' claims department stated that the bank was "overwhelmed" by the number of claims it had to file against Mortgage Loan originators.  But Bear Stearns nonetheless continued to securitize those Mortgage Loans.

50.     Testimony before Congress from Clayton Holdings ("Clayton"), one of the due diligence firms that Bear Stearns and EMC used to review the Mortgage Loans it securitized, further confirms that many of the Mortgage Loans transferred by Bear Stearns into its MBS Trusts breached Bear Stearns' representations and warranties.  Clayton reported that, based on its review of Mortgage Loans that Bear Stearns securitized between the First Quarter 2006 and the Second Quarter 2007, 17% of the Mortgage Loans it reviewed for Bear Stearns were defective, and Bear Stearns nevertheless included 42% of those defective loans in its securitizations.  The number of defective Mortgage Loans in Bear Stearns MBS securitizations is likely even higher than those figures indicate, because according to Bear Stearns, Clayton failed to identify many defective Mortgage Loans.  As the Bear Stearns executive who was in charge of the bank's asset-backed securities and wholeloans desk said of Clayton, "we are wasting way too much money on Bad Due Diligence."

51.     The due diligence work performed by Watterson Prime, another due diligence firm that Bear Stearns used to review Mortgage Loans it securitized, also demonstrates that many of the Mortgage Loans transferred by Bear Stearns into its MBS Trusts breached its representations and warranties.  A former Watterson Prime consultant who conducted due diligence on Bear Stearns Mortgage Loans stated on National Public Radio that "[a]bout 75

percent of the time, loans that should have been rejected [by Bear Stearns] were still put in the [securitization] pool and sold."   Again, the actual figures are likely even higher, because according to Bear Stearns, Watterson Prime failed to identify many defective Mortgage Loans. As an EMC due diligence manager said, "Watterson~Prime . . . does not always deliver."

52.     Given this information, it is no surprise that another Trustee for a Bear Stearns MBS Trust, similar to the Covered Trusts, has sued EMC to require it to repurchase defective loans.  *Bear Stearns Mortgage Funding Trust 2007-AR2, by Wells Fargo Bank, N.A. as Trustee v. EMC Mortgage LLC*, No. 6861, 2011 WL 4102212 (Del. Ch. Ct. Sept. 13, 2011).  Despite U.S. Bank's own knowledge of widespread defaults, U.S. Bank has not, however, acted in accordance with its obligations as Trustee under the Governing Agreements and TIA to enforce EMC's obligation to cure, substitute or repurchase defective Mortgage Loans once a breach of the Seller's representations and warranties is discovered.

53.     In addition, investigations have made clear that Wells Fargo, which served as the Master Servicer for the Covered Trusts, and, with the exception of the duties assigned to the Trustee, conducted the actual operations of the Covered Trusts, failed to perform its duties adequately.  For example, after conducting an investigation of the faulty mortgage servicing practices of Wells Fargo and four other servicers, the federal government and 49 states entered into a $25 billion settlement with Wells Fargo and the other servicers.  Also, a report by the U.S. Department of Housing and Urban Development's Office of Inspector General listed multiple systematic servicing failures by Wells Fargo including signing false affidavits in support of foreclosures without having knowledge of the source documents and engaging in "robosigning."

54.     Part of the reason Wells Fargo may have failed to perform its duties is because it was also the originator for many of the Mortgage Loans in the Covered Trusts, including the

trusts from which Plaintiff purchased MBS, and many of those Mortgage Loans did not comply with the representations and warranties made to the Covered Trusts and the Trustee concerning them.  That is demonstrated, for example, by a $125 million settlement that Wells Fargo entered into involving MBS backed by mortgages that it originated and purchased, where those mortgages were of a lower quality than Wells Fargo promised they would be – and that is just one of several similar cases against Wells Fargo.  Further, Wells Fargo has announced that on top of the billions of dollars of repurchase claims it has already received for defective mortgages it sold, it may be forced to repurchase an additional $1.8 billion worth of mortgages that it sold and which were subsequently securitized.

B.   The Covered Trusts Have Significant Losses

55.   The Covered Trusts have performed very poorly.  For example, BS ARM 2005-9 has more than $33 million in realized losses, and approximately 10% of the remaining balance of its Mortgage Loans are 90 days or more delinquent, which means that they are also likely to result in substantial realized losses in the future.  Also, BS ARM 2005-12 has more than $46 million in realized losses, and over 26% of the remaining balance of its Mortgage Loans are 90 days or more delinquent, and are likely to result in substantial realized losses in the future.

56.   These high losses and delinquency rates, which are indisputably known by U.S. Bank, indicate that many of the underlying Mortgage Loans in the Covered Trusts are not of the quality that EMC represented and warranted they would be.  Indeed, they are consistent with the public evidence discussed above noting the poor quality of the Mortgage Loans conveyed to Bear Stearns MBS Trusts.  Nonetheless, U.S. Bank failed to take any action to enforce EMC's obligation to cure, substitute or repurchase defective Mortgage Loans once the fact that EMC had systematically breached its representations and warranties regarding the quality of the

Mortgage Loans conveyed to the Bear Stearns MBS Trusts was known as U.S. Bank was required to do as Trustee.

