## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| OKLAHOMA POLICE PENSION AND RETIREMENT SYSTEM,<br><br>Plaintiff,<br><br>- against-<br><br>U.S. BANK NATIONAL ASSOCIATION (as Trustee Under Various Pooling and Servicing Agreements),<br><br>Defendant. | **CASE NO. 11-cv-8066**<br><br><br>**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT U.S. BANK NATIONAL ASSOCIATION'S MOTION TO DISMISS PLAINTIFF'S CORRECTED SECOND AMENDED COMPLAINT** |

## <u>TABLE OF CONTENTS</u>

**Page(s)**

**INTRODUCTION** ...................................................................................................... 1

**STATEMENT OF FACTS** ......................................................................................... 4

   **I.** **MBS Repay Their Holders With Collections From Performing Mortgage Loans Or Foreclosure Proceeds From Defaulted Mortgage Loans** ............................................... 5

   **II. U.S. Bank's Duties Under The Governing Agreements And The TIA** ...................... 5

   **III.U.S. Bank Breached Its Duties, Causing The Covered Trusts Significant Harm** ....... 6

**ARGUMENT** .............................................................................................................. 8

   **I.** **Plaintiff Has Adequately Alleged Standing** ................................................... 8

      **A.** **Plaintiff Has Standing To Bring Claims Against U.S. Bank On Behalf of Class Members Who Purchased MBS From The Same Covered Trusts as Plaintiff** ..... 9

      **B.** **Plaintiff Has Standing To Bring Claims Against U.S. Bank on Behalf of All Other Class Members** ...................................................................... 10

   **II. The Complaint States A Claim For Breach Of Contract** ............................................ 12

      **A.** **Plaintiff Alleges Material Breaches Of The Governing Agreements** ................... 12

         1.  Plaintiff Alleges That U.S. Bank Breached Its Duty To Enforce  The Seller's Representations And Warranties ..................................................................... 12

      **B.** **Plaintiff Has Alleged Causation And Substantial Losses** ....................................... 18

         1.  The Covered Trusts Have Suffered Losses .......................................................... 18

         2.  Plaintiff Properly Alleges Damages Based On MBS' Loss In Value .................. 20

         3.  Plaintiff Has Adequately Alleged Causation ....................................................... 23

   **III.The TIA Applies To All Of The Covered Trusts** ....................................................... 25

**A. Certificates, Like Notes, Are Debt Securities** ........................................................... 27

**B. Certificates, Like Notes, Are Subject To The TIA** ................................................ 30

**C. No Regulatory Guidance Supports Exempting Certificates From The TIA** ....... 32

**IV. The Complaint States A Claim For Violation Of The TIA** ........................................ 35

**CONCLUSION** ............................................................................................................................ 35

# TABLE OF AUTHORITIES

**Page(s)**

<span style="font-variant: small-caps;">Cases</span>

*American Elec. Power Co., Inc. v. Westinghouse Elec. Corp.*,
    418 F. Supp. 435 (S.D.N.Y. 1976)........................................................................23

*Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas*,
    No. 04 Civ. 10014 PKL, 2009 WL 3111766 (S.D.N.Y. Sept. 28, 2009) ...............22

*Ashcroft v. Iqbal*,
    556 U.S. 662, 129 S. Ct. 1937 (2009) .....................................................................8

*Bank of N.Y. v. Tyco Int'l Group*,
    545 F. Supp. 2d 312 ...............................................................................................18

*Bell Atl. Corp. v. Twombly*
    ("*Twombly*"), 550 U.S. 544 (2007).....................................................................8, 24

*Bluebird Partners, L.P. v. First Fidelity Bank, N.A. New Jersey*,
    85 F.3d 970 (2d Cir. 1996).................................................................................4, 30

*BNP Paribas Mortg. Corp. v. Bank of America, N.A.*,
    778 F. Supp. 2d 375 (S.D.N.Y. 2011).........................................................2, 13, 18

*Boykin v. Keycorp*,
    521 F.3d 202 (2d Cir. 2008).....................................................................................35

*Brooke Group Ltd. v. JCH Syndicate 488*,
    87 N.Y. 2d 530 (N.Y. 1996) ...................................................................................15

*Cassese v. Washington Mutual, Inc.*,
    262 F.R.D. 179 (E.D.N.Y. 2009) ............................................................................11

*Chevron, U.S.A., Inc. v. Natural Resources Def. Council, Inc.*,
    467 U.S. 837 (1984).................................................................................................34

*Community Health Ctr. v. Wilson-Coker*,
    311 F.3d 132 (2d Cir. 2002).....................................................................................35

*CWCapital Asset Mgt., LLC v. Chicago Prop., LLC*,
    610 F.3d 497 (7th Cir. 2010) (Posner, J.) ...............................................................28

*De La Mota v. The U.S. Dept. of Ed.*,
    412 F.3d 71 (2d Cir. 2005).......................................................................................35

*Donelli v. County of Sullivan,*
  No. 07-cv-2157(JGK), 2009 WL 2365551 (S.D.N.Y. July 31, 2009)....................................13

*Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.,*
  837 F. Supp. 2d 162 (S.D.N.Y. 2011)..........................................................................28

*Employees' Retirement System of the Government of the Virgin Islands v. J.P. Morgan Chase & Co.,*
  804 F. Supp. 2d 141 (S.D.N.Y. 2011)....................................................................11, 21

*Fasolino Foods Co., Inc. v. Banca Nazionale del Lavoro,*
  961 F.2d 1052 (2d Cir. 1992)....................................................................................30

*Fort Worth Employees' Retirement Fund v. J.P. Morgan Chase & Co.,*
  No. 09-cv-3701-JPO, ECF. No. 170 at 15 (S.D.N.Y. May 15, 2012) ...........................8, 9, 10

*Gen. Ret. Sys. of City of Detroit v. UBS, AG,*
  799 F. Supp. 2d 749 (E.D. Mich. 2011)......................................................................24

*Greenwich Fin. Servs. Distressed Mortg. Fund 3 LLC v. Countrywide Fin. Corp.,*
  603 F.3d 23 (2d Cir. 2010).......................................................................................28

*In re Bankers Trust Co.,*
  450 F.3d 121 (2d Cir. 2006).....................................................................................18

*In re Bear Stearns Mtg. Pass-Through Certificates Litig.,*
  No. 08 CIV. 8093 (LTS)(KNF), 2012 WL 1076216 (S.D.N.Y. Mar. 30, 2012)................9, 10

*In re Security Capital Assur. Ltd., Sec. Litig.,*
  729 F. Supp. 2d 569 (S.D.N.Y. 2010).........................................................................28

*LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.,*
  424 F.3d 195 (2d Cir. 2005)....................................................................................28

*LNC Investments, Inc. v. First Fidelity Bank,*
  No. 92 Civ. 7585 MBM, 1997 WL 528283 (S.D.N.Y. Aug. 27, 1997) ...........................21, 22

*Long Island Lighting Co. v. Transamerica Delaval, Inc.,*
  646 F. Supp. 1442 (S.D.N.Y. 1986)...........................................................................23

*Lorena International North America, Inc. v. Vican Trading,*
  No. 08-cv-2686, 2009 WL 1940428 (E.D.N.Y. July 2, 2009).................................................13

*Luminent Mortgage Capital, Inc. v. Merrill Lynch & Co.,*
  652 F. Supp. 2d 576 (E.D. Pa. 2009) ..........................................................................24

*Maine State Retirement System v. Countrywide Fin. Corp.,*
  No. 10-cv-0302, 2011 WL 4389689 (C.D. Cal. May 5, 2011)........................................9, 10

*MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*,
　No. 602825/08, 2009 WL 2135167 (N.Y. Sup. Jul. 8, 2009) ...................................................25

*Mills v. Foremost Ins. Co.*,
　511 F.3d 1300 (11th Cir. 2008) ...............................................................................................11

*Natural Resources Defense Council v. Abraham*,
　355 F.3d 179 (2d Cir. 2004)......................................................................................................34

*NECA-IBEW Health & Welfare Fund v. Goldman, Sachs & Co.*,
　743 F. Supp. 2d 288 (S.D.N.Y. 2010)......................................................................................21

*Niederland v. Chase*,
　No. 11-cv-6358, 2012 WL 2402603 (S.D.N.Y. June 26, 2012) ..............................................12

*Rensselaer Polytechnic Institute v. Varian, Inc.*,
　340 Fed. Appx. 747 (2d Cir. 2009)...........................................................................................23

*Ret. Bd. of the Policemen's Annuity & Benefit Fund of the City of Chicago v. Bank of
　New York Mellon*,
　No. 11 Civ. 5459(WHP), 2012 WL 1108533 (S.D.N.Y. Apr. 3, 2012) ........................ passim

*Ret. Sys. of Miss. v. Merrill Lynch & Co.*,
　277 F.R.D. 97 (S.D.N.Y. 2011) ..................................................................................................9

*Ret. Sys. v. Thornburg Mortg. Secs. Trust 2006-3*,
　825 F. Supp. 2d 1082 (D.N.M. 2011) .......................................................................................22

*Rose v. C.I.R.*,
　311 Fed. Appx. 196 (11th Cir. 2008) ........................................................................................30

*S.E.C. v. Sloan*,
　436 U.S. 103 (1978).....................................................................................................................34

*St. Martin Evangelical Lutheran Church v. South Dakota*,
　451 U.S. 772 (1981).....................................................................................................................34

*TIFD III-E, Inc. v. U.S.*,
　459 F.3d 220 (2d Cir. 2006).......................................................................................................29

*Topping v. Trade Bank of New York*,
　86 F.2d 116 (2d Cir. 1936)..........................................................................................................30

*Trust for Certificate Holders of Merrill Lynch Mortgage Pass-Through Certificates
　Series 1999-C1 v. Love Funding Corp.*,
　No. 04-cv-9890, 2005 WL 2582177 (S.D.N.Y. Oct. 11, 2005)................................................28

*U.S. v. Mead Corp.*,
  533 U.S. 218 (2001)................................................................................................34

*United States Securities and Exchange Commission v. Option One Mortgage Corp. n/k/a*
  *Canyon Corp.*,
  8:12-cv-00633-JST (C.D. Cal. Apr. 24, 2012) ......................................................28

## STATUTES, RULES AND REGULATIONS

15 U.S.C. §77aaa, *et seq.* ............................................................................... passim

Fed. R. Civ. P. 8 ............................................................................................. 13, 14, 16

Fed. R. Civ. P. 9(b) .........................................................................................13, 14, 16

## OTHER AUTHORITIES

H.R. Rep. No. 1016 (1939) ....................................................................................31

## INTRODUCTION

This action involves breaches of contractual duties, and similar violations under the Trust Indenture Act of 1939 (the "TIA"), 15 U.S.C. §77aaa, *et seq*., by a mortgage-backed securities ("MBS") Trustee that failed to perform its most basic responsibilities in the face of overwhelming evidence that, among other things, defective mortgages had been sold to the 14 MBS Trusts at issue here ("Covered Trusts").

