**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

─────────────────────────────────

**OKLAHOMA POLICE PENSION AND**
**RETIREMENT SYSTEM,**

     **Plaintiff,**

   - against -

**U.S. BANK NATIONAL ASSOCIATION,**

     **Defendant.**

─────────────────────────────────

      **11 Civ. 8066 (JGK)**

      <u>OPINION AND ORDER</u>

**JOHN G. KOELTL, District Judge:**

   This case is part of the fallout from the residential mortgage crisis.  The plaintiff, Oklahoma Police Pension and Retirement System, brings this putative class action against the defendant, U.S. Bank National Association ("U.S. Bank"), the trustee for fourteen trusts in which the plaintiff and the other members of the putative class invested (the "Covered Trusts").  The trusts own residential mortgage loans that were pooled and sold together as Bear Stearns mortgage backed securities ("MBS").  The plaintiff alleges that the defendant failed to fulfill its obligations as trustee for the Covered Trusts.  Specifically, the plaintiff alleges violations of the Trust Indenture Act of 1939 ("TIA"), 15 U.S.C. § 77aaa <u>et</u> <u>seq.</u> (2006), breaches of contract, and breaches of the implied covenant of good faith and fair dealing under New York law.  The plaintiff

seeks damages for the losses it claims to have incurred due to those alleged breaches.

The defendant has moved to dismiss the Corrected Second Amended Class Action Complaint ("the Complaint") arguing that the plaintiff lacks class standing and that the Complaint fails to state a claim on the merits.  Among other arguments, the defendant contends that nine of the fourteen Covered Trusts are not governed by the TIA.

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 based on alleged violations of the TIA.  The Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 based on the complete diversity of citizenship of the parties.

For the reasons explained below, the motion to dismiss is **granted in part and denied in part.**

**I.**

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts the allegations in the Complaint as true, and draws all reasonable inferences in the plaintiff's favor. McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007); Arista Records LLC v. Lime Group LLC, 532 F. Supp. 2d 556, 566 (S.D.N.Y. 2007).  The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at

2

a trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985). The Court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). While the Court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Id.

When presented with a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents that are referenced in the Complaint, documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit, or matters of which judicial notice may be taken. See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002); City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc., 814 F. Supp. 2d 395, 402 (S.D.N.Y. 2011); see also In re ProShares

Trust Secs. Litig., No. 09 Civ. 6935, 2012 WL 3878141, at *1-2
(S.D.N.Y. Sept. 7, 2012).

## II.

The Court accepts the plaintiff's allegations in the
Complaint as true for the purposes of this motion to dismiss.
The plaintiff is a state governmental pension fund authorized
under the laws of the state of Oklahoma to provide retirement
benefits to its members and their beneficiaries.  (Second
Amended Complaint ("Compl.") ¶ 13.)  The defendant is a national
banking association organized under the laws of the United
States and is the trustee for the Covered Trusts.  (Compl.
¶ 15.)

The plaintiff invested in trusts that own residential
mortgage loans that were bundled together and sold to investors
as Bear Stearns MBS.  (Compl. ¶ 1.)  The plaintiff held
interests in Bear Stearns ARM Trust 2005-9 and Bear Stearns ARM
Trust 2005-12.  (Shanker Decl. Exs. C ("Prospectus Supp. 2005-
12") & D ("SSA"); see Compl. ¶¶ 1, 55.)  The Bear Stearns ARM
Trust 2005-12 contains eight groups.  (Prospectus Supp. 2005-12
at S-7.)  The plaintiff invested in certificates in Group I-3;
thus, the plaintiff is entitled to distributions from the 2005-
12 Trust only from Group I-3.  (Prospectus Supp. 2005-12 at S-7,
S-8.)

The other members of the putative class purchased "the same or substantially similar Bear Stearns MBS. . . ." (Compl. ¶ 14.)  The Covered Trusts are Bear Stearns ARM Trusts or Bear Stearns Alt-A Trusts for which U.S. Bank served as trustee.[1] (Compl. ¶ 1.)  The MBS held by the plaintiff and other members of the class share the same trustee, sponsor, master servicer, and substantially similar governing agreements.  (Compl. ¶ 14.)

A Pooling and Servicing Agreement ("PSA") governs the trusts that issued certificates.  An Indenture governs the trusts that issued notes.[2]  Together with related agreements, the Complaint refers to the PSA and Indenture as the "Governing Agreements." (Compl. ¶ 2.)  The Governing Agreements provide that they shall be construed in accordance with the laws of the State of New York and that any dispute arising under the Governing Agreements shall be determined in accordance with the

---

[1] The Covered Trusts are as follows: Bear Stearns ARM 2005-1, Bear Stearns ARM 2005-2, Bear Stearns ARM 2005-3, Bear Stearns ARM 2005-4, Bear Sterns ARM 2005-5, Bear Stearns ARM 2005-6, Bear Stearns ARM 2005-7, Bear Stearns ARM 2005-9, Bear Stearns ARM 2005-10, Bear Stearns ARM 2005-11, Bear Stearns ARM 2005-12, Bear Stearns ARM 2006-1, Bear Stearns ARM 2006-2, and Bear Stearns ALT-A 2006-3.  (Compl., Ex. A.)

[2] Each certificate has its own PSA and each note has its own Indenture.  However, the parties do not dispute that the PSA attached as Exhibit A of the Shanker Declaration and the Indenture attached as Exhibit B of the Shanker Declaration are representative of the Indentures and PSAs at issue.  Thus, this opinion will reference the "Indenture" for the indentures that govern the notes and the "Pooling and Service Agreement ("PSA") for the PSAs that govern the certificates.

laws of the State of New York.  (Shanker Decl. Ex. A ("PSA")
§ 12.06; Shanker Decl. Ex. B ("Indenture") § 10.11.)

As trustee, U.S. Bank allegedly owed the plaintiff and
other putative class members statutory duties under the TIA and
contractual duties under the Governing Agreements.  The
defendant owed the same duties to all the putative class members
as trustee for the Covered Trusts.[3]  (Compl. ¶¶ 2, 14.)  The
plaintiff alleges that, as part of a "common scheme and course
of conduct," the defendant "systematically failed to perform"
its duties as trustee.  (Compl. ¶ 14.)

The plaintiff has brought this action alleging violations
of the TIA, breaches of contract, and breaches of the implied
covenant of good faith and fair dealing on behalf of itself and
a putative class consisting of all current and former investors
in the MBS who suffered losses due to the defendant's alleged
misconduct as trustee for the Covered Trusts.  (Compl. ¶ 1.)

### A.

The MBS were created through a multi-step process.  First,
Bear Stearns and its corporate affiliates, Bear Stearns

---

[3] Five of the Covered Trusts issued notes governed by an
Indenture.  Nine of the Covered Trusts issued certificates
governed by a PSA.  The plaintiff alleges that the TIA applies
to both the notes and the certificates.  The defendant asserts
that the TIA applies only to the notes.  This is discussed below
at IV.A.

Residential Mortgage Corporation and EMC Mortgage Corporation
("EMC"), originated mortgages to borrowers and purchased
mortgages originated from third-party lenders, including Wells
Fargo. (Compl. ¶ 17.) Wells Fargo was the master servicer for
the mortgage loans in the Covered Trusts. (Tr. 6; see Compl.
¶ 22.)

Second, Bear Stearns pooled the mortgages and sold the pool
of mortgages to a depositor. (Compl. ¶ 18.) EMC was the seller
for the Covered Trusts. (Compl. ¶ 18.) The depositor was
typically a shell entity owned and operated by Bear Stearns.
(Compl. ¶ 18.) The seller and depositor entered into the
Mortgage Loan Purchase Agreement ("MLPA"). THE MLPA requires
the seller, among other things, to provide complete and not
defective mortgage loan files. (Compl. ¶ 18.) Through the
MLPA, the seller represented and warranted that the mortgages in
the pool were of a certain quality, and the seller promised to
cure, substitute, or repurchase any mortgages that were not of
the warranted quality or that were otherwise defective. (Compl.
¶ 18.) The MLPA further provided that the defendant as trustee
would have the right to enforce the representations and
warranties that the seller made in the MLPA. (Compl. ¶ 18.)

Third, the depositor transferred the mortgage pool to the
trustee in exchange for the trustee's transfer of the MBS to the
depositor. (Compl. ¶ 19.) The PSA, the Indenture, and related

agreements govern the trustee's rights and obligations.  One of
the related agreements is the "Sale and Servicing Agreement"
("SSA").  The SSA governs the conveyance of mortgage loans in
which the notes participate and provides the rights and
obligations of the master servicer for the notes.  Pursuant to
the SSA, the depositor sold the mortgage loans in which the
notes participate to the issuer, which is the trust.  (SSA at
1.)

The Governing Agreements impose certain duties on the
trustee.  (Compl. ¶ 19.)  The PSA provides that "[t]he Depositor
concurrently with the execution and delivery of th[e] [PSA]
sells, transfers and assigns to the Trust without recourse all
its rights, title and interest in and to" the mortgage loans in
which the certificates participate.  (PSA § 2.01(a).)  The PSA
further provides that "[i]n connection with the above transfer
and assignment, the Depositor hereby delivers to the Custodian,
as agent for the Trustee" the mortgage note and other documents
for each mortgage loan.  (PSA § 2.01(b).)  The SSA contains
substantially the same provision regarding the depositor's
transfer of the mortgage notes and other documents to the
trustee.  (SSA § 2.01.)

Finally, the depositor sold the MBS to an underwriter,
typically another Bear Stearns entity, and provided the revenue
from the sale to the seller, which is EMC.  (Compl. ¶ 20.)  The

underwriter marketed and sold the MBS to investors, including the plaintiff and the other members of the putative class. (Compl. ¶ 20.)

The Covered Trusts contain tranches of MBS.  (Compl. ¶ 21.) Each tranche has its own level of potential risk and reward. (Compl. ¶ 21.)  Senior tranches retain priority in payment if losses occur.  (Compl. ¶ 21; see Indenture § 3.24(b).) Accordingly, the tranches have different credit ratings and values.  (Compl. ¶ 21.)

Following the sale of the MBS, the master servicer, Wells Fargo in this case, is responsible for collecting payments from the mortgagors, including through foreclosure pursuant to the SSA.  (Compl. ¶ 22; SSA § 3.12.)  The proceeds are then distributed to certificate holders or note holders, respectively, in accordance with tranche priority.  (Compl. ¶ 22.)  In addition to other factors that affect the ratings and value of an MBS, the ratings and value of an MBS vary inversely with payment defaults.  (Compl. ¶ 23.)  Thus, if payment defaults increase or if foreclosure becomes impossible, the rating and value of the MBS decreases.  (Compl. ¶ 23.)