        C.      <u>The Covered Trusts Did Not Perfect Title To The Mortgage Loans</u>

57.      In addition to overwhelming evidence of widespread breaches of representations and warranties concerning the Mortgage Loans conveyed to the Bear Stearns MBS Trusts, a review of the public land records for representative samples of foreclosed mortgages that were part of the Covered Trusts also confirms widespread irregularities in the transfer of Mortgage Loans into the Trusts.  To test the extent of these irregularities with respect to the Covered Trusts' loans, ten mortgages that were publicly recorded as foreclosed were drawn at random for two of the Covered Trusts.  This included pulling files from various states that permitted non-judicial foreclosures (such as California, where many of the Mortgage Loans were originated) and from states allowing judicial foreclosure.  The records for every foreclosure reviewed showed that the chain of assignments between the Originator and the Trust for the Mortgage Notes and Mortgages was incomplete and invalid.  Among other things, the assignments to U.S. Bank were not regularly made at the time the Mortgage Loans were conveyed to the Covered Trusts, as was required, but were only inserted and/or recorded in connection with the foreclosure proceeding – often after the proceeding had already been instituted.  (A schedule of the defective chain of title and recordings for the foreclosed mortgages sampled is attached as Exhibit D).  Likewise, representative samples of assignments for almost all of the other Covered Trusts, that were drawn from public databases in Hillsborough County, Palm Beach County and Lee County in Florida (which were chosen because their public land records are included in searchable databases, and large numbers of the Mortgage Loans in the Covered Trusts were made for homes in Florida), make the same showing.  (A schedule of those defective

assignments is attached as Exhibit E). Thus, the Covered Trusts did not take ownership of the Mortgage Loans in a legally cognizable manner that would protect the Covered Trusts and the MBS holders, or in the time period required by the Governing Agreements.

58. Bear Stearns MBS Trusts similar to those at issue here have been unable to foreclose on Mortgages due to irregularities in the chain of title. U.S. Bank is well aware of this problem. In a high profile decision, the Massachusetts Supreme Court ruled that U.S. Bank, acting as Trustee for a Bear Stearns MBS Trust, could not quiet title to property foreclosed in a non-judicial foreclosure and sale because the Trustee had not properly foreclosed on the defaulted loan. *Ibanez*, 941 N.E. 2d at 53. Significantly, in upholding the trial court's decision from March 2009, the Massachusetts Supreme Court held that U.S. Bank had not properly foreclosed because it did not "provide a complete chain of assignments" linking its ownership of the Mortgage Loan to the lender that originated the Mortgage Loan. It also held that an "assignment[] in blank" of the mortgage, which identifies the assignor but not the assignee, is invalid, because "a conveyance of real property, such as a mortgage, that does not name the assignee conveys nothing and is void."

59. Further, in November 2010, the Congressional Oversight Panel, which was established as part of the Emergency Economic Stabilization Act of 2008, issued a Report entitled "Examining the Consequences of Mortgage Irregularities for Financial Stability and Foreclosure." It recounts widespread foreclosure abuses over the last several years – often in connection with mortgages that have been securitized – and the numerous Federal and State investigations that have detailed this problem. Many of those abuses, such as forged or back-dated mortgage assignments, or the "robo-signing" of false affidavits used in foreclosure actions, arise from failures in the process of documenting and transferring Mortgage Loans from the

originators, to the interim entities in the securitization process, and ultimately into the securitization trusts.  As the Report explains, irregularities in the chain of title between the originator and the Trust can have significant legal consequences that damage the Trusts and MBS holders.

60.    Every county in the country maintains records of who owns land within its borders, of transfers of ownership in real property, and of related mortgages or deeds of trust.  In order to protect ownership interests, take clear title to property, and adjust claims among competing creditors filing liens against the property, fully executed, original documents must be recorded in a county recording office, establishing the source and timing of a person's ownership interests in that property.  These documents must include a description of both the property and the parties that transfer the property.

61.    When an individual purchases a home using a Mortgage Loan, at least the following documents are created: (i) a promissory note establishing the mortgagor's personal liability ("Mortgage Note"), (ii) a mortgage evidencing the lender's interest in the underlying collateral ("Mortgage" or "Deed of Trust"), and (iii) if the mortgage is transferred, proper assignments of the Mortgage Note and the Mortgage.  Without the Mortgage Note, a Mortgage secures no debt; while without the Mortgage, the Mortgage Note is simply an unsecured debt obligation.

62.    As a general matter, there are several methods in which a Mortgage Note can be transferred, including: (i) via a contract and sale, which is governed by the common law of contracts, or (ii) if a Mortgage Note is considered a negotiable instrument (which is not clear as a matter of law), it could be negotiated via Article 3 of the Uniform Commercial Code ("UCC") – Article 3 requires endorsement and the physical delivery of the note.  However, under New York

law, which applies to the Covered Trusts, the agreement that governs a transfer of debt can establish heightened requirements that must be complied with in order to affect the transfer. As discussed below, the Governing Agreements dictate the terms of the transfer of the Mortgage Loans (including the Mortgage Note) from the Depositor to the Trustee; and the MLPA governs their transfer from the Seller to the Depositor. These agreements purport to treat Mortgage Notes as negotiable instruments, but also impose heightened requirements that must be satisfied to complete their transfer. The Mortgage itself is a transfer of an interest in real property, and must be assigned and recorded in accordance with the law of the place where the property is located. States generally require a signed writing in order to transfer an interest in real property.