As trustee, Defendant U.S. Bank National Association ("U.S. Bank") serves as the representative of Plaintiff and Class members ("MBS holders"), and is the one party associated with the Covered Trusts who is independent of the companies that originate, pool and service the mortgage loans which underlie or "back" the MBS.  MBS holders need the protection such a trustee affords, because, given that MBS are debt instruments that repay holders with payments collected from the underlying mortgage loans, the quality of those mortgage loans determines the performance and value of the MBS.

For that reason, the Covered Trusts' Governing Agreements explicitly obligate U.S. Bank to enforce representations and warranties regarding the quality of the underlying mortgage loans, which are made by the companies that pooled and sold those mortgage loans to the Covered Trusts – affiliates of Bear Stearns and their successors (the "Seller").  (¶¶5, 39).[1]  Thus, U.S. Bank must require the Seller to remove mortgage loans that breach the representations and warranties from the Covered Trusts by repurchasing them for their outstanding principal balance or in some cases providing substitute mortgage loans of an equivalent value that actually comply with the representations and warranties.  (*Id.*).  As a result, in place of defective, low-quality mortgage loans, the Covered Trusts will either receive funds from repurchases to repay MBS

---

[1] References to ¶__ are to Corrected Second Amended Class Action Complaint ("Complaint"), ECF No. 24.

holders, or substitute mortgage loans of a sufficient quality that they can reasonably be expected to generate the funds necessary to repay MBS holders.

U.S. Bank breached its critical contractual duty to enforce the representations and warranties. The Seller has not repurchased a single mortgage loan from any of the Covered Trusts since April 2009, and it has not repurchased a mortgage loan from 9 of the Covered Trusts at any point in time. (¶74). Of the thousands and thousands of mortgage loans in the Covered Trusts, the Seller has only repurchased 41, a negligible percentage (far less than 1%), and it is not even clear that any of those repurchases were for breaches of representations and warranties or that they had anything to do with the Trustee's conduct. (*Id.*).

U.S. Bank does not dispute that it did not enforce the representations and warranties or that it had a duty to do so. Instead, U.S. Bank suggests that the duty only arises if it has knowledge of breaches of representations and warranties, and that it had no such knowledge. To credit that argument, one would have to accept that U.S. Bank has spent the last several years living under a rock. As Plaintiff alleges, in the years following Bear Stearns' collapse, numerous investigations and media reports have made clear that the mortgage loans Bear Stearns securitized regularly breached the representations and warranties Bear Stearns (and its affiliate EMC) made to securitization trusts and trustees. (¶¶46-54). Further, the Covered Trusts have suffered staggering losses inconsistent with the representations that were made concerning the quality of the mortgage loans being conveyed to the Covered Trusts. (¶¶55-56). These facts are sufficient to support a plausible claim that U.S. Bank had actual knowledge of breaches of representations and warranties triggering their obligation to enforce repurchase claims. *See BNP Paribas Mortg. Corp. v. Bank of America, N.A.*, 778 F. Supp. 2d 375, 397 (S.D.N.Y. 2011) (an indenture trustee's knowledge is a factual matter, inappropriate for a motion to dismiss).

Similar to its duty to enforce the representations and warranties, the Governing Agreements also obligate U.S. Bank to force the Seller to repurchase, substitute, or cure mortgage loans that have deficiencies in their documentation.  (¶¶5, 36-37).  The Governing Agreements dictate that, for each mortgage loan sold to the Covered Trusts, the Seller must physically transfer the associated mortgage note and mortgage to the Covered Trusts' Mortgage Files, and that the mortgage note and mortgage must be properly endorsed and assigned.  (¶¶29-30).  Those requirements ensure that the Covered Trusts can foreclose on delinquent mortgage loans in a timely manner, if at all.  U.S. Bank failed to discharge this duty as well.  An examination of a representative sample of foreclosed mortgages revealed that every loan had a defective chain of assignments.  (¶57).  Further, while the mortgage loans in the sample were ultimately foreclosed, likely through the use of tactics such as robo-signing, they are representative of defects that permeate the mortgage loans in the Covered Trusts.  These defects have resulted in significant losses to the Covered Trusts by impeding and delaying efforts to foreclose on delinquent loans, as is evidenced by the extraordinarily high numbers of mortgage loans in the Covered Trusts that are seriously delinquent but have not yet been foreclosed and sold.  (¶¶55, 71-72).  Additionally, U.S. Bank or its agent was obligated to review the Mortgage Files for these precise deficiencies.  (¶¶31-33).

As the value and performance of the MBS depends on the Covered Trusts possessing mortgage loans with the requisite quality and without document deficiencies, failure to enforce the representations and warranties and servicing violations that arise from document deficiencies constitute Events of Default under the Governing Agreements.  (¶77).  Once an Event of Default occurs, a heightened standard of care attaches to U.S. Bank, requiring it to exercise all of its rights and powers as a "prudent person" would under the circumstances.  (¶¶95, 101).  Moreover,

U.S. Bank must give MBS holders notice of those defaults.  (¶¶77, 94).  U.S. Bank admittedly did not do so here.

Instead, U.S. Bank sounds the common refrain of financial institutions over the last several years, and disclaims all responsibility for the massive harm that has occurred on its watch.  In so doing, it echoes the arguments of earlier indenture trustees, who during the Great Depression disclaimed any duties even as the trusts they were responsible for collapsed while their beneficiaries, the securities holders, were powerless to protect themselves.  Congress enacted the TIA to outlaw such misconduct, and to provide minimum federal protections to investors in debt securities "because previous abuses by indenture trustees had adversely affected 'the national public interest.'"  *Bluebird Partners, L.P. v. First Fidelity Bank, N.A. New Jersey*, 85 F.3d 970, 974 (2d Cir. 1996) (quoting 15 U.S.C. §77 bbb(a)).  U.S. Bank's assertion that the TIA is inapplicable to MBS styled as Certificates has previously been rejected by this Court.  *Ret. Bd. of the Policemen's Annuity & Benefit Fund of the City of Chicago v. Bank of New York Mellon*, No. 11 Civ. 5459(WHP), 2012 WL 1108533 (S.D.N.Y. Apr. 3, 2012).

As set forth more fully below, U.S. Bank's breaches of its contractual and TIA duties have resulted in enormous losses to MBS holders.  U.S. Bank's contention that it cannot be held liable for these losses because it was not paid enough to discharge its contractual and statutory duties evidences the limited regard with which it viewed Plaintiff and Class members.  In fact, however, U.S. Bank was paid millions of dollars for serving as Trustee of Bear Stearns' securitizations.  Even if U.S. Bank considers such sums insubstantial, it is the compensation that U.S. Bank, itself, negotiated in return for its promise to perform the critical duties that have been breached here.  U.S. Bank's motion to dismiss should be denied in all respects.

## **STATEMENT OF FACTS**

**I.    MBS Repay Their Holders With Collections From Performing Mortgage Loans Or Foreclosure Proceeds From Defaulted Mortgage Loans**

The MBS at issue in this case involve mortgage loans that were originated or purchased by Bear Stearns and its affiliates and then bundled together and sold to investors.  Pursuant to the Governing Agreements for the Covered Trusts, the Mortgage Files must be complete and contain all required assignments and endorsements of the mortgage loans to the Covered Trusts.  (¶ 29).  In addition, in the Mortgage Loan Purchase Agreement ("MLPA"), the Seller of the mortgage loans to the Covered Trusts also makes representations and warranties concerning the quality of the mortgage loans in the pool and promises to cure, substitute or repurchase mortgages that do not comply with these representations and warranties or are not appropriately documented, and the Trustee is given the right to enforce those repurchase rights.  (¶ 34).

MBS entitle their holders to the cash flows generated from the Trust's pool of mortgage loans, including through foreclosure, if necessary, which are collected by the Master Servicer and distributed to MBS holders in accordance with a payment "waterfall." (¶¶22-23).  The value of MBS, and their credit rating, depend primarily on the riskiness of the underlying mortgages, which is reflected in the Seller's representations and warranties concerning the quality of the mortgage loans in the pool, and, secondarily, to the extent that borrowers default, on the Covered Trust's ability to foreclose and recover the unpaid loan balance through a sale of the underlying collateral.  (¶23).  If the loans in the pools are of lower quality than represented or have defective documentation, investors are damaged either through the decline in value of the MBS or losses sustained by the Covered Trust.

**II.    U.S. Bank's Duties Under The Governing Agreements And The TIA**

As Trustee for the 14 substantially similar Covered Trusts at issue here, U.S. Bank undeniably owed Plaintiff and other MBS holders certain, critical duties both pursuant to the TIA

and the Covered Trusts' substantially identical Governing Agreements.  Indeed, as described more fully in the Complaint, the purpose of having a Trustee in an MBS securitization is to ensure that there is at least one independent party to the Governing Agreements who, unlike the MBS holders, did not face collective action, informational, or other limitations, and as a result could effectively protect the trusts and their beneficiaries.