**B.**

The Governing Agreements impose duties on the defendant as trustee.[4]  (Compl. ¶ 24.)  The parties dispute the extent to which the trustee fulfilled these duties.

**i.**

The Governing Agreements require that the Covered Trusts take title to the mortgage loans.  (Compl. ¶¶ 27-28.)  The plaintiff alleges that this requires, among other things, that the trustee, "through its agent, [] take physical possession of the Mortgage files, including the Mortgage Note and the Mortgage, properly endorsed and assigned to the Trustee." (Compl. ¶ 29; see PSA § 2.01(b)(i); Indenture §§ 2.02, 4.02.) Pursuant to the Governing Agreements, the trustee or its agent must review the mortgage loan files and file interim and final certifications verifying that the mortgage loan files are accurate and complete.  (Compl. ¶¶ 31-33.)

The plaintiff alleges that a complete mortgage loan file contains documentation of a complete chain of endorsements evidencing the various assignments of the mortgage loan from the

---

[4] The plaintiff argues that the TIA imposes duties on the trustee as well.  However, the obligations of federal law are separate from the obligations imposed on the trustee pursuant to the Governing Agreements.  Whether the defendant failed to perform any duties imposed by the TIA is discussed below at IV.B.

originator down the chain to the trustee.  (Compl. ¶ 31, 99.)
The plaintiff alleges that the trustee has a duty to ensure that
each assignment of the mortgage was duly executed, and that the
mortgage loan file contains all necessary documentation.
(Compl. ¶¶ 31, 33, 99.)  The plaintiff alleges that if the
mortgage loan file did not contain an endorsement, assignment,
or any other required documentation, or if it contained false
information, the trustee or its agent had a duty to make
reasonable efforts to obtain the missing information or correct
the misinformation.  (Compl. ¶ 99.)  Under the Governing
Agreements, the trustee is also obligated to give notice to the
seller and other parties of any "breach of any of the
representations and warranties set forth in the [MLPA], which
breach materially and adversely affects the value of the
interests of the Certificateholders or the Trustee in the
related Mortgage Loan" that the trustee discovers and to enforce
the seller's obligation to cure, substitute, or repurchase any
defective mortgage loans.  (Compl. ¶ 39; see PSA § 2.03(b).)

     The Governing Agreements impose particular obligations on
the trustee following an "Event of Default."  Pursuant to the
Indenture, only the conduct of the issuer, the trust, could
constitute an Event of Default.  (Indenture § 5.01, App. A at
8.)  An Event of Default occurs under the Indenture, among other
instances, when:

> [T]here occurs a default in the observance or performance of any covenant or agreement of the Issuer made in the Indenture, or any representation or warranty of the Issuer made in the Indenture or in any certificate or other writing delivered pursuant hereto or in connection herewith proving to have been incorrect in any material respect as of the time when the same shall have been made, and such default shall continue or not be cured . . . for a period of 30 days after there shall have been given, by registered or certified mail, to the Issuer by the Indenture Trustee or to the Issuer and the Indenture Trustee by the Holders of at least 25% of the aggregate Note Principal Balance of the Outstanding Notes, a written notice specifying such default or incorrect representation or warranty and requiring it to be remedied and stating that such notice is a notice of default hereunder.

(Indenture, App. A at 8.) The Indenture defines a "default" as "[a]ny occurrence which is or with notice or the lapse of time or both would become an Event of Default." (Indenture, App. A at 6.) Once the trustee has actual knowledge of an Event of Default, the trustee must exercise its rights and obligations under the Governing Agreements using the same degree of care and skill as a prudent person would, under the circumstances, in the conduct of his or her own affairs. (Indenture § 6.01(a).)

Pursuant the PSA, only the conduct of the master servicer, Wells Fargo, can trigger an Event of Default. (PSA § 8.01.) An Event of Default under the PSA occurs, among other instances, when:

> The Master Servicer fails to observe or perform in any material respect any other material covenants and agreements set forth in this Agreement to be performed by it . . . and such failure continues unremedied for

> a period of 60 days after the date on which written
> notice of such failure . . . shall have been given to
> the Master Servicer by the Trustee or to the Master
> Servicer and the Trustee by the Holders of
> Certificates evidencing Fractional Undivided Interests
> aggregating not less than 25% of the Trust Fund.

(PSA § 8.01(ii).)  Pursuant to the PSA:

> If an Event of Default has occurred and has not been
> cured or waived, the Trustee shall exercise such of
> the rights and powers vested in it by this Agreement,
> and . . . use the same degree of care and skill in
> their exercise, as a prudent person would exercise
> under the circumstances in the conduct of his [or her]
> own affairs.

(PSA § 9.01(a).)

Under the PSA and the Indenture, the duties of the trustee prior to an Event of Default and after the waiver or cure of an Event of Default are to be determined "solely by the express provisions of this Agreement. . . ."  (PSA § 9.01(d)(i); <u>see</u> Indenture § 6.01(b)(i).)  "[N]o implied covenants or obligations shall be read into this Agreement against the Trustee. . . ." (PSA § 9.01(d)(i); <u>see</u> Indenture § 6.01(b)(i).)

The plaintiff claims that Events of Default occurred and that the defendant did not fulfill its obligations as trustee following the Events of Default.  (Compl. ¶¶ 103-05.)  The plaintiff alleges that the master servicer and the issuer breached the following obligations:

> (a) [to] notify the Trustee and others of
> breaches of the representations and warranties
> that applied to the mortgages in the Covered
> Trusts; (b) [to] maintain accurate and adequate

> loan and collateral files in a manner consistent
> with prudent mortgage servicing standards; (c)
> [to] demand that deficient mortgage records be
> cured; (d) [to] avoid unnecessary servicing fees
> and overcharging for its services; and (e) place
> the interests of the MBS holders' before its own
> interests.

(Compl. ¶ 103.)  The plaintiff relies on "[r]epresentative samples . . . [that] show that the assignments and transfers of the Mortgage Loans to U.S. Bank as Trustee had not occurred and/or were not recorded at the time that the Covered Trusts closed." (Compl. ¶ 6.)  Public land records demonstrated that "the chain of assignments between the Originator and the Trust for the Mortgage Notes and Mortgages was incomplete and invalid [because] . . . the assignments to U.S. Bank were not regularly made at the time the Mortgage Loans were conveyed to the Covered Trusts . . . ." (Compl. ¶ 57.)  The plaintiff claims that it suffered damages as a direct result of the defendant's failure to perform its obligations as trustee under the Governing Agreements.  (Compl. ¶ 106.)

### ii.

The TIA provides "minimum federal protections to investors" that are incorporated in the Indenture, which governs the notes. (Compl. ¶¶ 26, 99.)  The TIA requires the trustee to "examine the evidence furnished to it [by obligors of the indenture, certifying, among other things, their compliance with conditions

14

and covenants provided for in the indenture,] to determine
whether or not such evidence conforms to the requirements of the
indenture." (Compl. ¶ 42 (citing 15 U.S.C. § 77ooo(a)
(alteration in Compl. and citation omitted).) Following a
default, the trustee must provide notice within ninety days to
all indenture security holders. (Compl. ¶ 43 (citing 15 U.S.C.
§ 77ooo(b).) During the period following a default, the trustee
has a duty to behave as a prudent person would under the
circumstances. (Compl. ¶ 44 (citing 15 U.S.C. § 77ooo(c).)

       The Governing Agreements impose other duties on the trustee
with regard to the notes. (Compl. ¶¶ 42, 92-93.) Under the
Indenture, prior to default the trustee must (i) take "all
necessary steps to perfect ownership rights in the mortgage
notes and collateral for the Covered Trusts"; (ii) review "the
Mortgage Loan Files to ensure that the Mortgage Loans were
properly documented"; (iii) review "the endorsements to the
original mortgage note to ensure that there was a complete chain
of endorsements" from the seller to the trustee, and if
endorsements were missing, take reasonable steps to secure the
endorsements; (iv) review "the Mortgage Loan Files to ensure
that there was a duly executed assignment of mortgage for each
of the Mortgage Loans in the Covered Trusts," and if the
assignments were missing to take reasonable steps to secure the
assignments; (v) identify "those Mortgage Loans for which there

                                   15

was missing, defective and/or incomplete documentation," and take reasonable steps to correct the irregularities; and (vi) examine the evidence of compliance provided by third-party lenders, such as Wells Fargo, to ensure compliance with the warranties in the Governing Agreements.  (Compl. ¶¶ 92-93; 15 U.S.C. § 77ooo(a)(1).)

The plaintiff claims that the defendant did not fulfill these duties in violation of the TIA and the Indenture.  (Compl. ¶¶ 92-93.)  The plaintiff also claims that the defendant violated its obligation to behave as a prudent person following an Event of Default by failing to provide notice of defaults to the seller.  (Compl. ¶¶ 45, 94.)  These failures allegedly prevented the plaintiff from receiving payment on the principal and interest due on the MBS and allegedly caused investors in the MBS to suffer a loss.  (Compl. ¶ 96.)

## C.

Following the collapse of Bear Stearns, public and private investigations, lawsuits filed against Bear Stearns, and public land records revealed that Bear Stearns MBS routinely contained defective mortgage loans that failed to perform.  (Compl. ¶¶ 46-52.)  Other Bear Stearns MBS trusts have been unable to foreclose on mortgages in Bear Stearns MBS due to deficiencies in the chain of title.  (Compl. ¶ 58.)  Like many other Bear

Stearns MBS trusts, the Covered Trusts have performed "very poorly." (Compl. ¶ 55.) The BS ARM 2005-9 trust has realized over $33 million in losses and the BS ARM 2005-12 trust has realized over $46 million in losses, and the plaintiff claims that more losses are impending due to high delinquency rates for the mortgages. (Compl. ¶ 55.)

The plaintiff claims that the defendant "indisputably" knew of these losses and knew that the losses indicated that the MBS did not meet the standards set forth in the Governing Agreements. (Compl. ¶ 56.) The plaintiff alleges that the defendant was "well aware" of deficiencies in the chain of title for many of the mortgage loans. (Compl. ¶ 58.) The plaintiff points to a recent decision by the Massachusetts Supreme Judicial Court which held that U.S. Bank had failed to foreclose properly on a defaulted loan because it did not "provide a complete chain of assignments," and therefore could not quiet title to the property at issue in that case. (Compl. ¶ 58 (citing U.S. Bank Nat'l Ass'n v. Ibanez, 941 N.E.2d 40, 53 (Mass. 2011)).) The plaintiff claims that the defendant failed to enforce the seller's obligation to cure, substitute, or repurchase the non-conforming loans despite the defendant's knowledge of the seller's breaches of the representations and warranties made in the MLPA. (Compl. ¶¶ 56, 73-74.)