63. If the Mortgage Note and Mortgage are not properly transferred to the Trust, then the Trust cannot foreclose on a borrower that falls into default. This is because only the person who (currently) holds both documents has standing to enforce the mortgage in a foreclosure action. It is therefore significant that a number of Courts have refused to recognize written assignments of the individual notes or mortgages to a securitization trust that occur only after a foreclosure proceeding has begun.

64. Additionally, if the transfer of a Mortgage is not recorded with the proper county authority, the holder of the Mortgage may then lose its place as the first lienholder on the underlying property. This means that if there are junior mortgagees or other creditors who have properly recorded their liens, they will have the right to payment from a sale of the underlying property before the Trust can recover from the foreclosure sale. As such, even if a note is properly transferred, it has value only if the corresponding mortgage has been properly recorded.

65. Moreover, as the November 2010 Congressional Oversight Report describes, several states have similarly acted to prohibit, or limit, the foreclosure of mortgages with

irregularities that are similar to the irregularities in Mortgage Loans underlying the Covered

Trusts:

- In New York, the court system now requires that those initiating residential foreclosure actions must file a new appropriate affirmation to certify that an appropriate employee has personally reviewed the documents and papers filed in the case and confirmed both the factual accuracy of these court filings and the accuracy of the notarizations contained therein.

- In California, a non-judicial foreclosure state, the attorney general sent a letter to JPMorgan Chase demanding that the firm stop all foreclosures unless it could demonstrate that all foreclosures had been conducted in accordance with California law.  The attorney general also called on all other lenders to halt foreclosures unless they can demonstrate compliance with California law.

- In Arizona, which is also a non-judicial foreclosure state, the attorney general sent letters on October 7, 2010 to several servicers implicated in the robo-signing scandals to demand a description of their practices and any remedial actions taken to address potential paperwork irregularities.  The attorney general wrote that if any employees or agents used any of the questionable practices in connection with conducting a trustee's sale or a foreclosure in Arizona, such use would likely constitute a violation of the Arizona Consumer Fraud Act, and the attorney general would have to take appropriate action.

- In Ohio, in addition to his lawsuit against GMAC, the attorney general filed an *amicus curiae* brief in an individual foreclosure case asking the court to consider evidence that GMAC committed fraud that tainted the entire judicial process and to consider sanctioning GMAC.  The attorney general also sent a letter to 133 Ohio judges asking them for information on any cases involving the robo-signer Xee Moua.  In addition, he asked Wells Fargo Bank to vacate any foreclosure judgments in Ohio based on documents that were signed by robo-signers and to stop the sales of repossessed properties.

- In The District of Columbia, Attorney General Peter Nickles announced on October 27, 2010 that foreclosures cannot proceed in the District of Columbia unless a mortgage deed and all assignments of the deed are recorded in public land records, and that foreclosures relying on MERS would not satisfy the requirement.  MERS responded the next day by issuing a statement that their procedures conform to the laws of the District of Columbia and encouraged their members to contact them if they experience problems with their foreclosures.

- In Connecticut, the attorney general started investigating GMAC/Ally and demanded that the company halt all foreclosures.  He also asked the company to provide specific information relating to its foreclosure practices.  In

addition, the attorney general asked the state Judicial Department on October 1, 2010 to freeze all home foreclosures for 60 days to allow time to institute measures to assure the integrity of document filings.  The Judicial Department refused this request.

66.     Similarly, as a result of a November 2010 report by New Jersey Legal Services to the New Jersey Supreme Court documenting irregularities in foreclosure proceedings – which was supported by extensive depositions and documentary evidence, including from lawyers and other participants in the foreclosure of securitized loans – New Jersey issued an Administrative Order amending its Court rules, provided a warning to the foreclosure Bar and issued an order to show cause to the major servicers of securitized Mortgage Loans including Chase Home Finance (which had acquired Bear Stearns along with EMC in 2008).  This report explained that many of the foreclosure abuses, such as robo-signing and the use of false affidavits, occurred to compensate for legal defects in the chain of assignments of securitized Mortgage Loans to their Trusts, and generally arose as the securitization participants cut corners to save costs.  As the report explained:

> A foreclosing plaintiff must show (1) that it holds the note, and (2) that the mortgage was either made to it or assigned to it in writing.  N.J.S.A. 46:9-9. ***Lenders no longer routinely execute or record Assignments of Mortgage when a loan is transferred because they regard it as unnecessary unless there is a default and too costly and time consuming to do in every case.***  See Exhibit Q in which a foreclosure attorney explains in a submission to the Court that; "The assignee performs its due diligence, bulk transfer agreements are executed, money is wired, and on a date certain the proverbial 'switch is flipped' wherein the assignee takes over regardless of the execution of a formal, legal assignment for each and every loan.  By way of example, one large national mortgage servicer recently purchased 1.3 million loans from another large servicer.  Even if it took one minute per assignment to execute (which itself is a stretch) it would take over ten years to execute all the resulting assignments is [sic] same were executed at the rate of 40 hours per week."  ***So typically at the time the lender makes a decision to foreclose it is not the record mortgagee.  To correct that defect, the attorney for the foreclosing mortgagee or the servicer of the loan will create an Assignment of Mortgage for the purposes of litigation which is in turn signed by a robo-signer.  Documents recorded with a public official are self executing and have special evidential status and therefore are especially pernicious.***

> ***Usually the assignment purports not only to assign the mortgage but also the note or underlying obligation.   The assignment of the note nearly always contradicts other documents which indicate that the note was transferred at different times and in different manners or not at all.***

(Emphasis added).