First, U.S. Bank, or its agent, had the duty to receive the Mortgage Files from the Depositor and review them within 90 days of closing to ensure that all relevant documents had been delivered.  (¶¶29-33).  In the event a Mortgage File was incomplete, U.S. Bank was obligated to so notify the Seller.  (¶¶36-37).  Upon receiving notice from U.S. Bank, the Seller was obligated to correct or cure any defect within 90 days.  (*Id.*).  If the Seller failed to do so, the Governing Agreements provide that U.S. Bank "shall enforce the Seller's obligation." (*Id.*).

In addition to its duty to receive and examine Mortgage Files, U.S. Bank was also obligated to enforce the Seller's obligation to repurchase mortgage loans in the Covered Trusts to the extent the loans failed to comply with the Seller's representations and warranties attesting to the quality of the mortgage loans that were being conveyed to the Covered Trusts.  (¶39).  As was the case with respect to defects in the Mortgage Files, upon discovery of a breach of the Seller's representations and warranties, U.S. Bank is required to notify the Seller.  (*Id.*).  Once again, in the event the Seller failed to cure such breach, the Governing Agreements provide that U.S. Bank "shall" enforce the Seller's repurchase obligation.  (*Id.*)

Finally, U.S. Bank was required to provide MBS holders with notice of defaults and, upon an Event of Default, to "exercise its rights under the Governing Agreements as a prudent person would, under those circumstances, in the conduct of his own affairs."  (¶¶77-79, 94-95).

## III.   U.S. Bank Breached Its Duties, Causing The Covered Trusts Significant Harm

As set forth more fully in the Complaint, U.S. Bank breached its critical contractual and statutory duties to MBS holders.  In this regard, U.S. Bank had extensive knowledge that Bear Stearns affiliate EMC Corporation ("EMC"), the Seller, had breached its representations and warranties concerning the quality of the mortgage loans conveyed to the Covered Trusts.  The Complaint also describes numerous investigations and media reports that, in the years following Bear Stearns' collapse, have made clear that the mortgage loans Bear Stearns securitized regularly breached its representations and warranties to securitization Trusts.  (¶¶46-54).  As a result, Bear Stearns MBS have many low-quality mortgage loans, which failed to perform, and consequently declined precipitously in value as they suffered high credit losses.  (¶¶55-56).

Knowledge that Bear Stearns routinely securitized loans that breached its representations and warranties was available to U.S. Bank from a variety of sources including litigation brought by insurers that guaranteed payments for holders of certain Bear Stearns MBS Trusts, as well as suits brought by investors adversely affected by the resulting high default rates in the Trusts. (¶¶46-47).  Indeed, the breach rates revealed by these litigations – on the order of 90% per Trust – were nothing short of astounding.  (¶47).

Likewise, U.S. Bank breached its duties to review Mortgage Files for defective and incomplete documentation and to enforce the Seller's obligation to repurchase mortgage loans in the Covered Trusts if those loans had defective documentation.  (¶¶71-76).  As alleged in the Complaint, U.S. Bank had considerable knowledge of defects in the Mortgage Files from its review of those files (or exception reports provided by the Custodian), its attempts to foreclose on mortgage loans with incomplete Mortgage Files, and the Covered Trusts' numerous mortgage loans that are 90 days or more delinquent but still have not yet been foreclosed and sold.  (*Id.*).

U.S. Bank's refusal to act has had a significant, negative impact on the performance of the Covered Trusts.  As detailed in the Complaint, the Covered Trusts have reported tens or even hundreds of millions of dollars in recognized losses to date and staggering delinquency rates, indicating that substantial additional losses are likely.  (¶¶55-56).  For example, the two Trusts in which Plaintiff invested have reported recognized losses to date of $102 million and high delinquency rates.  (¶55; *see also* Schwartz Decl. Exs. A & B).  These enormous losses were further evidence to U.S. Bank that the Seller's representations and warranties regarding the quality of the mortgage loans in the pools had been breached.

## ARGUMENT

### I.    Plaintiff Has Adequately Alleged Standing[2]

When a plaintiff has standing to bring a claim against a defendant on its own behalf, it also has standing to bring the claim against the defendant on behalf of a similarly situated class. Thus, under that rule, "named plaintiffs regularly litigate not only their own claims but also claims of other class members based on transactions in which the named plaintiffs played no part."  *Fort Worth Employees' Retirement Fund v. J.P. Morgan Chase & Co.*, No. 09-cv-3701-JPO, ECF. No. 170 at 15 (S.D.N.Y. May 15, 2012) (internal quotations omitted).

Class action standing does not require a named plaintiff to "literally suffer the same actual injury that each class member suffered . . . [which] would, of course, be impossible."  *Id.* at 16.  Rather, a plaintiff need only "show that he is within the class of persons who were

---

[2] Pursuant to Fed. R. Civ. P. 8, a complaint need only "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly* ("*Twombly*"), 550 U.S. 544, 570 (2007)).  "Asking for plausible grounds does not impose a probability requirement at the pleading stage; it simply calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" to prove the claim.  *Twombly*, 550 U.S. at 545.

concretely affected by injurious conduct *by the defendant* such that that plaintiff has the necessary stake in litigating the case." *Id.* (internal quotations omitted) (emphasis added).

A.     **Plaintiff Has Standing To Bring Claims Against U.S. Bank on Behalf of Class Members Who Purchased MBS from The Same Covered Trusts As Plaintiff**

U.S. Bank concedes that Plaintiff has standing to assert claims on behalf of all tranches of the 2005-9 Trust because all tranches of this Trust have interests in a single group of mortgage loans.  (Mem. at 9).[3]  However, U.S. Bank argues, incorrectly, that Plaintiff only has standing to bring claims on behalf of class members who purchased MBS from the Class I-3-A-1 tranche of the 2005-12 Trust that Plaintiff purchased because the various tranches of this Trust are supported by separate groups of mortgage loans.  (Mem. at 9).

Several courts in this District have recently rejected similar tranche-based standing arguments.  *Fort Worth*, No. 09-cv-3701, ECF No. 170 at 27; *In re Bear Stearns Mtg. Pass-Through Certificates Litig.*, No. 08 CIV. 8093 (LTS)(KNF), 2012 WL 1076216, at *24 (S.D.N.Y. Mar. 30, 2012).  Likewise, courts in this District have rejected the concept of tranche-based standing more indirectly, in the context of motions for class certification.  *See, e.g.*, *Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co.*, 277 F.R.D. 97, 108-09 (S.D.N.Y. 2011).

Indeed, *Fort Worth*, after an extensive analysis, rejected the specific argument made by U.S. Bank here – that standing must be tranche-based when tranches are backed by separate loan pools.  It also refused to follow *Maine State Retirement System v. Countrywide Fin. Corp.*, No. 10-cv-0302, 2011 WL 4389689 (C.D. Cal. May 5, 2011), on which U.S. Bank relies.  *Fort Worth*, No. 09-cv-3701, ECF No. 170 at 12, 23.  As *Fort Worth* explained, *Maine State* concluded that because tranches may have somewhat different characteristics, statements made in offering documents could be read as applying differently to each tranche, such that purchasers

---

[3] References to Mem. at __ are to Defendant U.S. Bank National Association's Memorandum of Law in Support of its Motion to Dismiss Plaintiff's Corrected Second Amended Complaint ("Memorandum"), ECF No. 26.

of one tranche were ultimately not injured by the same misrepresentation, or misconduct, as purchasers of another tranche (*Maine State* involved securities fraud claims). *Id*. at 23.

*Fort Worth* first questioned the soundness of that conclusion. For example, it indicated that the conclusion would not apply where the alleged misrepresentation or misconduct relates to "general practices" across a trust, as opposed to specific characteristics of a tranche. *Id*. at 24. Further, *Fort Worth* explained that, due to the structure of MBS trusts, "a drop in value of one tranche affect[s] the value of all of the tranches . . . [t]hus a purchaser of one tranche is allegedly in fact injured by misstatements that pertain only to another tranche." *Id*. at 26.

But *Fort Worth* finally concluded that, for the purposes of standing, it was not necessary to determine whether specific misrepresentations or misconduct applied to one tranche and not another. Instead, it determined that a plaintiff who has purchased from one tranche has the same "personal stake" as a purchaser from any other tranche if "the tranches are tied to the same alleged misrepresentations" or misconduct. *Id*. at 25; *Bear Stearns*, 2012 WL 1076216.

The Complaint here alleges, and U.S. Bank does not dispute, that each of the Covered Trusts had a single PSA that applied to all tranches, and that as Trustee of a Covered Trust, U.S. Bank owed the same contractual and statutory duties to purchasers of its various tranches. (¶¶2, 24-25). Moreover, the Complaint alleges that the same precise misconduct on the part of U.S. Bank stemming from the same contractual and statutory duties injured the various tranches in a Covered Trust, namely U.S. Bank's failure to perform its contractual and statutory duties. (¶¶10, 80). Thus, Plaintiff has standing to bring claims against U.S. Bank on behalf of class members who purchased MBS in the same Covered Trusts as Plaintiff.

**B.  Plaintiff Has Standing to Bring Claims Against U.S. Bank On Behalf Of All Other Class Members**

In addition, U.S. Bank argues, again without merit, that Plaintiff does not have standing to bring claims against it on behalf of class members who purchased MBS in Covered Trusts from which Plaintiff did not purchase MBS – in other words, that standing is trust-based.

In *Employees' Retirement. System of the Government of the Virgin Islands*, 804 F. Supp. 2d 141 (S.D.N.Y. 2011), a decision U.S Bank does not even bother to cite, this Court addressed whether a plaintiff had standing to bring Section 11 and 12(a)(2) claims concerning MBS Certificates that it did not purchase.  Because causes of action for violation of Sections 11 and 12 are predicated on the specific registration statement or prospectus containing a misrepresentation, this Court held that a plaintiff has no standing to sue for alleged misrepresentations in registration statements and prospectuses offering securities that it did not purchase.  *Id.* at 150-51.  However, this Court observed that such actions are distinguishable from those arising under Section 10(b), in which plaintiffs sue "over a broader course of conduct".  *Id.* at 150.  Therefore, "a plaintiff need not have purchased or sold every security that was affected by the alleged scheme to defraud to sue a defendant for the alleged scheme to defraud and to seek to represent a class of purchasers or sellers who similarly relied on the same scheme to defraud, even if they purchased different securities."  *Id.* at 150.