The plaintiff alleges that the MBS suffered from procedural deficiencies that impeded foreclosure on the mortgage loans and directly caused the value of the Covered Trusts' holdings to decrease. (Compl. ¶ 100.) To foreclose on one of the mortgages in an MBS, the mortgage note—"a promissory note establishing the mortgagor's personal liability"— and mortgage or deed of trust must have been transferred properly to the Trust and recorded properly by the Trust. (Compl. ¶¶ 61, 63-64.)

Under New York law, the Governing Agreements regulate the transfer of the mortgage loan, including the mortgage note, from the depositor to the trustee, and the MLPA regulates the transfer of the mortgage loan from the seller to the depositor. (Compl. ¶ 62.) New York, like several other states, regulates mortgage loans by requiring that a party initiating a foreclosure proceeding "file a new affirmation to certify that an appropriate employee has personally reviewed the documents and papers filed in the case and confirmed both the factual accuracy of these court filings and the accuracy of the notarizations contained therein." (Compl. ¶ 65.) The plaintiff alleges that the defendant breached its duties under the Governing Agreements and the TIA by failing to ensure proper transfer of the mortgage loans to the Covered Trusts and by failing to record properly the mortgage loans. (Compl. ¶ 71.) The plaintiff claims that this failure has impaired the ability

18

to recover losses for mortgage loans that are not currently being paid by the borrowers.  (Compl. ¶¶ 78, 100.)

The plaintiff further alleges that the defendant violated the Governing Agreements and the TIA by negligently reviewing the mortgage loan files and by failing to detect missing, incomplete, or defective documentation.  (Compl. ¶ 75.)  The plaintiff claims that these defects "would have been obvious to a reasonably competent Trustee performing its contractual duties with due care."  (Compl. ¶ 76.)

The plaintiff claims that the defendant failed to protect adequately MBS holders by failing to provide the notice of default as the Governing Agreements require.  (Compl. ¶ 77.)  The plaintiff alleges that the failure to provide the notice of default, "effectively denied MBS holders their expected consideration under the Governing Agreements."  (Compl. ¶ 77.)

The plaintiff claims millions of dollars in losses due to the defendant's alleged breaches of the Governing Agreements and alleged violations of the TIA.  (Compl. ¶ 80.)  The plaintiff alleges that deficiencies in the mortgage loan documentation delayed foreclosures, caused delinquencies in payments owed the Covered Trusts, and led to a decline in the value of the MBS. (Compl. ¶¶ 80, 100.)  The plaintiff alleges that its losses could have been avoided if the defendant had enforced the

obligation of the seller to repurchase, substitute, or cure the defective mortgage loans.  (Compl. ¶ 46.)

### D.

The Complaint alleges three causes of action.  The first cause of action is for violation of the TIA based on the defendant's alleged failure to ensure adequate assignment of the mortgage loans; to ensure complete documentation of the mortgage loans; to force the seller to repurchase, substitute, or cure the defective mortgage loans; and to provide notice of an Event of Default.  (Compl. ¶¶ 90-97.)  The second cause of action is for breach of contract arising from the failure of the defendant to fulfill the same obligations as delineated in the Governing Agreements.  (Compl. ¶¶ 98-106.)  The third cause of action is for breach of the implied covenant of good faith and fair dealing based on the defendant's alleged failure to protect the plaintiff's interests by failing to fulfill the obligations imposed by the Governing Agreements as alleged in the first and second causes of action.  (Compl. ¶¶ 107-11.)

The defendant now moves to dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

### III.

The first issue is whether the plaintiff has standing to assert the claims alleged in the Complaint on behalf of the putative class of purchasers of interests in all fourteen Covered Trusts.[5]  The defendant argues that the plaintiff may only assert claims relating to the two trusts in which it has owned securities, the Bear Stearns ARM 2005-9 and the Bear Stearns ARM 2005-12 Trusts, and lacks class standing to assert claims relating to the other Covered Trusts.  The defendant also asserts that the plaintiff lacks tranche standing and argues that the plaintiff can only assert claims relating to Group I-3 of the Bear Stearns ARM 2005-12 Trust because that is the only group in which it invested.

### i.

The plaintiff has satisfied the threshold requirement of demonstrating that it has standing under Article III of the

---

[5] At the argument on the motion to dismiss, the plaintiff made it clear that the plaintiff no longer holds any interests in the Covered Trusts at issue in this litigation.  (Tr. 87.)  The defendant responded at argument and in subsequent correspondence that the plaintiff's claims should therefore be dismissed pursuant to New York General Obligations Law § 13-107, which provides in part that a transfer of a bond shall vest in the transferee all claims or demands for damages against the trustee.  See N.Y. Gen. Oblig. Law § 13-107(1) (McKinney 2013).  Because this argument was not raised in the motion to dismiss, the Court declines to consider it at this time.  The defendant may raise the argument in any appropriate subsequent motion.

21

United States Constitution.  Article III requires that the plaintiff plead facts sufficient to establish an injury in fact that is fairly traceable to the defendant's actions and is redressable by the relief requested.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).  The plaintiff has alleged that the trusts in which it invested have diminished in value, that the decrease in value is due to the alleged breaches of contract and violations of the TIA by the defendant, and that such breaches and violations are redressable by an award of money damages.  Those factual allegations are sufficient to satisfy Article III.  See, e.g., NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co., 693 F.3d 145, 158 (2d Cir. 2012).

**ii.**

The Second Circuit Court of Appeals has recently drawn a distinction between Article III standing of a plaintiff to pursue a claim against a defendant and class standing.  See id. Class standing is necessary to allow a plaintiff to assert a claim on behalf of purchasers of securities from other offerings or tranches in which the plaintiff did not participate.  See id. at 162.  In NECA-IBEW, the Court of Appeals held that in a putative securities class action, a plaintiff has class standing if the plaintiff can demonstrate: (i) that the plaintiff "personally has suffered some actual . . . injury as a result of

22

the putatively illegal conduct of the defendant" and (ii) that

"such conduct implicates the same set of concerns as the conduct

alleged to have caused injury to other members of the putative

class by the same defendants."  Id. (internal quotation marks

and citations omitted and alteration in original); see N.J.

Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC, 709

F.3d 109, 128 (2d Cir. 2013).  The Court of Appeals held that

there is no requirement that the class representative "show[ ]

that [its] injuries . . . are the same . . . as those allegedly

suffered by purchasers of [Certificates from] outlying [T]rusts

backed by distinct sets of loans. . . ."  NECA-IBEW, 693 F.3d at

162 (alterations in original).

In NECA-IBEW, the Court of Appeals held that the plaintiff

had class standing to assert claims on behalf of purchasers of

certificates backed by mortgages originated by the same lenders

that originated the mortgages backing the plaintiff's

certificates.  Id. at 163-64.  The Court of Appeals determined

that this allowed the plaintiff to represent purchasers from

trusts from which the plaintiff had not purchased certificates

provided that the mortgages had the same originator.  Id. at

164.

The claims in that case arose from material misstatements

in violation of the Securities Act of 1933 contained in

registered securities offerings.  The Court of Appeals analyzed

23

the alleged misstatements in that case and found that they
related directly to the alleged faulty underwriting practices of
the mortgage originators.  Id. at 162-63.  Therefore, for the
claims of other purchasers to implicate "the same set of
concerns" as the plaintiff's claims, the Court of Appeals found
that the originators for the mortgages had to be the same as the
mortgage originators for the plaintiff's claims.  Id. at 163-64.
If the mortgage originators for the certificates purchased by
other class members were the same as for the certificates that
the plaintiff had purchased, it did not matter that the
plaintiff had not purchased certificates in that trust because
the concerns with the misrepresentations about the underwriting
practices of the originators remained substantially the same as
the plaintiff's concerns.  Id.  On the other hand, the plaintiff
lacked standing to represent purchasers in offerings that had
different mortgage originators than the certificates that the
plaintiff had purchased.  Id.

        In this case, the plaintiff alleges that the defendant's
failure to fulfill its obligations as trustee under the
Governing Agreements and the TIA caused the Covered Trusts to
diminish in value resulting in damages to the plaintiff.  The
plaintiff alleges that other class members also suffered damages
based on the same failures of the trustee to fulfill its duties
under the TIA and the Governing Agreements.  The parties agree

that the same form PSA governs each of the Covered Trusts
subject to a PSA.  Similarly, the parties agree that same form
Indenture governs each of the Covered Trusts subject to an
Indenture.  The plaintiff alleges the same breaches by the
trustee relating to each of the Covered Trusts.  These are
precisely the concerns that the Court of Appeals has asked
district courts to consider following NECA-IBEW to determine
whether an investor has standing to assert claims on behalf of a
class when the plaintiff did not invest in all of the trusts or
loan groups at issue in the litigation.  See N.J. Carpenters,
709 F.3d at 128 (remanding for reconsideration in light of NECA-
IBEW and directing the district court's attention to "whether
the relevant prospectuses contained 'similar if not identical'
descriptions of the underwriting standards, whether the trusts
'were backed by loans originated by [common] originators,' and
whether any differences among the originators of the mortgages
in each trust prevent the Fund's claims based on the different
securities from raising 'the same set of concerns.'" (quoting
NECA-IBEW, 693 F.3d at 162-64.)) (alteration in original).
Accordingly, the plaintiff's alleged injury implicates the same
set of concerns as the conduct alleged to have caused injury to
the other putative class members; indeed, the plaintiff alleges
that the same conduct by the same defendant caused the same

harm, albeit in varying degrees, to the plaintiff and to the
putative class members.