67.     One of the flawed practices for assigning mortgages cited by the New Jersey Legal Services report was where assignments appeared to have been executed and notarized in blank – a practice that appears to have been common for the transfer into the Covered Trusts.

68.     Finally, an April 2011 joint report entitled "Interagency Review of Foreclosure Policies and Practices" issued by the Federal Reserve, the FDIC, the Office of Thrift Supervision and the Office of the Comptroller further confirmed these abuses.   For this report, federal regulators reviewed a sampling of the Mortgage Loan Files belonging to 14 Mortgage Loan servicers that had signed consent orders with the federal regulators in April 2011.  Wells Fargo – which services the Mortgage Loans in the Covered Trusts for the Bear Stearns MBS – was one of the mortgage servicers included in the review.   U.S. Bank, which acted as servicer for MBS trusts similar to those at issue here, was also included in the review.

69.     In the report, the regulators stated: "The Federal Reserve System, the Office of the Comptroller (OCC), the Federal Deposit Insurance Corporation (FDIC), and the Office of Thrift Supervision (OTS), referred to as the agencies, conducted on-site reviews of foreclosure processing at 14 federally regulated mortgage servicers during the fourth quarter of 2010." Significantly, in the report, the regulators stated that its review of the mortgage servicers' loan files showed that there may be "***disputes over note ownership or authority to foreclose***." Report, at 6 (emphasis added).   The regulators also noted "***concerns about the prevalence of irregularities in the documentation of ownership [that] may cause uncertainties for investors of securitized mortgages***." *Id.* (emphasis added).

**IV.     U.S. Bank Failed To Discharge Its Critical Duties**

70.     Despite the Covered Trusts' high default rates and poor performance U.S. Bank failed to perform critical duties necessary to protect the Covered Trusts, Plaintiff and the class members.

A.     U.S. Bank Failed To Ensure Proper Transfer Of The Mortgage Loans To The Covered Trusts

71.     U.S. Bank breached its contractual duties under the Governing Agreements, and its obligations under the TIA by failing to ensure that the Mortgage Loans were properly transferred to the Covered Trusts and that those transfers were properly recorded.

72.     The high incidence of Mortgage Loan documentation defects likely explains, in part, why there are so many Mortgage Loans in the Covered Trusts that are 90 days or more delinquent, but not yet foreclosed and sold – neither the Trustee, nor the Master Servicer acting on its behalf, can readily foreclose on those loans, if faced with a borrower's objection, as in *Ibanez*.

B.     U.S. Bank Failed To Enforce The Seller's Obligation To Cure, Substitute Or Repurchase Defective Mortgage Loans

73.     U.S. Bank has had considerable knowledge of the defects in the Mortgage Loans, the breaches of EMC's representations and warranties, and the harm that this has caused MBS holders.  As discussed herein, U.S. Bank knew:

- from at least its review of the Mortgage Loan Files as required by the Governing Agreements, and from its attempts to foreclose on Mortgage Loans, that the Mortgage Loans had not been properly transferred to the Covered Trusts;

- from at least its review of the Mortgage Loan Files as required by the Governing Agreements, and from its attempts to foreclose on Mortgage Loans, that the Mortgage Loan Files were incomplete;

- from at least the high rate of delinquent and defaulted Mortgage Loans in the Covered Trusts, from the many suits against Bear Stearns and its affiliates

30

detailing the high number of defective loans in Bear Stearns securitizations, and from newspaper articles reporting similar facts, that many of the Mortgage Loans in the Covered Trusts did not comply with EMC's representations and warranties concerning their underwriting quality; and

- from at least the Covered Trusts' poor performance, and from its attempts to foreclose on Mortgage Loans, that MBS holders were being harmed by the defects in the Covered Trusts' Mortgage Loans.

74.    Despite all of that, U.S. Bank failed to take any action to protect the MBS holders, as it was required to do.  U.S. Bank did not cause EMC to repurchase, and EMC did not repurchase, a single Mortgage Loan because it was of a lower quality than promised by EMC's representations and warranties.  A review of Periodic Statements issued by the Covered Trusts indicates that across the thousands and thousands of Mortgage Loans sold to the Covered Trusts, EMC only repurchased 41 Mortgage Loans, which is far less than one percent of the total Mortgage Loans held by the Covered Trusts.  Each of those repurchases was due to the fact that the underlying borrower had pre-paid its loan.  Moreover, these repurchases only occurred in five of the Covered Trusts (Plaintiff invested in one of those Trusts, BS ARM 2005-12, in which five such repurchases occurred in January of 2006), and EMC has not made any such repurchases for approximately three years, since April of 2009.  Additionally, U.S. Bank did not cause EMC to substitute, and EMC did not substitute, a single Mortgage Loan held by the Covered Trusts.