The same reasoning applies to the claims here.  The misconduct that creates standing to bring a contract claim is not contained in a specific document, but rather is some actual practice of the defendant.  *E.g.*, *Cassese v. Washington Mutual, Inc.*, 262 F.R.D. 179, 182, 184 (E.D.N.Y. 2009) (cited by U.S. Bank, Mem. at 8); *Mills v. Foremost Ins. Co.*, 511 F.3d 1300, 1307 (11th Cir. 2008) (named plaintiff had standing to bring class-wide breach of contract claims permitted where the defendant engaged in a common course of conduct).[4]  Plaintiff and class members

---

[4] Although TIA is a securities statute, it regulates the conduct of trustees and imposes duties that are similar to contract or fiduciary duties.

purchased MBS from substantially similar Covered Trusts that had substantially similar Governing Agreements and had U.S. Bank serving as Trustee. (¶¶ 24-45). Further, Plaintiff here alleges that U.S. Bank owed the same obligations to MBS purchasers in all of the Covered Trusts, that it breached those obligations through a common course of misconduct, and thereby caused a similar injury to all class members. (¶¶ 70-76). Plaintiff accordingly has standing to bring breach of contract and related statutory claims against U.S. Bank on behalf of purchasers in all of the Covered Trusts.

## II.      The Complaint States A Claim For Breach Of Contract

### A.      Plaintiff Alleges Material Breaches Of The Governing Agreements[5]

#### 1.      Plaintiff Alleges That U.S. Bank Breached Its Duty To Enforce The Seller's Representations And Warranties

The Governing Agreements specifically require the Trustee to give prompt notice to the Seller of any breaches of representations and warranties, and further state that enforcement of the Seller's obligation to repurchase or substitute such defective mortgage loans is the Trustee's only remedy for those breaches. (¶39) (PSA §2.03(b), ECF No. 24-3 at 54-55; SSA §2.03(b), ECF No. 27-11 at 11-12). U.S. Bank argues that the Complaint does not allege a breach of this duty, because it does not allege that U.S. Bank had knowledge of breaches of representations and warranties. (Mem. at 16). This argument overlooks the abundance of evidence in the Complaint and summarized above that describes breaches of Bear Stearns' representations and warranties.

According to U.S. Bank, this overwhelming evidence still does not state a claim, because it insists, the Complaint must plead that it had knowledge of specific loans that breached the

---

[5] To survive a motion to dismiss for failure to state a breach of contract claim, the plaintiff must plead: (1) the existence of a contract, (2) a breach of an obligation imposed by that contract; and (3) damage suffered by the plaintiff as a result. *Niederland v. Chase*, No. 11-cv-6538, 2012 WL 2402603, at *5 (S.D.N.Y. June 26, 2012). As discussed herein, the Complaint adequately alleges each of those elements.

representations and warranties.  (Mem. at 17).  But that argument confuses the liberal pleading standard under Fed. R. Civ. P. 8, which U.S. Bank acknowledges applies to the claims at issue in this case (Mem. at 12 n.16), with the heightened pleading standard under Fed. R. Civ. P. 9(b) that applies to fraud claims.  *Donelli v. County of Sullivan*, No. 07-cv-2157(JGK), 2009 WL 2365551, at *2 (S.D.N.Y. July 31, 2009).  Applying the Rule 8(a) standard, courts have held that whether a trustee has knowledge of some event is an issue of fact inappropriate on a motion to dismiss.  *See BNP Paribas Mtg. Corp. v. Bk. of Am., N.A.*, 778 F. Supp. 2d 375, 396-97 (S.D.N.Y. 2011).  Indeed, courts typically treat a defendant's knowledge as an issue of fact that cannot support a motion to dismiss.  *E.g. Lorena International North America, Inc. v. Vican Trading*, No. 08-cv-2686, 2009 WL 1940428, at *3 (E.D.N.Y. July 2, 2009) ("the matter of what defendant knew at the time it formed a contract with plaintiff is a question of fact").  Even the Rule 9(b) heightened pleading standard does not apply to a defendant's knowledge or mind state.  *Donelli*, 2009 WL 2365551, at *2.

The Complaint satisfies Rule 8's standards.  It sets forth evidence that breaches of representations and warranties were rampant in Bear Stearns MBS securitizations, and it is plausible to infer that U.S. Bank was aware of that evidence because it was well-publicized and described the practices of a company for which U.S. Bank regularly served as MBS Trustee.  When combined with the extremely poor performance of the Covered Trusts, the fact that U.S. Bank had access to the Mortgage Files, that U.S. Bank had to have regular contact with the Master Servicer, and that another Trustee commenced litigation against EMC to enforce repurchase claims with respect to other Bear Stearns Trusts, the foregoing evidence raises a more

than plausible inference that U.S. Bank had knowledge of breaches of representations and warranties in the Covered Trusts.[6]

Further, given that the Seller has not repurchased one mortgage loan in over 3 years, has never repurchased a mortgage loan from 9 of the Covered Trusts, and has in total repurchased far less than 1% of the mortgage loans underlying all of the Covered Trusts, the Complaint adequately alleges that U.S. Bank breached its duty to enforce the representations and warranties.

2.      Plaintiff Alleges That U.S. Bank Breached Its Duty To Review The Mortgage Files And Its Separate Duty To Require The Seller To Correct Document Deficiencies

There is no dispute that the Governing Agreements require that the Trustee, or the Custodian, ***acting as the Trustee's agent***, review the Mortgage Files to ensure that the mortgage loans sold to the Covered Trusts do not have document deficiencies.  (¶¶31-33).[7]  Nevertheless, U.S. Bank contends that the Trustee has no responsibility if the Custodian ultimately does so, which U.S. Bank suggests happened here, because §9.02(vi) of the PSA provides that "the Trustee may perform its duties 'through Affiliates, agents or attorneys' and that the Trustee cannot be liable for the negligent acts of the Custodian."  (Mem. at 14-15).[8]  However, this provision is unenforceable because it violates the TIA, which does not permit a Trustee to insulate itself from liability with respect to its contractual duties.  See 15 U.S.C. §77ooo(d).

---

[6] U.S. Bank asks the Court to disregard the litigation brought by Wells Fargo because it was purportedly brought at the direction of a Certificate holder.  (Mem. at 16).  Even if this is true, it is noteworthy that the litigation was commenced solely on the basis of publicly available information collected by the Certificate holder since EMC had refused to provide either the Trustee or the Certificate holder with access to the underlying loan files.  (*See* Shanker Decl., Ex. F at ¶35).

[7] The Governing Agreements for the Covered Trusts governed by PSAs state that if the Custodian performs the review, it acts as the Trustee's "agent" (PSA §§2.02(a), 2.02(b), ECF No. 24-3 at 52, 53), and the Custodial Agreements annexed thereto repeat that the Custodian "acts as agent for the Trustee."  *See* PSA §§2.02(a), 2.02(b), ECF No. 24-3 at 52, 53, 190.  With respect to the Covered Trusts governed by Indentures, the MLPA associated with those Covered Trusts state that the Custodian acts as the Trustee's "agent."  *See* SSA MLPA §§5(c), 5(d), ECF No. 27-12 at 17, 18.

[8] U.S. Bank does not cite a corresponding provision in the Indentures.

Pursuant to the Governing Agreements, the Covered Trusts must include certain critical documents associated with the mortgage loans, and during the review, the Trustee, or the Custodian as its agent, checks to ensure that Mortgage Files actually include those documents. (¶¶29, 31). Thus, among other things, the Governing Agreements require that for each mortgage loan the Mortgage Files include a "certified copy of the assignment . . . with evidence of recording with respect to each mortgage Loan in the name of the Trustee thereon . . . ." (PSA §2.01(b)(iii), ECF No. 24-3 at 50; SSA §2.01(b)(iii), ECF No. 27-11 at 7). Based on a review of publicly available records, the Complaint alleges, that, among other missing or defective documents, the mortgages were routinely not assigned **to the Trustee (on behalf of the Covered Trusts)**. (¶57).

In response, U.S. Bank asserts that the Governing Agreements do not require the Mortgage Files to contain **intervening** assignments between the various parties associated with the securitizations – in other words, assignments between the Originator and the Seller, or between the Seller and the Depositor. (Mem. at 15). While that assertion is accurate insofar as it goes, it is little more than a diversion here, because the evidence cited in the Complaint demonstrates that assignments were not actually made **to the Trustee**. The provision U.S. Bank cites, that intervening assignments need not be included in the Mortgage Files, is consistent with, and in no way overrides, the requirement discussed above, that the Mortgage Files must include assignments to the Trustee. *Brooke Group Ltd. v. JCH Syndicate 488*, 87 N.Y. 2d 530, 533 (N.Y. 1996) ("when interpreting a contract, the entire contract must be considered so as to give each part meaning"). Indeed, taken together, they require an assignment directly to the Trustee from one of the parties to the securitization, but not intervening assignments down each link in

the securitization chain. Accordingly, the Complaint adequately alleges that U.S. Bank breached its duty to review the Mortgage Files.

In addition, whether or not U.S. Bank performed the review, and whether or not it had liability for the Custodian's performance of the review, U.S. Bank still has a separate obligation to force the Seller to repurchase, substitute or cure mortgage loans with document deficiencies. (¶¶35-37) (PSA §§2.02(a), 2.02(b), ECF No. 24-3 at 52, 53; SSA §§2.02(a), 2.02(b); ECF No. 27-11 at 9, 10).  U.S. Bank insists that the Complaint does not allege that it breached this duty, because it does not allege specific mortgage loans that U.S. Bank knew to have document deficiencies. (Mem. at 16-17). This argument once again conflates the lenient pleading standard of Rule 8, which applies here, with the heightened standard of Rule 9(b). The Complaint alleges, among other things, that the Mortgage Files were riddled with document deficiencies – demonstrating as much with specific evidence – and that U.S. Bank either reviewed the Mortgage Files itself or received exception reports that may have detailed some of these deficiencies, that Federal and state investigations noted common document deficiencies, and, in just two of the Covered Trusts, there are numerous deficient outstanding loans. (¶¶57-69). Thus, the Complaint adequately alleges that U.S. Bank breached this duty.