In this case, it is only the actions of the trustee in
performing its obligations under the Governing Agreements for
the Covered Trusts that are at issue.  In NECA-IBEW, the
essential misrepresentation at issue concerned the underwriting
practices of third-party originators, and the Court of Appeals
required that the plaintiff's class standing be limited to
representing purchasers of certificates issued by the same
third-party originators as the certificates purchased by the
plaintiff.  In this case, the defendant is the trustee for all
of the Covered Trusts at issue; thus, the plaintiff has class
standing to represent purchasers of certificates or notes in all
fourteen Covered Trusts.[6]

---

[6] Ret. Bd. of the Policemen's Annuity and Benefit Fund of the
City of Chi. v. Bank of N.Y. Mellon, No. 11 Civ. 5459, 2012 WL
1108533, at *3 (S.D.N.Y. Apr. 3, 2012) held that the plaintiff
had standing only to assert claims regarding trusts in which it
had invested. The Court based its decision on Lujan.
    Retirement Board was issued before the Court of Appeals
decided NECA-IBEW and is inconsistent with that decision.  In
NECA-IBEW, the Court of Appeals found that the plaintiff did
have standing under Article III as explained in Lujan.  693 F.3d
at 158.  The Court also found that the plaintiff had class
standing to represent purchasers of certificates from some
trusts in which the plaintiff had not purchased certificates
where the claims implicated the same set of concerns as the
plaintiff's claims because the plaintiff and the class members
held allegedly defective certificates that were issued by the
same third-party originators.  NECA-IBEW, 693 F.3d at 164.

In <u>Policemen's Annuity and Benefit Fund of Chicago v. Bank of America, NA</u>, No. 12 Civ. 2865, 2012 WL 6062544, at *7-8 (S.D.N.Y. Dec. 7, 2012), the Court, relying on <u>NECA-IBEW</u>, determined that the plaintiff lacked class standing to represent purchasers of certificates in which it did not invest because a breach of the trustee's duty in connection with one trust would not "infect" the value of certificates held in another trust. <u>Id.</u> at *7.  However, the discussion of "infection" in <u>NECA-IBEW</u> is not relevant to this case.  <u>NECA-IBEW</u> pointed out that a plaintiff purchaser of debt from one offering could represent purchasers of debt from another offering where an identical misrepresentation of the company's solvency was made in each offering.  693 F.3d at 163-64.  In that case, the misrepresentation would "infect" the debt in each offering in like manner given that the same company whose solvency was called into question backed all of the debt.  <u>Id.</u>  However, the Court of Appeals also pointed out that, as in <u>NECA-IBEW</u> and this case, that was <u>not</u> the case where purchasers bought certificates backed by a distinct set of loans issued by distinct originators.  <u>Id.</u>  However, the Court of Appeals, as already noted, found standing for the plaintiff to represent purchasers in different trusts where the alleged misrepresentation related to the activities of the same mortgage originator as the mortgager in the plaintiff's trust.  <u>Id.</u> at 164.  The Court of

Appeals did not require that the loan defaults in one trust "infect" the value of the loans in another trust for there to be class standing.  See id. at 163-64.

It is sufficient that the plaintiff has pleaded that the defendant breached the same obligations in the same way in connection with the trusts in which the plaintiff invested and the trusts in which putative class members invested, that those trusts were substantially similar, and that those breaches by the defendant caused injury to the plaintiff and to the putative class in the same way.  Therefore, in this case, the plaintiff's claims raise a sufficiently similar set of concerns to permit it to have standing to purport to represent certificate holders who invested in Covered Trusts in which the plaintiff did not invest.

## ii.

The defendant also argues that the plaintiff lacks standing to assert claims regarding tranches in which it did not invest. This tranche standing argument fails for the same reasons as the defendant's other standing arguments, namely because the plaintiff alleges actual injury due to the defendant's conduct and that injury implicates the same set of concerns as the conduct by the defendant that allegedly caused injury to the other putative class members.

As the Court of Appeals found: "[W]e do not believe the Certificates' varying levels of payment priority raise such a 'fundamentally different set of concerns' as to defeat class standing." NECA-IBEW, 693 F.3d at 164 (citation omitted); see Policemen's Annuity, 2012 WL 6062544, at *8-9.  It is sufficient for standing purposes that the lead plaintiff alleges an injury that implicates the same set of concerns as the injuries that the members of the putative class allegedly suffered.  See, e.g., NECA-IBEW, 693 F.3d at 162-65; Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co., 862 F. Supp. 2d 322, 337-39 (S.D.N.Y. 2012) (rejecting tranche-based standing objections when "the allegations [in the complaint] address the general practices pertaining to the entire body of loans . . . .  The fact that one tranche is backed by one sub-group of loans with particular interest rates, while another tranche is backed by another sub-group of loans with other interest rates, does not affect whether a plaintiff has the requisite 'personal stake' in establishing that particular underwriting practices pervaded the entire industry, and that descriptions of those underwriting practices in the Offering Documents were false and misleading"); In re Bear Stearns Mortg. Pass-Through Certificates Litig., 851 F. Supp. 2d 746, 778 (S.D.N.Y. 2012) (finding that when a plaintiff has established constitutional standing by establishing "that she suffered the same species of injury as

29

the members of the class, traceable to the same unlawful conduct by a defendant," the plaintiff need not further establish tranche standing to represent a class whose members invested in tranches in which the lead plaintiff did not invest). Because the plaintiff's alleged injury implicates the same set of concerns as the injury allegedly suffered by the other putative class members, the plaintiff has standing to represent investors in tranches in which the plaintiff did not invest.

The defendant's standing arguments really go to the adequacy of representation by the plaintiff. See NECA-IBEW, 693 F.3d at 158 n.9 ("NECA's standing to assert claims on others' behalf is an inquiry separate from its ability to represent the interests of absent class members under [Federal Rule of Civil Procedure] 23(a) . . . . What the district court thought was a 'standing' issue was in reality a class certification issue." (internal quotation marks and citations omitted)); see also id. at 159 n.10 (collecting cases); Fort Worth Emps.' Ret. Fund, 862 F. Supp. 2d at 333 ("A named plaintiff must show that it is a part of the class by showing that it has the same interest in redressing the same injurious conduct by the same defendant. But once it has established that, questions of adequacy, typicality and the like should be resolved at the class certification stage" (citations, internal quotations marks, and alteration omitted)); In re Bear Stearns, 851 F. Supp. 2d at 778

("Having satisfied Article III's standing criteria, the dissimilarities between the tranches is an issue appropriately left to the class certification stage" (citation omitted)); In re Buspirone Patent Litig. 185 F. Supp. 2d 363, 377 (S.D.N.Y. 2002).  Adequacy of representation is not before the Court at this stage of the proceedings.

Accordingly, the defendant's motion to dismiss on the ground that the plaintiff lacks standing to assert claims on behalf of the putative class is **denied.**


IV.

In the first cause of action, the plaintiff alleges that the defendant breached duties imposed by the TIA with regard to both the notes and the certificates.  The defendant moves to dismiss this claim for breaches of the TIA.  The defendant argues that the TIA applies only to the notes and that the TIA claims relating to the nine Covered Trusts that issued certificates should be dismissed.  The defendant further argues that the plaintiff has abandoned all but one of its claims for violation of the TIA.  The defendant argues that the remaining claim for violation of the TIA, which alleges that the defendant failed to perform its duties following a default must be dismissed because the plaintiff has failed to allege facts that establish that a default occurred on the notes.

31

**A.**

The plaintiff claims that the TIA applies to both the certificates and the notes.  The defendant does not dispute that the TIA applies to the notes.  However, the defendant disputes that the TIA applies to the certificates and argues that the TIA claim should be dismissed with respect to the nine Covered Trusts that issued certificates pursuant to a PSA.

The TIA applies to certain securities, including notes, bonds, debentures, or evidence of indebtedness, whether or not secured; certificates of interest or participation in any such note, bond, debenture, or evidence of indebtedness; and temporary certificates for, or guarantees of, any such notes, bonds, debentures, evidence of indebtedness, or certificates. 15 U.S.C. § 77ddd(a).  The TIA contains several exemptions to its applicability.  The defendant argues that two TIA exemptions apply to the certificates: section 304(a)(1), which exempts certain securities, and section 304(a)(2), which exempts "any certificate of interest or participation in two or more securities having substantially different rights and privileges."  See 15 U.S.C. §§ 77ddd(a)(1)-(2).

Section 304(a) of the TIA limits the statute's applicability only to certain kinds of securities:

> The [TIA] shall not apply to any of the following securities: (1) any security other than (A) a note, bond, debenture, or evidence of indebtedness, whether

> or not secured, or (B) a certificate of interest or participation in any such note, bond, debenture, or evidence of indebtedness, or (C) a temporary certificate for, or guarantee of, any such note, bond, debenture, evidence of indebtedness, or certificate.

15 U.S.C. § 77ddd(a)(1). On its face, the exemption in section 304(a)(1) would not apply if the security at issue fell into the exception for "evidence of indebtedness" or "a certificate of interest or participation in any such note, bond, debenture, or evidence of indebtedness." See id. If one or more of the exceptions to section 304(a)(1) applied and no other TIA exemption applied, the security at issue would be subject to the TIA. However, the certificates issued pursuant to a PSA fall within those exceptions to the section 304(a)(1) exemption. Therefore, section 304(a)(1) does not exempt the certificates from the TIA.

The notes and the certificates have some similarities. Like the notes, the certificates are evidence of indebtedness because mortgagors are obligated to make payments at fixed intervals on the mortgages underlying the certificates, and the certificate holders have the right to collect from the payment waterfall. See, e.g., Greenwich Fin. Servs. Distressed Mortg. Fund 3 LLC v. Countrywide Fin. Corp., 603 F.3d 23, 29 (2d Cir. 2010) (describing PSAs as "trust agreements similar to bond indentures"); CWCapital Asset Mgmt. v. Chi. Props., LLC, 610

F.3d 497, 499 (7th Cir. 2010) (describing pooled MBS governed by a PSA as "a kind of giant bond").  The prospectus supplements for the notes and the certificates create the same payment structure and obligations for the notes as for the certificates. (Tr. 63-64; see Schwartz Decl., Exs. F & G.)  The notes and the certificates have a waterfall that payments go through to satisfy the principal and interest obligations on the certificates or the notes, respectively.  Both prospectus supplements state that pursuant to the payment waterfall, note holders and certificate holders, respectively, "will receive a distribution of principal on their [notes or] certificates if there is cash available."  (Schwartz Decl., Ex. F at S.9 (notes); Schwartz Decl., Ex. G at S.13 (certificates).)  The payment waterfall ensures that certificate holders, like note holders, receive their share of proceeds collected by loan servicers from borrowers.

        The certificates also fall within the plain language of the section 304(a)(1)(B) exception for "a certificate of interest or participation in any such note, bond, debenture, or evidence of indebtedness."  The certificates are plainly interests in the underlying evidence of indebtedness.  The structure of the trusts gives certificate holders an interest in the underlying evidence of indebtedness, namely the MBS in which the certificates participate.  Therefore, because the certificates

fall within exceptions to the section 304(a)(1) exemption to the TIA that section does not exempt the certificates from the TIA. Accordingly, the certificates would be subject to the TIA if no other exemption applied.