C.    U.S. Bank Was Negligent When Reviewing Loan Files For Missing, Incomplete And Defective Documentation

75.    U.S. Bank also violated the TIA and breached its contractual duties under the Governing Agreements, by performing its contractual duties in a negligent manner.  Particularly, U.S. Bank negligently reviewed the loan files for missing, incomplete and defective documentation.

76.    The fact that there was a missing link in the chain of endorsements from the originator to U.S. Bank, or that there was no duly executed and recorded assignment of a

31

mortgage to U.S. Bank, among other things, would have been obvious to a reasonably competent Trustee performing its contractual duties with due care.  By failing to identify these obvious defects in the documentation of the Mortgage Loan Files, or to require that these defects be corrected, U.S. Bank was grossly negligent and breached its statutory and contractual duties.

      D.      <u>U.S. Bank Failed To Exercise Its Rights And To Perform Its Duties In A Manner That Benefited And Effectively Protected MBS Holders</u>

77.      U.S. Bank is also liable for failing to exercise its powers under the Governing Agreements, and to perform its duties, in a manner that benefited and effectively protected MBS holders.  U.S. Bank has had notice of events, including the many delinquent and defaulted mortgages in the Covered Trusts, indicating that EMC has not satisfied its material obligations under the Governing Agreements, and that Wells Fargo has not complied with duties, including by failing to require EMC to perform its obligations, and yet U.S. Bank has refused to provide the technical notice of default which it must recognize would require it to exercise additional powers, as Trustee, to protect MBS holders.  Indeed, U.S. Bank has not even provided notice of the defaults to MBS holders as required under the Governing Agreements, so that they could take steps to protect their own interests.  U.S. Bank has thereby effectively denied MBS holders their expected consideration under the Governing Agreements.

78.      Moreover, by failing to ensure that the Covered Trusts simply have good title to the Mortgage Loans, U.S. Bank has impaired and delayed its ability to recover losses for those Mortgage Loans where borrowers have ceased making payments, or for those Mortgage Loans that did not comply with the underwriting criteria described in EMC's representations and warranties to begin with.

79.     To the extent that U.S. Bank failed to institute suit against Wells Fargo and/or EMC because such a suit would expose it to liability for its own misconduct under the TIA and Governing Agreements, U.S. Bank violated its duty of loyalty as well as due care.

**V.     U.S. Bank Is Responsible To MBS Holders For The Credit Losses In The Trusts**

80.     U.S. Bank's failure to enforce the Covered Trusts' repurchase rights, and its violations of its other contractual and statutory duties, along with its negligence, have caused the MBS holders to suffer millions of dollars in losses.  Significant document deficiencies in the Mortgage Loan Files have delayed foreclosures, contributing to delinquencies in the payments owed to the Cover Trusts, which led to a decline in the value of the Bear Stearns MBS.  In addition, many of the Mortgage Loans conveyed to the Covered Trusts did not comply with EMC's representations and warranties, but were instead of a lower quality, which led to defaults in the principal and interest payments owed to the Covered Trusts, and to a decline in the value of the Bear Stearns MBS.  Had U.S. Bank performed its duties, in particular had it adequately reviewed the Mortgage Loan Files and enforced EMC's obligation to cure, substitute, or repurchase Mortgage Loans with document deficiencies or that breached the representations and warranties, the foregoing declines in the value of the Bear Stearns MBS would not have occurred.

**VI.     MBS Holders May Sue U.S. Bank As Trustee**

81.     The Governing Agreements provide certain limitations on the rights of MBS holders, which are not, however, applicable to this lawsuit.  More specifically, PSA Section 11.04(c) limits the right of MBS holders to bring a lawsuit relating to the Governing Agreements "against the Depositor, the Securities Administrator, the Master Servicer or any successor to any such parties unless," among other things, "the Holders of Certificates evidencing Fractional

Undivided Interests aggregating not less than 51% of the Trust Fund shall have made written request upon the Trustee to institute such action . . . ."  *See also* Indenture § 5.06.

82.     This section makes no mention of lawsuits against the Trustee.  Further, PSA Section 9.01(d) states that "[n]o provision of this Agreement shall be construed to relieve the Trustee or the Securities Administrator from liability for its own negligent action, its own negligent failure to act or its own willful misconduct."  *See also* Indenture § 6.01(c).

83.     Additionally, under the TIA and New York law, "no action" clauses do not apply to actions by MBS holders against Trustees for their own wrongdoing.  This is not a situation where the MBS holders are demanding that U.S. Bank initiate a suit in its own name to enforce their rights and obligations under the Governing Agreements.  Rather, this is an instance where the MBS holders are bringing an action ***against*** U.S. Bank for breaching its statutory and contractual obligations under the Governing Agreements, and for acting with gross negligence when performing its duties.  Because this is not an "action, suit or proceeding" that U.S. Bank is capable of bringing in its own name as Trustee under the Governing Agreements, the "no action" clause does not apply and does not bar Plaintiff from proceeding with this lawsuit.