In what amounts to an admission that the Covered Trusts contained numerous document deficiencies, U.S. Bank devotes an entire section of its Memorandum attempting to explain why it may still be able to foreclose on mortgage loans notwithstanding the existence of document deficiencies. (Mem. at 10-14). These after the fact rationalizations do not excuse U.S. Bank for breaching its express duties under the Governing Agreements, particularly not where the Servicer resorted to robo-signing or submitting false affidavits to overcome the document deficiencies. (¶¶53, 59).

3.      Plaintiff Alleges That U.S. Bank Failed To Act Prudently After An
        Event Of Default

Upon an Event of Default, the Governing Agreements require U.S. Bank to exercise its

rights and powers as a prudent person would under the circumstances.  (¶101).  U.S. Bank notes

that for those Covered Trusts governed by an Indenture, only the misconduct of the Issuer may

constitute an Event of Default (Indenture Definitions, ECF No. 27-9 at 30), but it does not deny

that the Complaint adequately alleges such conduct on the part of the Issuer.  (Mem. at 17-18).

U.S. Bank similarly notes that for those Covered Trusts governed by a PSA, only the misconduct

of the Master Servicer may constitute an Event of Default (PSA §8.01, ECF No. 24-3 at 113),

but again it does not deny that the Complaint adequately alleges such conduct on the part of the

Master Servicer.  (Mem. at 17-18).    The lone argument advanced as to why the Complaint

purportedly does not allege an Event of Default is that, according to U.S. Bank, the "trigger" for

an Event of Default did not occur.  (Mem. at 18).  To trigger an Event of Default, the misconduct

of the Issuer or Master Servicer must "continue[] unremedied for 60 days after the date on which

written notice of such failure, properly requiring the same to be remedied, ***shall have been given

to the Master Servicer by the Trustee or*** to the Master Servicer and the Trustee by the Holders

of Certificates evidencing Fractional Undivided Interests aggregating not less than 25% of the

Trust Fund."  (*Id*.) (PSA §8.01(ii), ECF No. 24-3 at 113; Indenture Definitions, ECF No. 27-9 at

30).  To the extent U.S. Bank is arguing that it did not have an obligation to provide notice of an

Event of Default to the Master Servicer or Issuer, notwithstanding that it had actual knowledge

of the Event of Default, U.S. Bank ignores the provisions of the Governing Agreements which

state that the Trustee shall be required to take notice of an Event of Default if its responsible

officers have actual knowledge thereof.  (PSA §9.01(d)(iv), ECF No. 24-3 at 118; Indenture

§6.01(h), ECF No. 27-7 at 46).    Moreover, such an argument would render the "actual

knowledge [provision] superfluous and would read a conflict into the contract," which, as another court in this District found in rejecting a substantially similar argument, "is contrary to well-established principles of contract construction." *BNP Paribas Mortg. Corp.*, 778 F. Supp. 2d at 397.

Alternately, if U.S. Bank is simply arguing that no Event of Default occurred because it never triggered an Event of Default by sending notice to the Master Servicer or Issuer, that argument fails under the "prevention doctrine." *See id.* (holding that indenture trustee was precluded from arguing that a condition precedent to its obligations had not occurred when it was the trustee's own breach that caused the failure of this condition). "It has been established for over a century that a party may not insist upon performance of a condition precedent when its non-performance has been caused by the party [it]self." *Bank of N.Y. v. Tyco Int'l Group*, 545 F. Supp. 2d 312, 324 n.81; *see also In re Bankers Trust Co.*, 450 F.3d 121, 129 (2d Cir. 2006) (indenture trustee's failure to inspect certificates may not excuse its failure to comply with the duty to give notice of defaults that would have been discovered had the indenture trustee inspected the certificates).

Thus the Complaint adequately alleges that U.S. Bank breached its duty to act prudently upon an Event of Default, because U.S. Bank took no action despite widespread breaches of representations and warranties and document deficiencies.  Likewise, as U.S. Bank never gave notice to MBS holders of Events of Default, it breached its obligation to do so.

### B.    Plaintiff Has Alleged Causation And Substantial Losses

#### 1.    The Covered Trusts Have Suffered Losses

Ignoring that Plaintiff has plainly alleged that it sold Bear Stearns MBS at a loss (¶¶1, 13), U.S. Bank asserts that "plaintiff cannot state an actionable claim for damages and lacks

standing to pursue a claim" because the tranches in which Plaintiff invested have suffered no principal losses to date. (Mem. at 19). As "proof," U.S. Bank attaches two "distribution summaries" from a website maintained by Wells Fargo, the securities administrator for the Trusts. However, the distribution summaries demonstrate that Plaintiff has stated a claim for relief for losses to MBS holders.

First, the distribution summaries reflect combined losses in the Trusts of nearly $97 million as of April 30, 2012. (*See* ECF Nos. 27-15, 27-16). These losses have grown to nearly $102 million as of June 25, 2012, the date of the most recent report.[9] Second, although they have thus far been absorbed by more junior tranches, these recognized losses have nevertheless necessarily reduced payments received to date by the senior tranches in the Trusts including the Class A-1 Certificates in the 2005-9 Trust and the Class I-3-A-1 Certificates in the 2005-12 Trust held by Plaintiff given the way the payment "waterfall" operates.[10] But for the losses incurred to date by the Trusts as a result of U.S. Bank's failure to review loan files and enforce put back rights, principal payments to date to senior tranches, including those held by Plaintiff, would have been greater.

Second, in addition to receiving lower principal payments than otherwise would have been received, the A-1 and I-3-A-1 tranches held by Plaintiff are all but certain to suffer losses as well, given the recognized losses and substantial existing delinquency rates in the Trusts to date. For example, junior tranches in the 2005-9 Trust have already suffered realized losses of nearly $42 million and there are only two tranches subordinate to the A-1 tranche with any remaining

---

[9] *See* Schwartz Decl. Exs. A & B. Indeed, losses have grown rapidly just in the few months this action has been pending.

[10] U.S. Bank fails to acknowledge this truth when it discusses the payments made by the Covered Trusts. (*See* Mem. at 19). It also fails to acknowledge that the safety net against losses provided by more junior tranches has been all but exhausted notwithstanding that half a billion dollars in principal payments are still owed to Class A-1 and Class I-3-A-1 investors collectively.

principal balance to absorb additional losses. (*See* Schwartz Decl. Ex. A at 1).[11]  However, these two tranches (A-2 and B-1) have a combined principal balance of just $25 million remaining. (*Id.*).  Indeed, the B-1 tranche, which had an original face amount of $24,250,000, has already absorbed more than $18 million in losses, a realized loss rate of over 75%.  (*Id.*).  At the same time, 77 loans in the 2005-9 Trust having a total principal balance of nearly $40 million are currently delinquent or in default.  (*Id.* at 9-10).  Moreover, 56 of these loans having a principal balance of almost $30 million have been delinquent for 180 days or more.  (*Id.* at 10.)  Thus, as the current Moody's rating of Caa1 for the A-1 tranche reflects (*see* Schwartz Decl. Ex. C), realized losses to the A-1 tranche from U.S. Bank's wrongdoing are inevitable.  It is simply a matter of time.

The same is true with respect to the I-3-A-1 tranche of the 2005-12 Trust.  The 2005-12 Trust has already suffered realized losses of more than $60 million.  (*See* Schwartz Decl. Ex. B at 1).  Given the structure of the waterfall in this Trust, there is only a single tranche (the I-3-A-2 tranche) subordinate to the I-3-A-1 tranche held by Plaintiff.  (*Id.*)  Significantly, this tranche has a remaining principal balance of just $2 million available to absorb additional losses.  (*Id.*).  At the same time, 14 loans serving as collateral for the Class I-3-A-1 tranche having a total principal balance of $8.4 million are currently delinquent or in default.  (*Id.* at 13).  Moreover, nearly all of these loans have been delinquent for 180 days or more.  (*Id.*).  Thus, as the current Moody's rating of Caa1 for the I-3-A-1 tranche reflects (*see* Schwartz Decl. Ex. D), losses to the Class I-3-A-1 tranche are also all but inevitable.  Thus the Complaint adequately alleges losses to the Trusts and the tranches held by Plaintiff.

2.    Plaintiff Properly Alleges Damages Based On MBS' Loss In Value

---

[11] Significantly, the realized losses of the B-2 through B-6 tranches ranged from 98-99% based on the information in the distribution summaries. ( *Id.*)

U.S. Bank also argues that it cannot be liable for the diminution in the value of the MBS because the Governing Agreements expressly provide that the Trustee is not liable for consequential damages.   In addition, U.S. Bank argues that a damages theory based on diminution in the value of the MBS is unavailable because the relevant prospectuses warned investors that there was no secondary market for the MBS and, therefore, they might not be resalable.  Both of these arguments fail.