Two courts in this district have held that certificates that for all relevant purposes are indistinguishable from the certificates at issue in this case are subject to the TIA and that section 304(a)(1) did not exempt the certificates from the TIA's coverage. See Policemen's Annuity, 2012 WL 6062544, at *15-16; Ret. Bd., 2012 WL 1108533, at *4-6.[7]  Those cases did not address the section 304(a)(2) exemption.[8]

_____

[7] On February 14, 2013, Judge Pauley denied a motion for reconsideration and certified the April 3, 2012 Memorandum and Order for interlocutory appeal under 28 U.S.C. § 1292(b). Ret. Bd. of the Policemen's Annuity & Benefit Fund of Chi. v. Bank of N.Y. Mellon ("Ret. Bd. II"), No. 11 Civ. 5459, 2013 WL 593766, at *5-6 (S.D.N.Y. Feb. 14, 2013).  The Court of Appeals has granted the application for interlocutory appeal. See  Order Granting Interlocutory Appeal, Ret. Bd. of the Policemen's Annuity & Benefit Fund of Chi. v. Bank of N.Y. Mellon, (May 7, 2013) (Nos. 13-661 & 13-664).

[8] Indeed, in denying the motion for reconsideration, Judge Pauley noted that the defendant had argued "for the first time" in its briefs on the motion for reconsideration that section 304(a)(2) applied to the certificates at issue in that case and "decline[d] to consider new arguments for dismissal that [the defendant] failed to raise in its original briefs." Ret. Bd. II, 2013 WL 593766, at *4.  The arguments about the inapplicability of the TIA in the defendant's briefs on the motion to dismiss before Judge Pauley concentrated solely on the defendant's claim that the certificates are equity securities exempt from the TIA pursuant to section 304(a)(1).

In her December 7, 2012 opinion, Judge Forrest did not address whether the section 304(a)(2) exemption applied to the certificates at issue in Policemen's Annuity, 2012 WL 6062544.

Section 304(a)(2) exempts from the TIA "any certificate of interest or participation in two or more securities having substantially different rights and privileges . . . ."  15 U.S.C. § 77ddd(a)(2).  The parties agree that there is no controlling precedent regarding the application of section 304(a)(2) to the certificates.  The defendant argues that section 304(a)(2) applies to the certificates at issue in this case because the certificates represent an interest in multiple MBS that originate in different states and that are backed by different collateral.  The defendant also points to the SEC's longstanding interpretation of the TIA as exempting certificates like those at issue here under section 304(a)(2).  The plaintiff argues that section 304(a)(2) does not apply because the underlying mortgages have substantially similar rights and

---

In a May 6, 2013 opinion, Judge Forrest rejected the argument that the section 304(a)(2) exemption applied to the certificates.  See Policemen's Annuity & Benefit Fund of Chi. v. Bank of Am. ("Policemen's Annuity II"), 2013 WL 1877618, at *9-10 (S.D.N.Y. May 6, 2013).

The parties in this case interpret section 304(a)(1) as an exemption for "equity" securities and rely on tax cases to define the difference between "debt" and "equity."  See, e.g., TIFD III-E, Inc. v. United States, 459 F. 3d 220, 234-41 (2d Cir. 2006).  The plaintiff argues that the certificates are more like debt and therefore, that section 304(a)(1) exemption does not apply.  The defendant argues that the certificates are more like equity and therefore, the section 304(a)(1) exemption does apply.  Because the plain terms of the exemption in section 304(a)(1) do not apply to the certificates for the reasons stated above it is unnecessary to reach the issue of the relevance, if any, of the treatment of debt and equity in the tax context.

privileges and that the SEC's interpretation of the TIA does not merit deference.

Section 304(a)(2) exempts from the TIA the certificates at issue in this case.  Section 304(a)(2) requires that the certificates (i) represent an interest or participation in two or more securities that (ii) have substantially different rights and privileges.  15 U.S.C. § 77ddd(a)(2).  The certificates plainly represent an interest or participation in two or more securities, namely the mortgage notes that were conveyed to the trusts, and that does not appear to be disputed.[9]

The parties dispute whether the securities covered by the certificates "hav[e] substantially different rights and privileges."  See id.  The certificates are exempt from the TIA because the underlying mortgage loans have substantially different rights and privileges.  The mortgage loans have different obligors, payment terms, maturity dates, interest rates, and collateral securing the loans, and they originate in different states and are subject to different laws regarding foreclosure procedures and deficiency judgments.  At oral

---

[9] In her May 6, 2013 opinion, Judge Forrest found that the section 304(a)(2) exemption did not apply because the certificates contained a "single interest in a security" and that each certificate did not represent an interest in more than one security.  Policemen's Annuity II, 2013 WL 1877618, at *9-10 (internal quotation marks omitted).  Neither of the parties in this case have urged that interpretation on the Court, and the parties agree that the certificates represent interest or participation in the underlying mortgages.

argument on this motion, the plaintiff argued that "the only rights and privileges that are meaningful in the context of an MBS securitization are that the mortgages have to be paid back with interest." (Tr. 71-72.) The plaintiff argued that the mortgages were substantially similar because they mostly originated in California. (Tr. 72.) However, the plaintiff conceded that at least 20% of the mortgage loans did not originate in California and would be subject to different state foreclosure provisions. (Tr. 72-73.)

The SEC's interpretation of the TIA lends further support to the conclusion that section 304(a)(2) exempts the certificates from the TIA. When construing a statute, courts may defer to the opinion of the agency charged with administering that statute to the extent that the agency's opinion has the power to persuade. United States v. Mead Corp., 533 U.S. 218, 227-28 (2001). To determine whether an agency's interpretation is entitled to deference, "courts have looked to the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position." Id. at 228 (citing Skidmore v. Swift & Co., 323 U.S. 134, 139-40 (1944)); see Cmty. Health Ctr. v. Wilson-Coker, 311 F.3d 132, 138 (2d Cir. 2002).

The defendant points to SEC guidance documents and no-action letters in which the SEC has taken the position that

section 304(a)(2) exempts certificates like those at issue here
from the TIA.  The guidance documents state:

> Certificates representing a beneficial ownership
> interest in a trust are offered to the public pursuant
> to a registration statement under the Securities Act.
> The assets of the trust include a pool of mortgage
> loans with multiple obligors administered pursuant to
> a "pooling and servicing agreement." Partial payment
> of the certificates is guaranteed by a third party.
> The certificates are treated as exempt from the Trust
> Indenture Act under Section 304(a)(2) thereof.[10]

U.S. SEC, TIA Questions & Answers of Gen. Applicability (Mar.
30, 2007), http://www.sec.gov/divisions/corpfin/guidance
/tiainterp.htm; SEC Div. Corporate Fin., Manual of Publicly
Available Tel. Interpretations 2, http://www.sec.gov/interps/
telephone/cftelinterps_tia.pdf.  The SEC no-action letters also
take the position that section 304(a)(2) exempts certificates
like those at issue in this case.  See, e.g., Harbor Fin., Inc.,
SEC No-Action Letter, 1988 WL 235128, at *1, *7 (Oct. 31,
1988)(stating that no enforcement action would be recommended if
certificates were issued without qualifying an indenture under
the TIA when counsel relied on the section 304(a)(2) exemption
and when the underlying mortgages had "different rights and
privileges [that] vary depending upon, among other things, the

---

[10] The guidance documents state in a note dated May 3, 2012 that
the SEC "is considering [the SEC's position regarding the
applicability of the TIA to certificates] in light of
[Retirement Board, 2012 WL 1108533]."  U.S. SEC, TIA Questions &
Answers of Gen. Applicability (Mar. 30, 2007),
http://www.sec.gov/divisions/corpfin/guidance/tiainterp.htm.

nature and extent of recourse against the borrower or other persons, and the nature, priority, and value of the security for the Mortgage"); Marion[11] Bass Secs., Inc., SEC No-Action Letter, 1984 WL 45531, at *1, *6 (July 9, 1984) (stating that no enforcement action would be recommended if a trust issued certificates without qualifying an indenture under the TIA pursuant to section 304(a)(2) because of the representation that "each Certificate would represent a fractional undivided interest in the Pool, and [] the Pool would consist of Bonds from several different bond issues, each with its own interest rate, redemption provision, trustee and collateral security").

The guidance documents and no-action letters demonstrate that the SEC[12] has interpreted section 304(a)(2) as exempting certificates like those at issue in this case from the TIA. However, the plaintiff argues that the SEC's interpretation is not entitled to deference because it is not well-reasoned and not persuasive.[13]  Although the SEC has not provided a detailed

---

[11] The company's name is alternately spelled "Marian" and "Marion" throughout the letter.

[12] It is undisputed that the SEC is the agency charged with enforcing the TIA.  See generally 15 U.S.C. §§ 77t, 77v (delineating the authority of the SEC in enforcing the TIA).

[13] The plaintiff states in passing that the TIA is unambiguous, and therefore, the Court cannot rely on the SEC's interpretation.  The plaintiff offers no analysis in connection with this assertion.  Moreover, in a recent opinion, Judge Forrest found that "the statutory language [of section 304(a)(2) of the TIA] is not ambiguous" because "[t]he issue instead is whether the facts as to the type of MBS here at issue indicate a

analysis for its conclusion that section 304(a)(2) does not cover certificates such as those in this case issued pursuant to a PSA, the exemption is straightforward and does not require a lengthy explanation.  The TIA is a "highly detailed" regulatory scheme and the SEC "can bring the benefit of specialized experience to bear on the subtle questions in this case. . . ." See Mead, 533 U.S. at 235.  That the SEC has consistently found that section 304(a)(2) exempts from the TIA certificates like those at issue in this case supports the conclusion that the certificates are not subject to the TIA.

Legislative history and secondary authority lend further support to the conclusion that the certificates at issue in this case are exempt from the TIA pursuant to section 304(a)(2). Senate and House reports issued contemporaneously with the TIA state that section 304(a)(2) "would exempt, for example, fixed-trust certificates evidencing an interest in a group of assorted bonds."  S. Rep. No.76-248, at 15 (1939); H.R. Rep. No. 76-1016, at 41 (1939).  Secondary sources also conclude that

single or multiple obligations."  Policemen's Annuity II, 2013 WL 1811618, at *10 n.10.  Indeed, the TIA is unambiguous with respect to the application of the section 304(a)(2) exemption only to certificates that represent an interest in multiple securities.  The certificates here do represent an interest in multiple underlying securities.  Accordingly, the SEC interpretation is simply further support for the most reasonable interpretation of section 304(a)(2), which is that it does apply to the certificates at issue in this case because they are certificates of interest or participation in multiple securities with substantially different rights and privileges.

section 304(a)(2) "include[s] pass-through certificates evidencing an interest in a pool consisting of more than one financial asset."  John Arnholz & Edward E. Gainor, Offerings of Asset-Backed Securities 2d Ed. § 15.05[A] & n. 92 (2012) (citation omitted)).