## CLASS ACTION ALLEGATIONS

84.     Plaintiff brings this class action on behalf of a class consisting of all current and former investors who acquired the Bear Stearns MBS for the Covered Trusts listed on Exhibit A, which includes all Bear Stearns ARM Trusts and all Bear Stearns Alt-A Trusts issued in 2005 or 2006 for which U.S. Bank served as Trustee, and suffered losses as a result of Defendant's misconduct alleged herein (the "Class").  Excluded from the Class are Defendant U.S. Bank, EMC, Bear Stearns, JPMorgan Chase, Wells Fargo, any of their related entities or affiliates, their officers and directors, their legal representatives, successors or assigns and any entity in which

Defendant, EMC, Bear Stearns, JPMorgan Chase, or Wells Fargo, has or had a controlling interest.

85.    The members of the Class are so numerous that joinder of all members is impractical.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by U.S. Bank and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

86.    Plaintiff's claims are typical of the claims of the members of the Class as they all purchased MBS based upon Governing Agreements substantially in the form of Exhibit C, and U.S. Bank's misconduct was substantially the same with respect to all persons investing in the Covered Trusts, causing all members to suffer similar harm as a result.  Thus, all members of the Class are similarly affected by U.S. Bank's statutory and contractual breaches, as well as its negligence, that are complained of herein.

87.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and mortgage-backed securities litigation.

88.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether U.S. Bank breached its contractual duties to MBS holders under the Governing Agreements by systemically failing to properly review the loan files for the Mortgage Loans and identify Mortgage Loans for which there

was missing, defective or incomplete documentation, and by failing to require EMC to cure those deficiencies;

- whether U.S. Bank violated the TIA by:

  o prior to default, failing to perform the duties specifically assigned to it under the Governing Agreements;

  o prior to default, failing to examine the evidence that EMC provided to the Covered Trusts certifying EMC's compliance with the covenants it made under the Governing Agreements, and by failing to determine whether that evidence conformed to the requirements of the Governing Agreements;

  o failing to timely inform MBS holders of breaches of the Governing Agreements; and

  o after an event of default, failing to exercise its rights and powers under the Governing Agreements as a prudent person;

- whether U.S. Bank was negligent when carrying out its duties and obligations under the Governing Agreements; and

- whether and to what extent members of the Class have suffered damages as a result of U.S. Bank's breach of its statutory and contractual duties and the proper measure of damages.

89.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable.  There will be no difficulty in the management of this action as a class action.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### (Violation of the Trust Indenture Act of 1939, 53 Stat. 1171)

90.    Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

91.    Congress enacted the Trust Indenture Act of 1939 ("TIA"), 53 Stat. 1171, 15 U.S.C. §77aaa, *et seq*., to ensure, among other things, that investors in certificates, bonds, and

similar instruments have adequate rights against, and receive adequate performance from, the responsible trustees.  15 U.S.C. §77bbb.  The Covered Trusts' Governing Agreements are "indentures" and U.S. Bank is an "indenture trustee" within the meaning of the TIA.  15 U.S.C. §77ccc(7), (10).  Moreover, the TIA applies to and is deemed to be incorporated into the Governing Agreements, and the related MBS.  15 U.S.C. §77ddd(a)(1).  U.S. Bank violated multiple provisions of the TIA.

92.     First, the TIA requires that, prior to default, the indenture trustee shall be liable for any duties specifically set out in the indenture.  15 U.S.C. §77ooo(a)(1).  As set forth above, U.S. Bank failed to comply, in good faith, with numerous duties specifically assigned to it by the Governing Agreements, including the duty:

(a)     to take all necessary steps to perfect the ownership rights in the mortgage notes and collateral for the Covered Trusts, and to ensure that other parties to the Governing Agreements performed their responsibilities to permit these rights to be perfected;

(b)     to review the Mortgage Loan Files to ensure that the Mortgage Loans were properly documented and that there were no missing, incomplete or defective documents in the Mortgage Loan Files, and, where documents were missing, incomplete or defective, to take reasonable steps to cause the other parties to the Governing Agreements to correct those irregularities;

(c)     to review the endorsements to the original mortgage note to ensure that there was a complete chain of endorsements from EMC or the originator to U.S. Bank as Trustee for the Covered Trusts, and where endorsements were missing, to take reasonable steps to ensure that the endorsements were obtained;

(d)     to review the Mortgage Loan Files to ensure that there was a duly executed assignment of mortgage for each of the Mortgage Loans in the Covered Trusts, and where assignments were missing to take reasonable steps to ensure that the necessary assignments were obtained by or from other parties to the Governing Agreements; and

(e)     to identify those Mortgage Loans for which there was missing, defective and/or incomplete documentation, and where defective and/or incomplete documentation was identified to take reasonable steps to ensure that the irregularities were corrected by other parties to the Governing Agreements.

By failing to comply with these specific duties, U.S. Bank violated the TIA.