First, U.S. Bank's argument that the Governing Agreements and prospectuses limit the damages available to Plaintiff for violation of the TIA must be rejected.   In *Employees' Retirement System of the Government of the Virgin Islands v. J.P. Morgan Chase & Co.*, 804 F. Supp. 2d 141 (S.D.N.Y. 2011), defendants made the identical argument made by U.S. Bank in this case – *i.e.*, "that the only cognizable loss that can be suffered by an investor in an asset-backed security is a failure to receive the pass-through payments guaranteed to holders, [and] . . . [b]ecause there is no guarantee that a market for the securities will exist or that resale prices will remain stable . . . a drop in market value is insufficient." *Id.* at 155-56.  This Court rejected these contentions citing "'the well-established rule that "individual security holders may not be forced to forego their rights under the federal securities laws due to a contract provision.'"  *Id.* at 155 (quoting *McMahan & Co. v. Wherehouse Entmt., Inc.*, 65 F.3d 1044, 1051 (2d Cir. 1995)).[12] Thus, Plaintiff cannot be precluded from pursuing whatever damages are available to it under the TIA.  As Judge Mukasey held in *LNC Investments, Inc. v. First Fidelity Bank*, No. 92 Civ. 7585 MBM, 1997 WL 528283, at *34 (S.D.N.Y. Aug. 27, 1997), "the TIA is part of the broad federal

---

[12] This Court's decision in *Employees' Retirement System of the Government of the Virgin Islands v. J.P. Morgan Chase & Co.* is directly contrary to Judge Cedarbaum's decision in *NECA-IBEW Health & Welfare Fund v. Goldman, Sachs & Co.*, 743 F. Supp. 2d 288, 291 (S.D.N.Y. 2010), on this point, which is cited by U.S. Bank.  The latter decision was appealed and the Second Circuit heard argument on February 3, 2012.

securities scheme" and, therefore, Plaintiff is entitled to enforce its right to damages under the TIA irrespective of the language of the Governing Agreements or prospectuses.  *See also Genesee Cty. Emps.' Ret. Sys. v. Thornburg Mortg. Secs. Trust 2006-3*, 825 F. Supp. 2d 1082, 1148 (D.N.M. 2011) (statements in prospectus cannot limit the remedies available to a purchaser of securities under the federal securities laws).

The measure of damages for violation of the TIA is set forth in its Section 323(b), which provides that "no person permitted to maintain a suit for damages under the provisions of this subchapter shall recover, through satisfaction of judgment in one or more actions, a total amount in excess of his actual damages on account of the act complained of."  15 U.S.C. §77www(b).  In *LNC Investments, Inc.*, Judge Mukasey held that plaintiffs suing a trustee for violation of its prudent man duties under the TIA were entitled to recover their out-of-pocket losses – *i.e.*, the difference between what they paid for the MBS and the value that they received.  1997 WL 528283, at *34.  In this regard, Judge Mukasey observed that Section 28(a) of the Securities Exchange Act of 1934, like Section 323(b) of the TIA, limits a plaintiff's recovery to actual damages and that actual damages under the Exchange Act are measured by out-of-pocket losses. *Id.*  Accordingly, the diminution in value of Plaintiff's MBS is recoverable as actual damages under the TIA provided Plaintiff can establish a causal link between U.S. Bank's violation of its duties and that decline in value.

Second, U.S. Bank's argument that the diminution in the value of the MBS constitutes "consequential" damages that are not recoverable under the Governing Agreements is also unavailing.  Consequential damages are "'[l]osses that do not flow directly and immediately from an injurious act, but that result indirectly from the act.'"  *Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas*, No. 04 Civ. 10014 PKL, 2009 WL 3111766, at *10

(S.D.N.Y. Sept. 28, 2009), quoting BLACK'S LAW DICTIONARY 445-46 (9th ed. 2009).  Whether damages claimed in a contract action are direct or consequential is an issue of fact that "must be left for resolution at trial."  *American Elec. Power Co., Inc. v. Westinghouse Elec. Corp.*, 418 F. Supp. 435, 459-60 (S.D.N.Y. 1976); *see also Rensselaer Polytechnic Institute v. Varian, Inc.*, 340 Fed. Appx. 747, 750-51 (2d Cir. 2009) (vacating grant of summary judgment and remanding for trial on damages holding that a genuine issue of material fact remained as to whether claimed damages were direct or consequential and, therefore, recoverable under the contract).  Moreover, "[a] defendant may be estopped from asserting a contractual limitation of consequential damages if, [as in this case,] the defendant has acted in bad faith."  *Long Island Lighting Co. v. Transamerica Delaval, Inc.*, 646 F. Supp. 1442, 1458 (S.D.N.Y. 1986).

Here, the value of the MBS purchased by Plaintiff and Class members was directly dependent on the performance of the Covered Trusts.  (¶¶21, 23).  Thus, U.S. Bank's failure to put back loans to the Seller directly impacted the price of the MBS and the alleged diminution in value of the MBS constitutes direct rather than consequential damages.  At a minimum, under New York law, this is a factual issue that cannot be decided by this Court on a motion to dismiss.

### 3.   Plaintiff Has Adequately Alleged Causation

U.S. Bank next argues that the Complaint does not allege that U.S. Bank's violations of its statutory and contractual duties caused a diminution in the value of the MBS and reduced principal and interest payments to the Covered.  First, U.S. Bank contends that Plaintiff has failed to allege a public disclosure that caused the price of the MBS to decline.  Next, U.S. Bank contends that Plaintiff has failed to allege that inadequate documentation in Mortgage Files caused reduced principal and interest payments to the Covered Trusts.  These arguments lack merit.

As an initial matter, the argument that Plaintiff has failed to point to a public disclosure causing a decline in the Certificates' value erroneously attempts to import a Rule 10b-5 damage analysis, which focuses on stock price reaction when the truth is revealed, into this case for violation of the TIA and breach of contract.   However, the value of the MBS at issue here depends on *the performance* of the Covered Trusts – specifically, whether they are making, and are likely to continue to make, scheduled principal and interest payments and yield the promised rate of return.   (¶¶21, 23).   The Trustee's failure to enforce repurchase rights and its inability to foreclose on collateral as a result of documentation defects clearly impacts that performance, because those failures reduce the amount of money flowing into the Covered Trusts for distribution to MBS holders.   While U.S. Bank may attempt to disprove Plaintiff's allegations of loss causation at a later stage in these proceedings by pointing to what it characterizes as "the real estate market collapse," Plaintiff's loss causation allegations are nevertheless plausible and suffice at the pleading stage.   *See Gen. Ret. Sys. of City of Detroit v. UBS, AG*, 799 F. Supp. 2d 749, 760 (E.D. Mich. 2011) (applying New York contract law and rejecting argument that plaintiff was required to show at the pleading stage that defendant's discharge of its contractual obligations "would have been able to overcome the credit collapse and the coinciding deterioration of the market for asset–backed securities.").[13]   Accordingly, U.S. Bank's motion to dismiss on this basis must be denied.[14]

---

[13] Thus, U.S. Bank's reliance on *Luminent Mortgage Capital, Inc. v. Merrill Lynch & Co.*, 652 F. Supp. 2d 576 (E.D. Pa. 2009), is misplaced.  As the court observed in *General Retirement Sys.*, 799 F. Supp. 2d at 761, *Luminent* was a securities fraud case and the plausibility pleading standard applicable to Plaintiff's loss causation allegations "'does not impose a probability requirement at the pleading stage.'"  *Id.* (quoting *Twombly*, 550 U.S. at 556).

[14] U.S. Bank's characterization of allegations that its breaches of duty caused reduced principal and interest payments to MBS holders as "speculative, contradicted by Plaintiff's allegations, and implausible" (*see* Mem. at 22) fails for the same reasons.

Next, U.S. Bank argues that other allegations in the Complaint undercut the allegations that U.S. Bank's breaches were responsible for reduced principal and interest payments to the Covered Trusts.  U.S. Bank makes two arguments in support of this erroneous contention.  First, it argues that "Plaintiff has not stated that a *single* loan in one of the Trusts has been adversely impacted [*i.e.*, could not be foreclosed upon] because of the alleged breaches."  (Mem. at 22 (emphasis in original)).   However, this argument ignores the Complaint's allegations that incomplete loan files "have delayed foreclosures, contributing to delinquencies in the payments owed to the Cover[ed] Trusts."  (¶ 80).  It also ignores completely the Complaint's allegations that U.S. Bank's failure to put back loans that breached the Seller's representations and warranties has reduced principal and interest payments to the Covered Trusts.  (*Id.*).

Second, U.S. Bank points to the Complaint's allegations that the value of MBS, and their credit ratings, depend primarily on the riskiness of the underlying mortgages.  In particular, U.S. Bank characterizes the allegations regarding Bear Stearns' breaches of its representations and warranties regarding the loans in the pools as a concession that these factors, and not any alleged breach on the part of the Trustee, were the cause of Plaintiff's losses.  These contentions are nonsensical.  To the extent the Seller improperly included risky loans in the Covered Trusts that breached its representations and warranties, U.S. Bank, as Trustee, had an obligation to put back those loans to the Seller.  The Complaint plausibly alleges that U.S. Bank's failure to enforce the Covered Trusts' put back rights caused Plaintiff's losses.[15]

## III.    The TIA Applies To All Of The Covered Trusts

---

[15] In a footnote, U.S. Bank argues that Plaintiff's claim for breach of the implied covenant of good faith and fair dealing should be dismissed as duplicative of its breach of contract claim.  *See* ECF No. 26 at 23 n.33.  However, an analogous claim for breach of the implied covenant in litigation brought by insurer MBIA against Countrywide Home Loans was denied by Justice Bransten.  *See MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, No. 602825/08, 2009 WL 2135167 (N.Y. Sup. Jul. 8, 2009).  Accordingly, U.S. Bank's motion to dismiss Plaintiff's third cause of action for breach of the implied covenant of good faith and fair dealing should be denied.

The TIA itself and its legislative history make clear that the abuses which led to its enactment are the exact abuses at issue in this case.  In this regard, Section 302(a)(2) of the TIA, 15 U.S.C. §77bbb(a)(2), provides in pertinent part that:

(1)  Upon the basis of facts disclosed by the reports of the Securities Exchange Commission made to the Congress . . . it is hereby declared that the national public interest and the interest of investors in notes, bonds, debentures, evidences of indebtedness, and certificates of interest or participation therein, which are offered to the public, are adversely affected –

(2)  when the trustee does not have adequate . . . duties and responsibilities, in connection with matters relating to the protection and enforcement of the rights of such investors; when, notwithstanding the obstacles to concerted action by such investors, and the general and reasonable assumption by such investors that the trustee is under an affirmative duty to take action for the protection and enforcement of their rights, trust indentures (A) generally provide that the trustee shall be under no duty to take any such action, even in the event of default, unless it receives notice of default, demand for action, and indemnity, from the holders of substantial percentages of the securities outstanding thereunder, and (B) generally relieve the trustee from liability even for its own negligent action or failure to act; . . .