The Governing Agreements indicate that the parties structured their transactions in conformity with the SEC's stated views that the TIA does not apply to certificates such as those at issue in this case.  When the parties wanted the TIA to apply to securities, the parties issued those securities as notes and structured the transaction to conform to the TIA and to provide investors with any benefits provided by the TIA.  Accordingly, the Indenture that governs the notes explicitly incorporates the TIA in various places.  (See Indenture § 1.02 ("Whenever this Indenture refers to a provision of the [TIA], the provision is incorporated by reference in and made a part of this Indenture.").)  Section 9.05 of the Indenture states that, "[e]very amendment of this Indenture . . . shall conform to the requirements of the [TIA] as then in effect so long as this Indenture shall then be qualified under the [TIA]."  (Indenture § 9.05.)  Section 10.06 of the Indenture states:

> If any provision hereof limits, qualifies or conflicts
> with another provision hereof that is required to be
> included in this Indenture by any of the provisions of
> the [TIA], such required provision shall control.  The
> provisions of the TIA §§ 310 through 317 that impose

42

> duties on any Person (including the provisions
> automatically deemed included herein unless expressly
> excluded by the Indenture) are a part of and govern
> this Indenture, whether or not physically contained
> herein.

(Indenture § 10.06.)  Moreover, the Indenture contains a table

entitled "Reconciliation and Tie Between Trust Indenture Act of

1939 and Indenture Provisions," which lists various provisions

of the TIA and provides their analog in the Indenture.

(Indenture at v.)  Conversely, the PSA does not mention the TIA

at all.  Indeed, the PSA contains no evidence that the parties

expected the TIA to apply to the certificates.

The parties had the right to structure their transactions

as subject to or as exempt from the TIA.  The parties had no

right to avoid the TIA if it did apply to the transaction, but

the parties could rely on long-standing SEC guidance to

structure their transaction in a way that Congress expressly

exempted from the TIA.  Having structured a transaction within

the section 304(a)(2) exemption of the TIA, supported by a plain

reading of that exemption and long-standing SEC guidance, the

TIA should not now be retroactively applied to the certificates.

The certificates are exempt from the TIA pursuant to

section 304(a)(2) because they are certificates of participation

in two or more securities with substantially different rights

and privileges.  This conclusion is consistent with the plain

text of the TIA, the SEC's interpretation of the TIA, and the

legislative history of the TIA.  Accordingly, the first cause of
action for breach of the TIA is **dismissed** with respect to the
certificates issued pursuant to a PSA, and the defendant's
motion to dismiss any claim for breach of the TIA relating to
the certificates is **granted**.


**B.**

In the first cause of action, the plaintiff alleged various
violations of the TIA.  It is undisputed that the TIA applies to
the notes issued pursuant to an Indenture and that five of the
Covered Trusts are governed by an Indenture.  In response to the
defendant's motion to dismiss, the plaintiff abandoned all of
its allegations for a breach of the TIA except for its claims in
paragraphs 94 and 95 of the Complaint that the defendant failed
to provide notice of defaults under section 315(b) of the TIA,
15 U.S.C. § 77ooo(b), and failed to act prudently following an
Event of Default under section 315(c) of the TIA, 15 U.S.C.
§ 77ooo(c).  (Pl.'s Mem. in Opp. to Def.'s Mot. to Dismiss ("Pl.
Mem.") at 35; Def.'s Reply Mem. ("Def. Reply") at 11.)
Therefore, any claims for breach of the TIA, other than breaches
of sections 315(b) and (c) are **dismissed**.

Section 315(b) of the TIA provides that "[t]he indenture
trustee shall give to the indenture security holders . . .
notice of all defaults known to the trustee, within ninety days

44

after the occurrence thereof . . . ."  15 U.S.C. § 77ooo(b).
Section 315(c) provides that "[t]he indenture trustee shall
exercise in case of default (as such term is defined in such
indenture) such of the rights and powers vested in it by such
indenture, and [] use the same degree of care and skill in their
exercise as a prudent [person] would exercise or use under the
circumstances in the conduct of his [or her] own affairs."  Id.
§ 77ooo(c).

Pursuant to the Indenture, only certain conduct of the
issuer—here, the trust—can constitute a default or trigger an
Event of Default.  A "Default" is defined in the Indenture as:
"Any occurrence which is or with notice or the lapse of time or
both would become an Event of Default."  (Indenture, App. A at
6.)  An Event of Default is defined as five actions or inactions
by the issuer.  (Indenture, App. A. at 8-9.)  Among the Events
of Default is the failure of the issuer to abide by its
covenants or representations.  (Indenture, App. A. at 8.)
Specifically, pursuant to the Indenture an Event of Default
occurs when:

> [T]here occurs a default in the observance of
> performance of any covenant or agreement of the Issuer
> made in the Indenture, or any representation or
> warranty of the Issuer made in the Indenture . . .
> proving to have been incorrect in any material respect
> as of the time when the same shall have been made and
> such default shall continue or not be cured . . . for
> a period of 30 days after there shall have been given
> . . . to the Issuer by the Indenture Trustee or to the

45

Issuer and the Indenture Trustee by the Holders of at
least 25% of the aggregate Note Principal Balance of
the Outstanding Notes, a written notice specifying
such default or incorrect representation or warranty
and requiring it to be remedied and stating that such
notice is a notice of default hereunder. . . .

(Indenture, App. A at 8.)

The Complaint is not a model of clarity because while a
default requires action or inaction by the issuer the Complaint
alleges that there were numerous defaults, including failures by
EMC, the seller, to cure defects in the mortgage loans and/or to
substitute conforming loans. (Compl. ¶ 94.) However, the
Complaint also alleges numerous defaults by the issuer. In
particular, it alleges that the issuer breached its obligation
under the Indenture to require EMC to abide by its
representations and warranties with respect to the mortgage
loans and to cure, substitute, or repurchase nonconforming
mortgage loans. (Compl. ¶¶ 94, 103; Indenture §§ 3.04(a), 3.06;
see SSA § 2.03(b).)

The defendant argues that the plaintiff has failed to
allege the specific facts necessary to show that any of the
mortgages conveyed to the trust were in fact defective. (Def.'s
Mem. in Supp. Mot. to Dismiss ("Def. Mem.") at 12, 16-17.))
However, undisputed allegations in the Complaint render
plausible the plaintiff's claim that the issuer breached its
obligations in violation of the Indenture. Specifically, the

46

plaintiff has alleged and the defendant does not dispute that
the Covered Trusts performed extremely poorly, that there is
documented evidence of irregularities in other, similar trusts,
and that the seller repurchased less than 1% of the mortgage
loans in the Covered Trusts.  (Compl. ¶ 74.)  It is also
undisputed that the defendant did not provide notice of any
defaults.  (Def. Mem. at 18.)

        The defendant alleges that no breach of these provisions of
the TIA occurred because no Event of Default was declared by the
issuer or by the requisite number of certificate holders.  (Def.
Mem. at 26-27.)  But sections 315(b) and (c) of the TIA depend
only on a "default," not an "event of default," and the
Indenture defines a "default" separately from an "event of
default."  (See Indenture, App. A at 6, 8.)  The Complaint has
sufficiently alleged "defaults" by the issuer.  The plaintiff
does not claim that a "event of default" was ever declared.
However, the defendant cannot escape liability for having failed
to send out notices it was required to send out or to act as it
was required to do with the excuse that it failed to send out
notice that would have triggered an Event of Default.

        Therefore, there are sufficient plausible allegations that
defaults occurred and that the defendant violated section 315(b)
of the TIA by failing to provide notice of all defaults to the
indenture security holders and violated section 315(c) of the

TIA by failing to act as a prudent person following such defaults.  This is consistent with the conclusion of both Judge Forrest and Judge Pauley denying motions to dismiss similar claims.  See Policemen's Annuity II, 2013 WL 1877518, at *11-12; Ret. Bd., 2012 WL 1108533, at *9.

Therefore, the defendant's motion to dismiss the TIA claims asserted in the first cause of action is **granted** except for the claims for violation of sections 315(b) and (c) asserted with respect to the five Covered Trusts governed by the Indenture.

**V.**

In the second cause of action, the plaintiff pleaded a breach of contract claim based on the allegation that the defendant breached its duties under the Governing Agreements, specifically: (i) the duty "to take all necessary steps to perfect the ownership rights in the mortgage notes and collateral for the Covered Trusts, and to ensure that other parties to the Governing Agreements performed their responsibilities to permit these rights to be perfected"; (ii) the duty to review the mortgage loan files and to ensure proper documentation and filing of the mortgage loans by taking reasonable steps to identify and correct any missing or defective documents; (iii) the duty to review the mortgage loan files and to ensure a complete chain of endorsements from the

48

originator to the trustee and to take steps to obtain missing

any documents; (iv) the duty to review the mortgage loan files

to ensure a duly executed assignment of each mortgage in the

Covered Trusts and to take steps to obtain any missing

documents; (v) the duty to identify the mortgage loan files

where there was missing or defective documentation and to take

reasonable steps to ensure the irregularities were corrected,

and (vi) the duty to exercise its rights as trustee as a prudent

person following an Event of Default.  (Compl. ¶¶ 99, 103, 105.)

These obligations arise out of the PSA for the certificates and

the Indenture and SSA for the notes.  The plaintiff has claimed

losses as a direct result of these alleged breaches by the

defendant.  (Compl. ¶ 106.)  The defendant has moved to dismiss

arguing that the plaintiff has failed to state a claim for

breach of contract because the Complaint does not sufficiently

allege a material breach, causation, or damages.

New York law governs the PSA, Indenture, and SSA.  (PSA

§ 12.06; Indenture § 10.11; SSA § 7.03.)  A breach of contract

claim under New York law requires: (i) the existence of a

contract; (ii) performance by the party seeking recovery; (iii)

nonperformance by the other party; and (iv) damages attributable

to the breach.  Mazzola v. Roomster Corp., 849 F. Supp. 2d 395,

402 (S.D.N.Y. 2012) (quoting IMG Fragrance Brands, LLC v.

Houbigant, Inc., 679 F. Supp. 2d 395, 402 (S.D.N.Y. 2009)).