93.     The TIA also requires that, prior to default, U.S. Bank examine the evidence that Wells Fargo provided to the Covered Trusts certifying its compliance with the covenants it made under the Governing Agreements, and that U.S. Bank determine whether that evidence conformed to the requirements of the Governing Agreements.  15 U.S.C. §77ooo(a) (citing 15 U.S.C. §77nnn).  Wells Fargo provided evidence to U.S. Bank that it had complied with its obligations under the Governing Agreements, even though it was readily apparent that Wells Fargo had failed to do so.  Therefore, U.S. Bank violated the TIA by failing to examine that evidence, or failing to examine it with the requisite care, and failing to determine whether that evidence conformed to the requirements of the Governing Agreements, or failing to make that determination with the requisite care.

94.     In addition, the TIA requires that U.S. Bank inform MBS holders of breaches of the Governing Agreements within ninety days after their occurrence.  15 U.S.C. §77ooo(b) (citing 15 U.S.C. §77mmm(c)).  Here, there were numerous defaults, including the failure of EMC to cure defects in the Mortgage Loan Files and/or to substitute conforming loans for

defective loans in the Covered Trusts, and Wells Fargo's as well as the Issuer's failure to enforce EMC's obligations in this regard.  Given the great importance of those defaults to the MBS holders' interests, U.S. Bank was required to provide notice of those defaults.  Accordingly, by failing to provide such notice, U.S. Bank violated the TIA.

95.     Second, in case of default, the TIA requires that U.S. Bank exercise its rights and powers under the Governing Agreements as a prudent person would, under those circumstances, in the conduct of his own affairs.  15 U.S.C. §77ooo(c).  Again, given the obvious importance of the defaults set forth in the preceding paragraph and herein, which impaired the rights of MBS holders to collect their full principal and interest and which reduced the value of the MBS, any prudent person under those circumstances would have exercised all of his rights to, among other things, obtain complete Mortgage Loan Files, cure any defects in the Mortgage Loan Files and/or substitute conforming loans, and a prudent person would have exercised those rights promptly. Indeed, with the number of delinquent and defaulting mortgages in the Covered Trusts increasing, as a result, *inter alia*, of such defects, the MBS holders could have been protected from the resulting losses only through the Trustee's prompt exercise of those rights – which were designed precisely to limit the number of delinquent and defaulting mortgages in the Covered Trusts.  By failing to exercise its rights in those circumstances, U.S. Bank violated the TIA.

96.     Third, the TIA states that, notwithstanding any other provision of the indenture, the right of any holder of any indenture security to receive payment of the principal and interest on the indenture security, on or after the respective due dates, shall not be impaired or affected without the holder's consent.[2]   15 U.S.C. §77ppp(b).  As set forth above, by failing to cause

---

[2] This section also provides that, notwithstanding any other provision of the indenture, the right of any holder of any indenture security to institute suit for the enforcement of any such payment

defective Mortgage Loans to be corrected by other parties to the Governing Agreements, U.S. Bank impaired the MBS holders' ability to collect the payments due to them under the Governing Agreements.  Moreover, after the defaults, U.S. Bank's failure to, among other things, exercise its rights to force the repurchase or substitution of any non-conforming loans also impaired the MBS holders' ability to collect payments due them.  By creating such impairments, U.S. Bank violated the TIA, and caused losses to Plaintiff and the Class, in connection with their ability to fully collect the principal and interest due under the MBS, and through the reduction in the value of the MBS.

97.     U.S. Bank is liable to Plaintiff and the Class for their actual damages incurred as a result of its violations of the TIA.

<u>SECOND CAUSE OF ACTION</u>

**(Breach of Contract)**

98.     Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

99.     As set forth in detail above, the MBS signed by U.S. Bank incorporated the Governing Agreements, and the Governing Agreements as a matter of law incorporate the provisions of the TIA.  Under these contracts, and at common law, U.S. Bank owed the MBS holders a duty to perform its duties, including, without limitation:

(a)     to take all necessary steps to perfect the ownership rights in the mortgage notes and collateral for the Covered Trusts, and to ensure that other parties to the Governing Agreements performed their responsibilities to permit these rights to be perfected;

---

on or after the respective due dates shall not be impaired or affected without the holder's consent.  15 U.S.C. §77ppp(b).

(b)      to review the Mortgage Loan Files to ensure that the Mortgage Loans were properly documented and publicly filed, and that there were no missing, incomplete or defective documents in the Mortgage Loan Files, and where documents were missing, incomplete and defective to take reasonable steps to cause the other parties to the Governing Agreements to correct these Mortgage Loan irregularities;

(c)      to review the endorsements to the original mortgage notes to ensure that there was a complete chain of endorsements from EMC or the originator to U.S. Bank as Trustee for the Covered Trusts, and where endorsements were missing, to take reasonable steps to ensure that the endorsements were obtained by or from other parties to the Governing Agreements;

(d)      to review the loan files to ensure that there was a duly executed assignment of mortgage for each of the Mortgage Loans in the Covered Trusts, and where assignments were missing to take reasonable steps to ensure that the necessary assignments were obtained by or from other parties to the Governing Agreements;

(e)      to identify those Mortgage Loans for which there was missing, defective and/or incomplete documentation, and where defective and/or incomplete documentation was identified to take reasonable steps to ensure that the irregularities were corrected by other parties to the Governing Agreements, and that the mortgages and assignments were properly filed in the land records.