Significantly, the TIA finds that these abuses are "injurious to the capital markets, to investors, and to the general public," and so declares "it . . . to be the policy of this subchapter, ***in accordance with which policy all the provisions of this subchapter shall be interpreted***, to meet the problems and eliminate the practices, enumerated in this section, connected with such public offerings."  Section 302(b), 15 U.S.C. §77bbb(b) (emphasis added).

The SEC Report (Schwartz Decl. Ex. E), which was one of the reports referenced in Section 302 that led to the enactment of the TIA and was authored in large part by William O. Douglas and Abe Fortas, essentially describes the relationship between MBS holders and U.S. Bank.  Specifically, the SEC Report observed that due to collective action requirements "both in law and in practice, [the] reliance of the security holder upon the trustee for protection of his investment [wa]s complete."  (SEC Report at 3).  The SEC concluded, however, that this reliance [was] "unfounded" because trustees "ha[d] taken virtually all of the powers designed to protect

the bondholders, but ha[d] rejected any duty to exercise them" (*id.* at 4) even though the trustee "alone [wa]s capable of effective action." (*Id.* at 5).

Indeed, the SEC Report observed that trustees had "neglected to perform even the negligible duties which the indenture place[d] upon them, ***particularly in matters which [would] result in default of the issuer***," and that "[i]t [wa]s . . . virtually standard practice to provide in indentures that the trustee [could] shut its eyes to the existence of a default unless it [wa]s formally notified of it by holders of a specified percentage of the outstanding bonds," a difficult, if not impossible task. (*Id.* at 31-32, 38) (emphasis added). Even then, the SEC noted there was a "further barrier" because "the trustee h[ad] no obligation to take any action which in its opinion [was] likely to involve it in expense or liability unless the security holders furnish[ed] it with indemnity." (*Id.* at 43). Such inaction, the SEC observed, threatened security holders with "[i]rreparable loss . . . clearly traceable to the trustee's inaction." (*Id.* at 45, 47).

Noting that all of the foregoing had "resulted in injury to thousands of investors," the SEC concluded that "certain minimum standard specifications" needed to be prescribed for the protection of investors in securities such as these "[a]s in the case of other contracts involving persons not capable nor in a position to protect themselves." (*Id.* at 3, 6). According to the SEC, "a more proper balance between the interests of investors and requirements of issuers [could] be had only by enlarging the definition of the trustee's duties in those cases where its failure to take swift and positive action [left] the investors without effective protection of their interests." (*Id.* at 6). Congress codified that balance in the TIA.

### A.   Certificates, Like Notes, Are Debt Securities

The TIA's purpose and plain language dictate that MBS fall within its purview. U.S. Bank acknowledges as much with regard to MBS styled as "Notes." (Mem. at 28). There is no

difference between MBS styled as Notes and MBS styled as "Certificates."   Both are debt securities, as numerous courts have recognized.   The Second Circuit found that PSAs governing MBS Trusts are "similar to bond indentures," *Greenwich Fin. Servs. Distressed Mortg. Fund 3 LLC v. Countrywide Fin. Corp.*, 603 F.3d 23, 29 (2d Cir. 2010), and that MBS Certificates are "bonds."   *LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 200 (2d Cir. 2005).   Courts in this district have also repeatedly held that Certificates "are debt securities." *E.g. Bank of New York Mellon*, 2012 WL 1108533 at *6; *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 182 (S.D.N.Y. 2011).[16]

Notably, U.S. Bank does not cite any contrary authority.   Moreover, it is worth noting that the SEC – upon whom U.S. Bank relies in other parts of its Memorandum – recently stated that MBS, issued under PSAs as certificates are "debt obligations."   *United States Securities and Exchange Commission v. Option One Mortgage Corp. n/k/a Canyon Corp.*, 8:12-cv-00633-JST, ECF No. 1 at ¶20 (C.D. Cal. Apr. 24, 2012) (complaint); *see also* www.sec.gov./litigation/litreleases/2012/lr22344.htm.

This conclusion is fully supported by the characteristics of the Bear Stearns MBS styled as Notes and those labeled Certificates.   Just like the Notes, Certificates make "principal" and "interest" payments on a fixed "distribution date".   (*E.g.* PSA §§ 5.01(c)(i), 5.01(c)(ii), 5.01(c)(iii), Definitions-Distribution Date, ECF No. 24-3 at 77, 79,  80-81, 14.   The Prospectus Supplement for the 2005-12 Trust, which issued Certificates, states that on each distribution date Certificate holders "will receive a distribution of principal on their certificates if there is cash available on that date for the payment of principal," and will also be "entitled to receive: the

---

[16] *Trust for Certificate Holders of Merrill Lynch Mortgage Pass-Through Certificates Series 1999-C1 v. Love Funding Corp.*, No. 04-cv-9890, 2005 WL 2582177, at *1 (S.D.N.Y. Oct. 11, 2005); *In re Security Capital Assur. Ltd., Sec. Litig.*, 729 F. Supp. 2d 569, 575 (S.D.N.Y. 2010) (MBS are "debt securities"); *CWCapital Asset Mgt., LLC v. Chicago Prop., LLC*, 610 F.3d 497, 499 (7th Cir. 2010) (Certificates issued under a PSA are "bonds") (Posner, J.).

interest that has accrued on the current principal amount of such certificates . . . ."  (Schwartz Declaration, Ex. G, at S-13).  The Prospectus Supplement for the 2005-9 Trust, which issued Notes, uses virtually the exact same language to describe the payments to Note holders. (Schwartz Declaration, Ex. F, at S-8, S-9).[17]

An Event of Default under the Notes also has the same practical effect as an Event of Default under the Certificates.  As the Indenture states, "[n]o recourse may be taken, directly or indirectly, with respect to the obligations of the Issuer . . . ."  (Indenture § 10.14, ECF No. 27-8 at 20).  This means that Notes are nonrecourse debt, and when they default on a payment, Note holders can only look to the assets of the Covered Trusts for recovery.  Those assets simply consist of the underlying mortgage loans, and Note holders have no right to make mortgagors deliver payments they do not owe or to foreclose on mortgages that have not defaulted.  The only "benefit" a Note holder receives from an Event of Default is a Trustee with a heightened duty to exercise its power to force the Seller to repurchase defective mortgages, which the Trustee should have been doing in any event.  *Supra* at 17-18.  Certificate holders end up in that precise position after an Event of Default.  *Id*.

Notes and Certificates are debt not because they guarantee that their holders will receive their principal balance under any conceivable eventuality (*see* Mem. at 30), but because they create "reasonable expectations" that their holders will do so.  *E.g. TIFD III-E, Inc. v. U.S.*, 459 F.3d 220, 222 (2d Cir. 2006).  Here, that expectation was created by, among other things, applying an "AAA" credit rating to most of the Notes and most of the Certificates.  (Schwartz Dec. Ex. G, at S-86) (ratings "address the likelihood of the receipt by certificateholders of all

---

[17]   On each payment date Note holders "will receive a distribution of principal on their notes if there is cash available on that date for the payment of principal . . ." and will also be "entitled to receive: the interest that has accrued on the note principal balance of such notes. . . ." (*Id*.)

distributions to which the certificate holders are entitled"); (Schwartz Decl. Ex. F, at 53) (same). The possibility that Notes and Certificates ultimately might not perform does not mean that they are not debt, to the contrary debt instruments offer interest to compensate for that very risk. *Fasolino Foods Co., Inc. v. Banca Nazionale del Lavoro*, 961 F.2d 1052, 1057 (2d Cir. 1992). Moreover, "nonrecourse debt," such as Notes and Certificates, are a well recognized category of debt instruments in which the borrower "is not personally liable for the debt on default . . . [and] the creditor's recourse is to repossess the related [collateral]." *E.g., Rose v. C.I.R.*, 311 Fed. Appx. 196, 198 n.3 (11th Cir. 2008); *Bank of New York Mellon*, 2012 WL 1108533 at *6 (rejecting the sum certain and nonrecourse arguments advanced by U.S. Bank).

The mere act of affixing one label to an MBS as opposed to another has no power to change the actual, substantive characteristics of the MBS.  (*See* Mem. at 29).  As the Second Circuit explained in holding that a "lender cannot evade the usury statute by a disguise," "courts never permit a form to shield illegality or statutes to be evaded by sham or pretense." *Topping v. Trade Bank of New York*, 86 F.2d 116, 118 (2d Cir. 1936).  That is especially true here, because "[t]he interpretation of the indenture provisions mandated by the [TIA] does not depend on ordinary contract principles – the intent of the parties – but depends on an interpretation of the legislation." *Bluebird Partners, L.P.*, 85 F.3d at 974 (internal quotation omitted); *Bank of New York Mellon*, 2012 WL 1108533, at *5.

### B.    Certificates, Like Notes, Are Subject To The TIA

For the same reasons, 15 U.S.A. §77ddd(b), which, under certain circumstances, exempts certificates of interest from the TIA, does not apply to the Certificates here.

The TIA addresses "certificates of interest" separately from "notes," "bonds" and "evidences of indebtedness."  *Compare* 15 U.S.C. §§77ddd(a)(1)(B) and 77ddd(a)(2), *with* 15

U.S.C. §77ddd(a)(1)(A).  This indicates that for purposes of the TIA, the term "certificates of interest" refers to securities with some substantive difference from "notes," "bonds" and "evidences of indebtedness," and not just a different label.  The TIA's legislative history affirms as much, and explains that Congress made certificates of interest subject to the TIA under 15 U.S.C. §77ddd(a)(1)(B) because, "[p]ractical considerations . . . demand their inclusion, [otherwise] adoption of the certificate of interest device would provide too easy a method of avoiding the requirements of the [TIA]."  H.R. Rep. No. 1016, at 41 (1939).