49

Under New York law, "the initial interpretation of a contract is a matter of law for the court to decide." K. Bell & Assocs., Inc. v. Lloyd's Underwriters, 97 F.3d 632, 637 (2d Cir. 1996) (quoting Readco, Inc. v. Marine Midland Bank, 81 F.3d 295, 299 (2d Cir. 1996)) (internal quotation marks omitted).  "Whether a contract term is ambiguous is a question of law." Curry Rd. Ltd. v. K Mart Corp., 893 F.2d 509, 511 (2d Cir. 1990) (citation omitted).  However, the Court should construe a contract as a matter of law only if the contract is unambiguous on its face. See Metro. Life Ins. Co. v. RJR Nabisco, Inc., 906 F.2d 884, 889 (2d Cir. 1990).  A contract is unambiguous if it has "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." Sayers v. Rochester Tel. Corp. Supp. Mgmt. Pension Plan, 7 F.3d 1091, 1095 (2d Cir. 1993) (quoting Breed v. Ins. Co. of N. Am., 385 N.E.2d 1280, 1282 (N.Y. 1978)) (alteration in original).  Where the contract language is subject to more than one reasonable meaning and where extrinsic evidence of the parties' intent exists, the question of the proper interpretation should be submitted to the trier of fact, unless the extrinsic evidence is so one-sided that no reasonable jury could find in favor of the non-moving party. See 3Com Corp. v. Banco do Brasil, S.A., 171 F.3d 739,

746-47 (2d Cir. 1999); <u>Consarc Corp. v. Marine Midland Bank,</u>
<u>N.A.</u>, 996 F.2d 568, 573 (2d Cir. 1993).

**A.**

The defendant argues that the Complaint does not allege
adequately a material breach of the Governing Agreements because
(i) the plaintiff fails to allege that the mortgage loans were
not properly conveyed to the trust; (ii) the defendant did not
have an obligation under the Governing Agreements to review the
documentation of the chain of assignments in the mortgage loan
files; (iii) the plaintiff did not plead with sufficient
specificity that the defendant improperly failed to compel the
seller to substitute, repurchase, or otherwise cure
nonconforming loans; and (iv) the plaintiff has not pleaded an
Event of Default.  The defendant argues that, accordingly, the
plaintiff cannot establish that the defendant failed to exercise
its duties as a prudent person following an Event of Default.

**i.**

The plaintiff alleges that the defendant breached its
obligation under the Governing Agreements to ensure proper
assignment of the mortgage loans to the trust and to ensure that
the mortgage loan files were complete.  The plaintiff alleges
that as a result the mortgage loans have diminished in value.

51

The Complaint alleges that in order to foreclose on a mortgage loan the mortgage note and mortgage loan must have been transferred to the trust and the trustee must have recorded the mortgage note and mortgage loan. (Compl. ¶ 63.) Moreover, the Complaint alleges that under New York law, a party initiating a foreclosure proceeding is required to "file a new affirmation to certify that an appropriate employee has personally reviewed the documents and papers filed in the case and confirmed both the factual accuracy of these court filings and the accuracy of the notarizations contained therein." (Compl. ¶ 65.) The Complaint also alleges that state officials in other states, including California, had required exacting procedures before foreclosures could be effectuated. (Compl. ¶ 65.) The plaintiff alleges that the defendant did not ensure proper transfer of the mortgage loans and did not properly record the mortgage loans. The plaintiff claims that this failure has caused delayed foreclosures and "delinquencies in the payments owed to the Cover[ed] Trusts, which led to a decline in the value of the Bear Stearns MBS," and these failures have impaired the Covered Trusts' ability to recover losses. (Compl. ¶¶ 78, 80.) The defendant responds that the Governing Agreements permit the depositor to sell its interest in the mortgage loans to the trust and that the PSA constituted such a sale. Under the defendant's interpretation of the Governing Agreements, no

transfer of documents was necessary to convey the mortgage loans
to the trusts.

The Complaint's allegations are sufficient to create an
issue of fact regarding whether it was a material breach of the
Governing Agreements for the defendant to fail to ensure proper
assignment of the mortgage loans to the Covered Trusts.
Sections 2.01(a) and (b) of the PSA govern the transfer and sale
of the mortgage loans from the depositor to the trust.  Section
2.01(a) states that "[t]he Depositor concurrently with the
execution and delivery of this Agreement, sells, transfers and
assigns to the Trust without recourse all its rights, title and
interest in and to" the mortgage loans.  (PSA § 2.01(a).)
However, the plaintiff points to Section 2.01(b), which states
that "[i]n connection with the above transfer and assignment,
the Depositor hereby delivers to the Custodian, as agent for the
Trustee" the Mortgage Note and other documents.[14]  (PSA
§ 2.01(b).)

The defendant also argues that the plaintiff's claim of
improper transfer and recordation of defective mortgage loan

---

[14]Regardless of whether the execution of the PSA would be
sufficient to convey title, it is certainly plausible to contend
that the absence of intervening assignments would hamper
foreclosures and that the Governing Agreements required the
trustee to force the seller to repurchase, substitute, or cure
mortgage loans with document deficiencies.  (See PSA §§ 2.02(a),
(b); SSA §§ 2.02(a)(b).)  The Complaint also alleges that
necessary documents were routinely missing from the mortgage
loan files in the Covered Trusts.  (Compl. ¶ 57.)

files fails because the Complaint does not allege which loans

had such deficiencies.[15]  The Complaint alleges that the trustee

did not possess the necessary documents to demonstrate proper

assignment to the Covered Trusts and recordation of the mortgage

notes and loans.  At this stage of the proceedings, the

plaintiff need only plead a sufficient factual basis for a

plausible claim of breach of contract due to improper

documentation or assignment.  Cf. Emps.' Ret. Sys. of the Gov't

of the V.I. v. J.P. Morgan Chase & Co., 804 F. Supp. 2d 141, 152

(S.D.N.Y. 2011) ("A plaintiff need not allege that any

particular loan or loans were issued in deviation from the

underwriting standards, so long as the complaint alleges

widespread abandonment of underwriting guidelines." (quoting

Tsereteli v. Residential Asset Securitization Trust 2006-A8, 692

F. Supp. 2d 387, 392 (S.D.N.Y. 2010)) (internal quotation marks

omitted)).  The plaintiff alleged that many of the mortgage loan

files were missing the mortgage note and mortgage loan documents

in contravention of the assignment obligations in the Governing

Agreements.  The plaintiff alleged that a review of the public

---

[15] The defendant also argues that as a secured creditor it can
foreclose on the mortgages notwithstanding any missing
documents.  However, this argument is not responsive to the
plaintiff's argument that it is a material breach of the
Governing Agreements for the defendant not to fulfill its
obligation to procure the documents that the plaintiff alleges
are missing.  Whether foreclosure remains possible relates to
the damages attributable to this breach.

land records demonstrated that "the chain of assignments between
the Originator and the Trust for the Mortgage Notes and
Mortgages was incomplete and invalid [because] . . . the
assignments to U.S. Bank were not regularly made at the time the
Mortgage Loans were conveyed to the Covered Trusts," and that
these irregularities in title have made foreclosure impossible
in other circumstances.  (See Compl. ¶¶ 57-58, 80.)  The
allegations in the Complaint are sufficient at this stage of the
proceedings to satisfy the pleading requirements for a breach of
the defendant's duty to assure adequate conveyance of the
mortgage loans to the trust and adequate loan documentation.


### ii.

The plaintiff alleges that the defendant breached its
obligations under the PSA, the Indenture, and the SSA when it
failed to require EMC, the seller, to repurchase loans that were
of lower quality than warranted and when it failed to require
EMC to repurchase or substitute loans where there was defective
documentation.  (Compl. ¶¶ 73-74, 80.)  The defendant argues
that the plaintiff has failed to identify any specific loan that
should have been repurchased.  (Def. Mem. at 16-17.)  However,
the Complaint does allege that there have been significant
losses in the Covered Trusts, that the mortgage files were
riddled with document deficiencies, that federal and state

investigators have uncovered widespread abuses in such files, and that there were numerous document deficiencies found in the public records of the foreclosures on two of the Covered Trusts. (Compl. ¶¶ 55-69.)  The plaintiff also points to public reports and testimony about breaches of representations and warranties by Bear Stearns affiliates in connection with MBS trusts. (Compl. ¶¶ 46-52.)  The plaintiff understandably argues that it cannot be expected to detail the defects in specific loans before it has had discovery.

The plaintiff has made sufficient factual allegations to state a plausible claim that there were in fact breaches of the seller's representations and warranties and that there was a failure by the defendant to require their correction.  As Judge Forrest thoughtfully concluded in rejecting a similar contention:

> Indeed, based on the allegations of the [Complaint], it would be implausible to assume that somehow all of the mortgage loans underlying the MBS miraculously avoided being originated with practices generally utilized [by the seller] and its contracted affiliates at that time.
>
> At the pleading stage, plaintiffs cannot be required to identify breaches of representations and warranties with respect to the individual loans in the specific trusts-such information is, at this stage, is uniquely in the possession of defendants. Rather, plaintiffs satisfy their burden where their allegations "raise a reasonable expectation that discovery will reveal evidence" proving their claim.

<u>Policemen's Annuity II</u>, 2013 WL 1877618 at *12 (citation omitted).

**iii.**

The plaintiff claims that an Event of Default as defined in the PSA and the Indenture occurred and that the defendant breached its obligations under the PSA and the Indenture by failing to exercise its duties following an Event of Default as a prudent person would in the conduct of his or her own affairs. The defendant stresses that only the conduct of the issuer—the trust—under the Indenture or the master servicer—Wells Fargo—under the PSA can create an Event of Default.  The Event of Default provision under the Indenture is set out above.  The Event of Default provision in the PSA included the following as an Event of Default

> [When] [t]he Master Servicer fails to observe or perform in any material respect any other material covenants and agreements set forth in this Agreement . . . and such failure continues unremedied for a period of 60 days after the date on which written notice of such failure . . . shall have been given to the Master Servicer by the Trustee or to the Master Servicer and the Trustee by the Holders of Certificates evidencing Fractional Undivided Interests aggregating not less than 25% of the Trust Fund.

(PSA § 8.01(ii).)  In addition to the alleged breaches of the Indenture and SSA by the issuer, which are discussed above, the Complaint also alleges breaches by Wells Fargo, the master servicer.  (Compl. ¶¶ 53-54.)