100.    U.S. Bank's breach of its duties set forth in the Governing Agreements, as described above, meant that Plaintiff and the MBS holders did not receive the consideration they bargained for, *i.e.*, they did not receive securities that were collateralized by enforceable Mortgage Loans.  These violations reduced and/or delayed collections on the Mortgage Loans in

the Covered Trusts, diminished the value of the MBS, and caused Plaintiff's and the Class' losses, including on sales of MBS, losses that U.S. Bank rather than MBS holders should bear.

101.    In addition, once an event of default occurred under the Governing Agreements, or a default occurred under the TIA, U.S. Bank had the obligation to exercise all rights and powers vested in it by the Governing Agreements, and to use the same degree of care and skill in their exercise as a prudent man would, under those circumstances, in the conduct of his own affairs.

102.    An "Event of Default" occurs under several situations defined in the Governing Agreements,  including PSA §8.01(ii):

> The Master Servicer fails to observe or perform in any material respect any other material covenants and agreements set forth in this Agreement to be performed by it, which covenants and agreements materially affect the rights of Certificateholders, and such failure continues unremedied for a period of 60 days after the date on which written notice of such failure, properly requiring the same to be remedied, shall have been given to the Master Servicer by the Trustee or to the Master Servicer and the Trustee by the Holders of Certificates evidencing Fractional Undivided Interests aggregating not less than 25% of the Trust Fund.

*See also* Indenture Appendix A, Event of Default (iii).

103.    There were material breaches of the Governing Agreements, including by the Master Servicer, and the Issuer, among others, to, for example:

(a)    notify the Trustee and others of breaches of the representations and warranties that applied to the mortgages in the Covered Trusts;
(b)    maintain accurate and adequate loan and collateral files in a manner consistent with prudent mortgage servicing standards;
(c)    demand that deficient mortgage records be cured;
(d)    avoid unnecessary servicing fees and overcharging for its services; and
(e)    place the interests of the MBS holders' before its own interests.

*See also* Indenture § 3.04(a); 3.06.

104.    U.S. Bank and its responsible officers, along with other parties to the Governing Agreements, had notice of these and other defaults, through, among other things, defaults and delinquencies in the Covered Trusts, foreclosure actions brought on behalf of the Covered Trusts, and, more recently, widespread news coverage of foreclosure fraud, including Consent Agreements that U.S. Bank and Wells Fargo entered into with the OCC for their wrongful foreclosure practices.

105.    These Events of Default impaired the rights of MBS holders to collect their full principal and interest, and reduced the value of the MBS.  Accordingly, under those circumstances, a prudent person would have exercised all of its rights to recover for those Events of Default, and would have done so promptly.  By failing to take such action, U.S. Bank breached the Governing Agreements.

106.    U.S. Bank is liable to Plaintiff and the Class for the losses they suffered as a direct result of U.S. Bank's failure to perform its contractual obligations under the Governing Agreements.

## THIRD CAUSE OF ACTION

### (Breach of Implied Covenant of Good Faith and Fair Dealing)

107.    Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

108.    New York law implies an obligation of good faith and fair dealing into all contracts.  That obligation requires that no party to a contract do anything which will destroy or injure the right of another party to receive the benefits of the contract.  U.S. Bank breached the implied covenant of good faith and fair dealing in the Governing Agreements.

109.    As set forth above, U.S. Bank had notice that Bear Stearns, EMC and Wells Fargo had breached their obligations under the Governing Agreements through: its review of the Mortgage Loan Files, foreclosure actions in which it was involved, public investigations, lawsuits, and media coverage.  The public investigations, lawsuits and media coverage also put U.S. Bank on notice that Bear Stearns and EMC faced significant legal and financial difficulties.

110.    By failing to take action to protect the MBS holders' interests under those circumstances, which indicated that the Covered Trusts' assets and ability to recover losses were being greatly depleted, U.S. Bank frustrated the MBS holders' rights to their consideration under the Governing Agreements.

111.    U.S. Bank is liable to Plaintiff and the Class for the losses they suffered as a direct result of its breach of the covenant of good faith and fair dealing.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for relief and judgment, as follows:

A.      Awarding compensatory damages and/or equitable relief in favor of Plaintiff and the Class against U.S. Bank for breaches of its statutory and contractual duties, its gross negligence, and its ordinary negligence, in an amount to be proven at trial, including interest thereon;

B.      Awarding Plaintiff its reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

C.      Such other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

Dated: May 14, 2012

SCOTT+SCOTT LLP

David R. Scott (DS 8053)
Beth A. Kaswan (BK 0264)
Max Schwartz (MS 2517)
500 Fifth Avenue, 40th Floor
New York, NY 10110
Telephone:  212-223-6444
Facsimile:  212-223-6334

*Counsel for Plaintiff*

45

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served this 14th day of May, 2012 upon

counsel for Defendant via overnight mail, as follows:

Michael S. Kraut
John M. Vassos
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY  10178

*Counsel for Defendant*

SCOTT+SCOTT LLP

David R. Scott (DS 8053)
Beth A. Kaswan (BK 0264)
Max Schwartz (MS 2517)
500 Fifth Avenue, 40th Floor
New York, NY 10110
Telephone:  212-223-6444
Facsimile:  212-223-6334

*Counsel for Plaintiff*