If adoption of the substantive certificate of interest device is by itself insufficient to exempt securities from the TIA, then affixing the title "certificate of interest" or "certificate" to a security that is substantively a note or a bond is surely insufficient as well.  Any other interpretation is impermissible, as contrary to the TIA's purpose of protecting investors in debt securities from abuses by trustees and protecting the national interest against harm from those abuses – such as the well-documented role that the hundreds of billions of dollars worth of MBS certificates have, due in part to the conduct of U.S. Bank and other MBS trustees, played in the nation's recent economic crisis.  15 U.S.C. §77bbb(b).  Indeed, there would be little point in Congress enacting the TIA, or any other legislation, if its laws could be so easily evaded.  Although U.S. Bank urges that result, it has of course engaged in the very abuses the TIA seeks to eliminate.  Accordingly, given that certificates are indistinguishable from debt, they are subject to the TIA as debt securities under 15 U.S.C. §77ddd(a)(1)(A), irrespective of their label.

Even if the Certificates were true certificates of interest, they would still not be exempt from the TIA under 15 U.S.C. § 77ddd(a)(2) (*see* Mem. at 30-31), because they would not be certificates of interest in "two or more securities."  Certificates do not provide for a right to, nor do they depend on, proceeds from any specific underlying mortgage, rather they provide for a

right to payments from an entire group or pool of mortgages.  (Schwartz Decl. Ex. G, at S-10).

Moreover, Certificates do not receive a pro rata share of the proceeds from any mortgage, or

even any group or pool of mortgages.  Instead, those proceeds are divided among the MBS

holders through a complex waterfall.  Certificates do not even receive all of those proceeds.

Further, after all the other Certificate holders receive the payments they are entitled to each

month, the "Residual Certificate," or "Class R," holder receives any excess that funds that the

Covered Trusts may have collected.  (*See* PSA § 5.01(c)(i), ECF No. 24-3 at 77).  This further

demonstrates that Certificates are debt.  But it also shows that if they were certificates of interest,

they would provide an interest in the single group or pool of mortgages from which they collect

proceeds.  Based on the foregoing reasoning, *Bank of New York Mellon* concluded that MBS

certificates did not represent an interest in two or more securities, and that they were not exempt

from the TIA under 15 U.S.C. § 77ddd(a)(2).  2012 WL 1108533, at *8.

U.S. Bank's suggestion that the underlying mortgages have substantially different rights,

and that Certificates therefore fall within 15 U.S.C. §77ddd(b) is thus irrelevant.  (Mem. at 31).

It is also inaccurate, as the fact that mortgages may not have the same scheduled payments or

relate to the same property is immaterial as compared to the fact that they are all obligated to

make interest payments to and face foreclosure from the Covered Trusts.  The rights provided by

the mortgages are in truth substantially similar.  Under any of the foregoing scenarios, the TIA

applies to Certificates.

## C.        No Regulatory Guidance Supports Exempting Certificates From The TIA

Unable to muster a single case, U.S. Bank resorts to citing several informal sources.

First, it pulls a quote from the website of the SEC's Division of Corporation Finance, and

rearranges a few sentences to provide as much heft as this informal, five sentence, conclusory

statement from the Division's staff will bear.  (Mem. at 32).  Then U.S. Bank neglects to mention

that this quote follows a warning that statements on the Division's website "are not rules,

regulations, or statements of the Commission," "do not necessarily contain a discussion of all

material considerations necessary to reach the conclusions stated," and thus "are not binding due

to their highly informal nature."   (http://sec.gov/divisions/corpfin/cfguidance.shtml).   The

Division could not have explained with any greater force that the statement merits no deference.

Accordingly, *Bank of New York Mellon* refused to do so.  2012 WL 1108533, at *6.

Second, U.S. Bank refers to a supposed first RMBS deal in 1977 that the SEC did not

stop.  (Mem. at 33).  The No-Action Letter that describes that deal does not, however, conclude

that the certificates were not debt or that they were exempt from the TIA under 15 U.S.C.

§77ddd(a)(2).   *Bank of Am. Nat'l Trust and Sav. Ass'n*, 1977 WL 14664 (SEC No-Action Letter

May 19, 1977).  To the contrary, counsel for Bank of America urged that the certificates were

exempt from the TIA under 15 U.S.C. §77ddd(a)(4) – which specifically exempts securities that

need not be registered under the Securities Act from the TIA.  *Id*.  at *1.  The other No-Action

letters U.S. Bank cites offer no more help to its position:

- *Harbor Fin., Inc.*, 1988 WL 235128, at *1, similar to *Bank of Am*., did not recommend
  enforcement action due to "the exemption from registration under the Securities Act."

- *Citytrust*, 1990 WL 305069, does not even request a no-action determination with respect
  to the application of the TIA, but rather to the Investment Company Act.

- *Marion Bass Sec., Inc.*, 1984 WL 45531, involved certificates that evidenced interests in
  a proposed pool that consisted primarily of industrial development bonds, some of which
  were secured by "personal property."  *Id*. at *5.  The certificates did not receive a credit
  rating, nor is there any indication that they made principal or interest payments.  *Id*. at *3.

- Each of the four letters also states that it merely "expresses the Division's positions on
  enforcement action and does not purport to express any ***legal conclusion*** . . ."  *See, e.g.,*
  *Marion Bass Sec.*, 1984 WL 45531, at *1(emphasis added).

That MBS Certificates were offered publicly without being qualified under the TIA does not help U.S. Bank either.  Assuming that the SEC actually made a decision not to stop those offerings, it was merely applying the unpersuasive interpretation of the Division of Corporation Finance that *Bank of New York Mellon* already found unworthy of deference.  Such a decision, unsupported by any other statement, has no additional power to persuade, and similarly merits no deference.  Nor does that decision merit deference simply owing to its repetition over the passage of time.  Courts regularly deny deference to statements that are "longstanding" and "consistent" if they are not otherwise persuasive.  *St. Martin Evangelical Lutheran Church v. South Dakota*, 451 U.S. 772, 784 n.13 (1981); *S.E.C. v. Sloan*, 436 U.S. 103, 118 (1978) (refusing to defer to an interpretation that an agency held consistently for over 30 years, because the interpretation, "though of long standing, is . . . inconsistent with the statutory mandate").

Indeed, when faced with a question of statutory interpretation, a court must independently determine whether the statute at issue is unambiguous.  *Chevron, U.S.A., Inc. v. Natural Resources Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984).  If it is unambiguous, and if an agency's "interpretation is inconsistent with the plain language of the [statute]," then the agency's interpretation is "not entitled to *Chevron* deference" or any other form of deference. *Natural Resources Defense Council v. Abraham*, 355 F.3d 179, 198-99 (2d Cir. 2004).  Even assuming that the TIA is ambiguous, which it is not, an informal interpretation by the SEC only merits "respect proportional to its 'power to persuade.'"  *U.S. v. Mead Corp.*, 533 U.S. 218, 235 (2001) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). The persuasiveness of such an interpretation depends on "its writer's thoroughness, logic, and expertness, its fit with prior interpretations, and any other sources of weight."  *Id*. at 235.  Under that standard, the Second Circuit has refused to defer to agency statements, such as those U.S. Bank cites, that "offer[] no

explanation of the considerations or reasoning underlying its practice, except perhaps [a] conclusory statement . . . ."  *Boykin v. Keycorp*, 521 F.3d 202, 208-09 (2d Cir. 2008); *De La Mota v. The U.S. Dept. of Ed.*, 412 F.3d 71, 80 (2d Cir. 2005).

   *Community Health Ctr. v. Wilson-Coker*, 311 F.3d 132 (2d Cir. 2002) is consistent with the foregoing cases.  (*See* Mem. at 33-34).  It involved the Medicaid statute, which the court described as a "vast program[]."  *Id*. at 134.  The court also found that the agency interpretation at issue there was consistent with Medicaid's "background principles" and "overall design."  *Id*. at 138-39.  Assuming that the TIA possesses Medicaid's unusual size and complexity, and resulting legislative gaps, which it does not, *Community Health* does not support deference in this case, because the agency interpretation Defendant champions here undermines the TIA's clear language and purpose, without offering any reason for doing so.[18]

## IV.   The Complaint States A Claim For Violation Of The TIA

   The TIA requires U.S. Bank to provide notice of defaults, under 15 U.S.C. § 77ooo(b), and to act prudently upon an Event of Default, under 15 U.S.C. § 77ooo(c).  U.S. Bank does not dispute that if an Event of Default occurred under the Governing Agreements, the Complaint adequately alleges a violation of the two foregoing provisions.  (Mem. at 26-27).  The Complaint adequately alleges an Event of Default.  *Supra* at 17-18.  Accordingly, as in *Bank of New York Mellon*, Plaintiff adequately alleges violations of those TIA provisions.  2012 WL 1108533, at *8-*9.

## CONCLUSION

   For the foregoing reasons, the Court should deny U.S. Bank's Motion to Dismiss.

---

[18] For the reasons stated above, the informal letter from the Department of Labor cited by U.S. Bank merits no deference either, and it is also irrelevant.  (Mem. at 34).  Likewise, the treatises U.S. Bank invokes offer up *ipse dixit* by authors who typically represent or represented Trustees and other parties to securitizations.  If they offered anything else, U.S. Bank would have cited it in the Memorandum.

Dated:  July 13, 2012                    SCOTT+SCOTT LLP


                                         /s/ Max R. Schwartz
                                         David R. Scott (DS 8053)
                                         Beth A. Kaswan (BK 0264)
                                         Deborah Clark-Weintraub (DW6877)
                                         Max Schwartz (MS 2517)
                                         500 Fifth Avenue, 40th Floor
                                         New York, NY 10110
                                         Telephone:  212-223-6444
                                         Facsimile:  212-223-6334

                                         *Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served this 13th day of July, 2012 upon

counsel for Defendant via ECF:

Michael S. Kraut
John M. Vassos
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY  10178

*Counsel for Defendant*

SCOTT+SCOTT LLP

/s/ Max R. Schwartz
David R. Scott (DS 8053)
Beth A. Kaswan (BK 0264)
Deborah Clark-Weintraub (DW6877)
Max Schwartz (MS 2517)
500 Fifth Avenue, 40th Floor
New York, NY 10110
Telephone:  212-223-6444
Facsimile:  212-223-6334

*Counsel for Plaintiff*

37