The defendant does not contend that the allegations with
respect to the trustee's conduct following an Event of Default
should be dismissed because there have been insufficient
allegations of substantive breaches by the issuer (under the
Indenture) and the Master Service (under the PSA).  Nor does the
defendant contend that this claim should be dismissed because
the plaintiff has failed to plead with sufficient specificity
how a prudent person would have conducted itself following an
Event of Default.  Rather, the defendant argues that the claim
relating to the obligation to act like a prudent person
following an Event of Default should be dismissed because the
Event of Default required that notice be given and no such
notice was ever given.  (Def. Mem. at 17-18.)

The defendant points out that either the trustee or holders
of 25% or more of the securities has to give written notice of a
breach of a material covenant or agreement, and the breach would
have to continue unremedied for sixty days to trigger an Event
of Default.  However, the trustee cannot rely on its own failure
to give notice to escape its own liability.  See Bank of N.Y. v.
Tyco Int'l Grp., S.A., 545 F. Supp. 2d 312, 324 n.81 (S.D.N.Y.
2008); see also In re Banker's Trust Co., 450 F.3d 121, 129 (2d
Cir. 2006) (finding that the indenture trustee's failure to
inspect certificates may not excuse its failure to comply with
the duty to give notice of defaults that would have been

discovered had the indenture trustee inspected the
certificates).

The defendant argues that the trustee did not prevent
notice from being given because 25% of the security holders
could have given notice, and such notice would have triggered an
Event of Default had the defects not been remedied within the
specified 60-day period.  However, the defendant conceded that
it was not aware of any case in which the the failure of the
alleged wrongdoer to give notice was excused when the alleged
wrongdoer's failures prevented at least one way of satisfying
the precondition.  (Tr. 8-9.)  Such a finding would be required
to grant the defendant's motion to dismiss this claim on the
ground that adequate notice of an Event of Default as never
given.

In short, the plaintiff has alleged sufficient factual
allegations that the defendant breached one or more of its
obligation under the PSA, the Indenture, and the SSA.
Accordingly, the defendant's motion to dismiss the plaintiff's
claim for breach of the trustee's duty to perform its
obligations as a prudent person following an Event of Default is
**denied**.

**B.**

The plaintiff alleges that breaches of the Governing
Agreements by the defendant caused the mortgage loans to
diminish in value, which resulted in damages to the plaintiff.
The defendant argues that the plaintiff has failed to establish
causation and damages in connection with its claims for breach
of contract under the Governing Agreements.  The defendant
argues that it made no guarantees regarding the quality of the
mortgage loans; thus, any losses due to a drop in the trading
prices of the mortgage loans are consequential damages for which
the trustee cannot be held liable pursuant to the Governing
Agreements.  Moreover, the defendant claims that its alleged
breaches did not proximately cause the damages that the
plaintiff alleges.  The defendant argues that any losses are due
to the real estate market collapse, not to a breach by the
defendant.

These arguments regarding causation and damages raise
issues of fact that cannot be resolved on a motion to dismiss.
The plaintiff alleges that the defendant's breaches of contract
"reduced and/or delayed collections on the Mortgage Loans in the
Covered Trusts, diminished the value of the MBS, and caused
[the] Plaintiff's and the Class' losses, including on sales of
MBS . . . ."  (Compl. ¶ 100.)  Whether the mortgage loans
decreased in value, and whether that decrease in value was

60

caused by the alleged breaches by the defendant cannot be resolved on this motion to dismiss.

Moreover, under New York Law, although the evidence of damages may be slight, "[t]hat damages are uncertain, or may not even exist, is an insufficient reason" to grant a motion to dismiss.  See Acumen Re Mgmt. Corp. v. Gen. Sec. Nat. Ins. Co., No. 09 Civ. 01796, 2012 WL 3890128, at *11 (S.D.N.Y. Sept. 7, 2012).  It is "well-settled" in New York "that even if the breach of contract caused no loss or if the amount of loss cannot be proved with sufficient certainty, the injured party is entitled to recover as nominal damages a small sum fixed without regard to the amount of the loss, if any."  Hirsch Elec. Co. v. Cmty. Servs., Inc., 536 N.Y.S.2d 141, 143 (App. Div. 1988); see also T & N PLC v. Fred S. James & Co. of N.Y ., Inc., 29 F.3d 57, 60 (2d Cir. 1994) ("[N]ominal damages are always available for breach of contract"); C.K.S. Ice Cream Co. v. Frusen Gladie Franchise, Inc., 567 N.Y.S.2d 716, 716 (App. Div. 1991) ("Even if it were shown that no actual damages have been sustained, plaintiff would seem entitled to proceed to trial at least on its contract cause of action if only to vindicate its right to nominal damages.").  It is inappropriate to grant a motion to dismiss where damages are unclear based on disputed factual allegations because "whenever there is a breach of a contract . . . the law infers some damage."  See Acumen, 2012 WL 3890128,

at *11 (quoting <u>Finley v. Atl. Transp. Co.</u>, 115 N.E. 715, 718
(N.Y. 1917)); <u>see, e.g.</u>, <u>Mazzola</u>, 849 F. Supp. 2d at 403.

   Accordingly, the defendant's motion to dismiss the
plaintiff's second cause of action for breach of contract is
**denied**.


## C.

   The plaintiff alleges breach of the implied covenant of
good faith and fair dealing.   The defendant moves to dismiss
this claim as duplicative of the claims for breach of contract.

   New York recognizes as implicit in every contract "a
covenant of good faith and fair dealing in the course of
contract performance."   <u>Dalton v. Educ. Testing Serv.</u>, 663
N.E.2d 289, 291 (N.Y. 1995) (citation omitted); <u>see also</u> <u>Jofen
v. Epoch Biosciences, Inc.</u>, No. 01 Civ. 4129, 2002 WL 1461351,
at *8 (S.D.N.Y. July 8, 2002).   This covenant incorporates "any
promises which a reasonable person in the position of the
promisee would be justified in understanding were included,"
<u>Rowe v. Great Atl. & Pac. Tea Co.</u>, 385 N.E.2d 566, 569 (N.Y.
1978) (citation and quotation marks omitted), although it does
not include any obligation that would be inconsistent with the
express terms of the contract, <u>see Dalton</u>, 663 N.E.2d at 291-92.
The covenant includes a pledge that "neither party shall do
anything which will have the effect of destroying or injuring

the right of the other party to receive the fruits of the contract." Id. at 291 (quoting Kirke La Shelle Co. v. Paul Armstrong Co., 188 N.E. 163, 167 (N.Y. 1933)); see M/A-COM Sec. Corp. v. Galesi, 904 F.2d 134, 136 (2d Cir. 1990) (per curiam).

However, "New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." Harris v. Provident Life & Accident Ins. Co., 310 F.3d 73, 81 (2d Cir. 2002) (alteration in original); see Woodhams v. Allstate Cas. Co., 748 F. Supp. 2d 211, 223 (S.D.N.Y. 2010), aff'd, 453 F. App'x 108 (2d Cir. 2012) (summary order); see also Reed v. Delta Airlines, Inc., No. 10 Civ. 1053, 2011 WL 1085338, at *5 (S.D.N.Y. Mar. 23, 2011). "Instead, an alleged breach of the implied covenant of good faith and fair dealing is part of a general breach of contract claim." Reed, 2011 WL 1085338, at *5.

A plaintiff can maintain a claim for breach of the implied covenant of good faith and fair dealing simultaneously with a breach of contract claim "only if the damages sought by the plaintiff for breach of the implied covenant are not intrinsically tied to the damages allegedly resulting from breach of contract." Page Mill Asset Mgmt. v. Credit Suisse First Bos. Corp., No. 98 Civ. 6907, 2000 WL 335557, at *8 (S.D.N.Y. Mar. 30, 2000) (quoting Canstar v. J.A. Jones Constr.

Co., 622 N.Y.S.2d 730, 731 (App. Div. 1995)) (internal quotation marks omitted); see Nanjing Textiles IMP/EXP Corp. v. NCC Sportswear Corp., No. 06 Civ. 52, 2006 WL 2337186, at *12 (S.D.N.Y. Aug. 11, 2006); Concesionaria DHM, S.A. v. Int'l Fin. Corp., 307 F. Supp. 2d 553, 563-65 (S.D.N.Y. 2004); see also Excelsior Fund, Inc. v. JP Morgan Chase Bank, N.A., No. 06 Civ. 5246, 2007 WL 950134, at *6-7 (S.D.N.Y. Mar. 28, 2007). Therefore, a plaintiff's claim for breach of the implied covenant of good faith and fair dealing should be dismissed as duplicative when it arises from the same facts as the breach of contract claim. See, e.g., Excelsior Fund, 2007 WL 950134, at *7.

Moreover, under New York Law, "[the] implied covenant of good faith and fair dealing cannot give the holders of Debentures any rights inconsistent with those explicitly set out in the Indenture." Broad v. Rockwell Int'l Corp., 642 F.2d 929, 957 (5th Cir. 1981) (interpreting New York law). New York law does not permit an implied covenant to supplant the express covenants in the agreements. See id. (citing Burr v. Stenton, 43 N.Y. 462, 464 (1871) and Neuman v. Pike, 591 F.2d 191, 194 (2d Cir. 1979)). Accordingly, the plaintiff cannot establish a claim for breach of the implied covenant of good faith and fair dealing based on conduct that is already explicitly addressed in the underlying Governing Agreements.

The plaintiff has alleged breach of the implied covenant of good faith and fair dealing based on the same factual allegations that underlie its claim for damages for breach of contract.  Specifically, the plaintiff reiterates its claims in the Complaint regarding the defendant's failure to fulfill its obligations as trustee following the discovery that the mortgage loans were of lower quality than warranted.  (See Compl. ¶¶ 107-11.)  These claims are indistinguishable from the allegations in the breach of contract claims.  Therefore, the plaintiff cannot simultaneously maintain its claims for breach of contract and breach of the implied covenant of good faith and fair dealing.

Because the claim for breach of the implied covenant of good faith and fair dealing arises from the same conduct that underlies the claim for breach of contract, the plaintiff's claim for breach of the implied covenant of good faith and fair dealing alleged in third cause of action is **dismissed** and the defendant's motion to dismiss this claim is **granted.**

**CONCLUSION**

The Court has considered all of the arguments raised by the parties.  To the extent not specifically addressed above, the arguments are either moot or without merit.  The defendant's motion to dismiss is **granted in part and denied in part**.  The Clerk is directed to close **Docket No. 25**.

**SO ORDERED.**

Dated:    **New York, New York**
          **May 31, 2013**              _____/s/_____
                                              **John G. Koeltl**
                                       **United States District Judge**