**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

OKLAHOMA POLICE PENSION AND
RETIREMENT SYSTEM,

                    Plaintiff,

    - against-

U.S. BANK NATIONAL ASSOCIATION
(as Trustee Under Various Pooling and
Servicing Agreements),

                  Defendant.

Civil Action No. 11-8066 (JGK)

**Honorable John G. Koeltl**

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF
CLASS REPRESENTATIVE AND CLASS COUNSEL**

**TABLE OF CONTENTS**

I.     INTRODUCTION ......................................................................................... 1

II.    THE COMMON FACTS UNDERLYING PLAINTIFF'S CLAIMS .................................... 4

    A.    The Common Evidence with Respect to the Formation and Structure of
            Bear Stearns' MBS Securitizations.................................................................. 4

    B.    The Common Evidence with Respect to the Originators' Systemic Disregard
            of Their Underwriting Guidelines................................................................... 7

    C.    The Common Evidence with Respect to Bear Stearns' Defective Securitizations........ 11

    D.    The Common Duties Imposed on the Trustee by the TIA .............................................. 13

    E.    The Common Evidence of USB's Actual Knowledge of Breaches of
            Representations and Warranties and an Event of Default .............................................. 15

    F.    USB's Common Practices and Misconduct upon Obtaining Actual Knowledge of
            Breaches of Representations and Warranties and Events of Default.......................... 17

    G.    Plaintiff and the Class Were Injured by USB's Failure to Act ...................................... 19

    H.    The Proposed Class Representative ................................................................... 19

III.    THE CLASS DEFINITION.................................................................................... 20

IV.    ARGUMENT ..................................................................................................... 20

    A.    Class Certification: General Requirements and Standard of Review ........................... 20

    B.    The Class Meets the Requirements of Rule 23(a)........................................................ 21

         1.    The Class Is Sufficiently Numerous that Joinder Would Be Impracticable .............. 21

         2.    There Are Questions of Law and Fact Common to the Class.................................... 22

         3.    Plaintiff's Claims Are Typical of the Other Class Members' Claims ....................... 23

         4.    Plaintiff Will Fairly and Adequately Protect the Interests of the Class.................... 25

    C.    The Class Meets the Requirements of Rule 23(b)(1)................................................... 26

    D.    The Class Meets the Requirements of Rule 23(b)(3)................................................... 27

         1.    Common Questions of Law and Fact Predominate over Any Potential
              Individual Questions ................................................................................ 27

         2.    A Class Action Is a Superior Method for Resolving This Dispute............................ 32

V.    CONCLUSION................................................................................................... 34

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Am. Int'l Group, Inc. v. Bank of Am. Corp.*,
  Index No. 652199/2011 (N.Y. Supreme Court)......................................................8

*Ambac Assurance Corp. v. EMC Mortgage Corp.*,
  Index No. 650421/2011 (N.Y. Supreme Court)......................................5, 12, 13

*Ambac Assurance Corp. v. EMC Mortgage Corp.*,
  No. 1:08-cv-09464-RMB (S.D.N.Y.) ...................................................................16

*Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*,
  133 S. Ct. 1184 (2013)........................................................................................21

*Argent Classic Convertible Aribtrage Fund (Bermuda) Ltd. v. National City Corp.*,
  No. 1:08-nc-70016 (N.D. Ohio)...........................................................................11

*Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*,
  920 F. Supp. 2d 475 (S.D.N.Y. 2013)...................................................................3

*Assured Guaranty Corp. v. EMC Mortgage Corp.*,
  No. 1:10-cv-05367-NRB (S.D.N.Y.) ...................................................................16

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
  222 F.3d 52 (2d Cir. 2000)..................................................................................25

*Banyai v. Mazur*,
  205 F.R.D. 160 (S.D.N.Y. 2002) .........................................................................21

*Brown v. Kelly*,
  609 F.3d 467 (2d Cir. 2010)...........................................................................20, 27

*Butler v. Sears, Roebuck & Co.*,
  727 F.3d 796 (7th Cir. 2013) .........................................................................28, 32

*Consol. Rail Corp. v. Hyde Park*,
  47 F.3d 473 (2d Cir. 1995)..................................................................................21

*Cruden v. Bank of New York*,
  No. 85 Civ, 4170 (JFK), 1988 WL 9514 (S.D.N.Y. Feb. 1, 1988)..................23, 24

*Damassia v. Duane Reade, Inc.*,
  250 F.R.D. 152 (S.D.N.Y. 2008) .........................................................................25

*Fed. Housing Fin. Agency v. JPMorgan Chase & Co.*,
    Case No. 11 Civ. 6188, 2012 WL 6000885 (S.D.N.Y. Dec. 3, 2012) ......................................3

*In re Am. Int'l Grp., Inc. Sec. Litig.*,
    689 F.3d 229 (2d Cir. 2012) .............................................................................................28

*In re Citigroup Plan ERISA Litigation*,
    241 F.R.D. 172 (S.D.N.Y. 2006) ....................................................................................26

*In re EVCI Career Colleges Holding Corp. Sec. Litig.*,
    Master File No. 05 Civ. 10240 (CM), 2007 WL 2230177 (S.D.N.Y. July 27, 2007) ............34

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    574 F.3d 29 (2d Cir. 2009) ........................................................................................23, 25

*In re IndyMac Mortgage-Backed Sec. Litig.*,
    286 F.R.D. 226 (S.D.N.Y. 2012) ...........................................................................2, 31, 33

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
    No. 04 Civ. 8144 (CM), 2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009) ................................33

*In re Medical Capital Securities Litigation*,
    No. SACV–09–1048, 2011 WL 5067208 (C.D. Cal. July 26, 2011) ......................................29

*In re NTL, Inc. Sec. Litig.*,
    No. 02 Civ. 3013 LAK AJP, 2006 WL 330113 (S.D.N.Y. Feb. 14, 2006) ............................22

*In re Parmalat Sec. Litig.*,
    No. 04 Civ. 0030, 2008 WL 3895539 (S.D.N.Y. Aug. 21, 2008) (Kaplan, J.) ......................25

*In re Revco Sec. Litig.*,
    142 F.R.D. 659 (N.D. Ohio 1992) .....................................................................................33

*In re U.S. Foodservice Inc. Pricing Litig.*,
    No. 3:07-md-1894 (CFD), 2011 WL 6013551 (D. Conn. Nov. 29, 2011), *aff'd* 729
    F.3d 108 (2d Cir. 2013) ...................................................................................22, 24, 32

*In re U.S. Foodservice, Inc. Pricing Litigation*,
    729 F.3d 108 (2nd Cir. 2013) ..........................................................................................29

*In re Vivendi Universal S.A. Sec. Litig.*,
    242 F.R.D. 76 (S.D.N.Y. 2007) ........................................................................................33

*In re Wash. Mut. Mortg. Backed Sec. Litig.*,
    No. C09-37 MJP, 2012 WL 2995046 (W.D. Wash. July 23, 2012) .......................................3

*In re Wells Fargo Mortgage-Backed Certificates Litig.*,
    6:09-cv-01376 (LHK) (N.D. Cal. Nov. 14, 2011), ECF No. 473 ...........................................2

*In re Wells Fargo Mortgage-Backed Certificates Litig.*,
    712 F. Supp. 2d 958 (N.D. Cal. Apr. 22, 2010)................................................................7

*Kottler v. Deutsche Bank AG*,
    No. 05 Civ. 7773 (PAC), 2010 WL 1221809 (S.D.N.Y. Mar. 29, 2010)..............................24

*Lapin v. Goldman Sachs & Co.*,
    254 F.R.D. 168 (S.D.N.Y. 2008) ........................................................................................32

*Levinson v. About.com, Inc.*,
    No. 02 Civ. 2222 (DAB), 2009 WL 1026021 (S.D.N.Y. Apr. 13, 2009)..............................32

*Maine State v. Countrywide*,
    2:10-CV-00302 (MRP) (C.D. Cal. December 17, 2013), ECF No. 572....................................2

*MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*,
    30 Misc.3d 1201(A), 958 N.Y.S.2d 647 (N.Y. Sup. Ct. Dec. 22, 2010) ...................................3

*N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*,
    Case No. 08 Civ. 5653 (PAC), 2011 WL 3874821 (S.D.N.Y. Aug. 16, 2011) ..................2, 31

*N.J. Carpenters Health Fund v. Residential Capital, LLC*,
    No. 08 CV 8781 (HB), 2012 WL 4865174 (S.D.N.Y. Oct. 15, 2012) ...................................28

*N.J. Carpenters Health Fund v. Residential Capital, LLC*,
    272 F.R.D. 160 (S.D.N.Y. 2011), *aff'd* 477 Fed. Appx. 809 (2d Cir. 2012) .........................24

*N.J. Carpenters Health Fund v. Residential Capital, LLC*,
    Case No. 08 CV 8781 (HB), 2013 WL 6839093 (S.D.N.Y. Dec. 27, 2013)............................2

*Novella v. Westchester County*,
    No. 02-cv-2192, 2004 WL 3035405 (S.D.N.Y. Dec. 29, 2004).......................................2, 26

*Oklahoma Police Pension and Retirement Sys. v. U.S. Bank Nat'l Association*,
    291 F.R.D. 47 (S.D.N.Y. 2013) .........................................................................6, 14, 15, 20

*Ortiz v. Fibreboard Corp.*
    527 U.S. 815 (1999)....................................................................................................26, 27

*Ret. Sys. of Miss. v. Goldman Sachs Grp., Inc.*,
    280 F.R.D. 130 (S.D.N.Y. 2012) ....................................................................................2, 31

*Ret. Sys. of Mississippi v. Merrill Lynch & Co., Inc.*,
    277 F.R.D. 97 (S.D.N.Y. 2011) .................................................................................. *passim*

*Robidoux v. Celani*,
    987 F.2d 931 (2d Cir. 1993)......................................................................................21, 22, 24

*Syncora Guarantee Inc. v. EMC Mortgage Corp.*,
    No. 1:09-cv-03106-PAC (S.D.N.Y.) ................................................................16

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*,
    546 F.3d 196 (2d Cir. 2008)......................................................................21

*Torres v. Gristede's Operating Corp.*,
    No. 04 Civ. 3316 (PAC), 2006 WL 2819730 (S.D.N.Y. Sept. 29, 2006) ..............33

*Tsereteli v. Residential Asset Securitization Trust 2006-A8*,
    283 F.R.D. 199 (S.D.N.Y. 2012) .............................................................2, 31

*UFCW Local 1776 v. Eli Lilly and Co.*,
    620 F.3d 121, 131 (2d Cir. 2010).................................................................28

*Wal-Mart Stores v. Dukes*,
    131 S. Ct. 2541 (2011).........................................................................22, 28

STATUTES, RULES & REGULATIONS

**United States Code**

    15 U.S.C. § 77aaa ...............................................................................1
    15 U.S.C. § 77ooo(c) ..................................................................14, 15, 28

**Federal Rules of Civil Procedure**

    Rule 23 ................................................................................. *passim*
    Rule 23(a).............................................................1, 20, 21, 34
    Rule 23(a)(1)....................................................................21
    Rule 23(a)(2)....................................................................22
    Rule 23(a)(3)....................................................................23
    Rule 23(a)(4)................................................................4, 25
    Rule 23(b) ..................................................................20, 21
    Rule 23(b)(1)....................................................... *passim*
    Rule 23(b)(1)(A)............................................................1, 27
    Rule 23(b)(1 (B)................................................................27
    Rule 23(b)(3)........................................................ *passim*
    Rule 23(g) ..................................................................1, 4
    Rule 30(b)(6)....................................................................1

Plaintiff Oklahoma Police Pension and Retirement System ("Plaintiff") respectfully moves pursuant to Rules 23(a), 23(b)(1)(A) and (B), 23(b)(3), and 23(g) of the Federal Rules of Civil Procedure to: (i) certify a class of all persons and entities that held the Bear Stearns Adjustable Rate Mortgage ("BSARM") Notes (the "Notes") identified in Appendix A at any time on or after March 14, 2008[1] and who were damaged thereby (the "Class");[2] (ii) appoint Plaintiff as a Class Representative with respect to the Class; and (iii) appoint Scott+Scott, Attorneys at Law, LLP ("Scott+Scott") as Class Counsel.

## I.    INTRODUCTION

Plaintiff's claims for violation of the federal Trust Indenture Act of 1939, as amended (the "TIA"), 15 U.S.C. §77aaa, *et seq.*, present quintessential candidates for class certification under Fed. R. Civ. P. 23 ("Rule 23").  As Trustee, U.S. Bank National Association ("USB") assumed identical duties under the TIA and breached these duties in an identical manner. ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ in administering the Covered Trusts,[3] USB employed a single set of uniform policies and procedures, which Plaintiff claims violated USB's statutory duties.  Thus, Plaintiff's claims present a single, predominant, up-or-down issue of liability – regarding whether USB's misconduct breached its uniform statutory duties – that is

---

[1]    This date marks the end of Bear Stearns' dramatic decline over the course of a fourteen month period beginning in January 2007, when its stock closed at a record high of $171.51 per share.  In June 2007, two Bear Stearns hedge funds collapsed after suffering huge losses on subprime mortgage investments.  By October 2007, prosecutors had launched a criminal probe.  Then, on December 20, 2007, Bear Stearns announced its first ever quarterly loss of $859MM driven by $1.9B in write downs of securities tied to bad mortgages.  Thereafter, large numbers of MBS issued by Bear Stearns were downgraded and liquidity dried up as lenders and customers fled in a classic "run on the bank."  On Sunday, March 16, 2008, with a bankruptcy filing its only other option, Bear Stearns agreed to be acquired by JPMorgan Chase for just $2 per share, a 99% decline in value in just fourteen months.  JPMorgan Chase later raised its bid to $10 per share.

[2]    Excluded from the Class are USB and its officers, affiliates, and directors at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which USB has or had a controlling interest.

[3]    Unless defined herein, capitalized terms used herein have the same meanings as in the Corrected Second Amended Complaint ("CSAC").

common to all Class members and is readily susceptible to common proof.   USB either

satisfactorily discharged its duties under the TIA with respect to the Covered Trusts, or it did not.

Rule 23(b)(3)'s commonality and predominance requirements are therefore satisfied in this case,

and trying all Class members' claims in a single proceeding is inherently more manageable and

superior to hundreds of separate trials with respect to these issues.   Similarly, this class may also

be maintained under Rule 23(b)(1), because it involves a situation where "the defendant is

required by law or necessity to treat all members of the class alike."   *Novella v. Westchester*

*County*, No. 02-cv-2192, 2004 WL 3035405, at *8 (S.D.N.Y. Dec. 29, 2004).

Indeed, Plaintiff's claims for violation of the TIA are analogous to claims for violation of

§11 of the Securities Act against sponsors of mortgage-backed securities ("MBS") trusts which

have also alleged breaches of the guidelines used to underwrite the mortgage loans at issue.

Courts in this and other Circuits have uniformly found that §11 claims arising from such

analogous circumstances meet the requirements for class certification.[4]

Although Courts have repeatedly held that individual questions regarding damages,

standing alone, are insufficient to defeat class certification, Plaintiff will also use common

evidence to establish the damages suffered by Class members as a result of USB's alleged

misconduct.   Defective loans sold to the Covered Trusts, which USB should have (but did not)

required to be repurchased, have contributed materially to defaults and delinquencies and

---

[4]      *See Pub. Emps.' Ret. Sys. of Mississippi v. Merrill Lynch & Co., Inc.*, 277 F.R.D. 97, 121 (S.D.N.Y. 2011)
("*Merrill Lynch*") (certifying a class of 18 MBS offerings issued pursuant to three registration statements); *N.J.
Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*, Case No. 08 Civ. 5653 (PAC), 2011 WL 3874821, at *9
(S.D.N.Y. Aug. 16, 2011) ("*DLJ Mortgage*"); *Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 283
F.R.D. 199, 217 (S.D.N.Y. 2012) ("*Tsereteli*"); *Pub. Emps.' Ret. Sys. of Miss. v. Goldman Sachs Grp., Inc.*, 280
F.R.D. 130, 142 (S.D.N.Y. 2012) ("*Goldman*"); *In re IndyMac Mortgage-Backed Sec. Litig.*, 286 F.R.D. 226, 243
(S.D.N.Y. 2012) ("*IndyMac*") (certifying a class of 10 MBS offerings issued pursuant to two registration
statements); *N.J. Carpenters Health Fund v. Residential Capital, LLC*, Case No. 08 CV 8781 (HB), 2013 WL
6839093 (S.D.N.Y. Dec. 27, 2013) ("*RALI II*") (certifying a class of 12 MBS offerings).   *See also In re Wells Fargo
Mortgage-Backed Certificates Litig.*, 6:09-cv-01376 (LHK) (N.D. Cal. Nov. 14, 2011), ECF No. 473, Final
Judgment and Order of Dismissal with Prejudice (certifying settlement class across 28 offerings); *Maine State v.
Countrywide*, 2:10-CV-00302 (MRP) (C.D. Cal. December 17, 2013), ECF No. 572, Final Judgment and Order of
Dismissal with Prejudice (certifying settlement class across 420 offerings).

reduced payments flowing to Noteholders, which in turn has impaired the Notes' value.  As explained in the accompanying Declaration of Dean T. Smith, damages to Class members caused by USB's breaches of its statutory duties can be calculated using a common cash flow model that calculates the fair market value of the Notes based upon the increases in expected cash flows that would have occurred had USB acted in accordance with its statutory duties.  *See* Ex. 1 (Declaration of Dean T. Smith).[5]  These changes in cash flows will be calculated using the extrapolated results from a re-underwriting of a statistically significant sample of Mortgage Loans in each of the Covered Trusts to the entire population of Mortgage Loans in the pools (*see* Ex. 2 (Declaration of Richard K. Green, Ph.D)) and delinquency information contained in publicly-filed, monthly remittance reports.  Statistical sampling is an industry-accepted means of determining whether loans in MBS trusts breached representations and warranties.[6]

Finally, as detailed herein, the remaining prerequisites for class certification under Rule 23 – numerosity, typicality, and adequacy – pose no barrier in this case.  As demonstrated by the analysis of Dr. Michael Hartzmark (Ex. 54), there are nearly 2,000 investors in the Class.  In addition, Plaintiff's claims are typical of the claims of the Class it seeks to represent.  Plaintiff shares with the Class the common and overriding interest in proving that USB failed to meet its statutory obligations.  Moreover, Plaintiff is unquestionably fit to fairly and adequately represent

---

[5]      Unless otherwise noted, citations to "Ex. _" are to the Exhibits to the accompanying Declaration of Deborah Clark-Weintraub ("Clark-Weintraub Declaration").

[6]      *See Fed. Housing Fin. Agency v. JPMorgan Chase & Co.*, Case No. 11 Civ. 6188, 2012 WL 6000885, at *4-*6 (S.D.N.Y. Dec. 3, 2012); *Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*, 920 F. Supp. 2d 475, 512 (S.D.N.Y. 2013) ("the sample is . . . reflective of the proportion of the [underlying loans] in the entire pool exhibiting any given characteristic").  In addition, such statistical sampling has been repeatedly accepted by courts in actions by investors and insurers seeking recovery of losses suffered as a result of breaches of representations and warranties with respect to defective mortgage loans pooled in securitizations of MBS.  *See, e.g., In re Wash. Mut. Mortg. Backed Sec. Litig.*, No. C09-37 MJP, 2012 WL 2995046, at *5-*6 (W.D. Wash. July 23, 2012); *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 30 Misc.3d 1201(A), 958 N.Y.S.2d 647, at *5 (N.Y. Sup. Ct. Dec. 22, 2010).

the Class, as there are no conflicts between Plaintiff and other members of the Class, and Plaintiff is not subject to unique defenses.

Finally, proposed Class Counsel satisfies the adequacy of counsel requirements of Rules 23(a)(4) and 23(g).   Proposed Class Counsel has vast experience in complex class action litigation and extensive experience in litigating the types of claims at issue in this litigation.   In addition, proposed Class Counsel has worked to identify and investigate the claims asserted in this action, and has ample resources to commit to representing the Class.

For all of the reasons summarized above and further detailed below, and all of the reasons stated herein, Plaintiff's motion for class certification should be granted.

## II.      THE COMMON FACTS UNDERLYING PLAINTIFF'S CLAIMS

### A.      The Common Evidence with Respect to the Formation and Structure of Bear Stearns' MBS Securitizations

From 2005 to 2007, Bear Stearns was one of the largest underwriters of residential mortgage-backed securities ("RMBS") in the country.   Acting through its network of corporate affiliates, Bear Stearns controlled each step of the securitization process for the Covered Trusts, including:  (i) the selection, evaluation, and acquisition of the loans in the pools; (ii) the creation of the securitization structure; and (iii) the registration, sale, and underwriting of the MBS to investors.[7]   Bear Stearns and its affiliates, EMC Mortgage Corporation ("EMC") and Structured Asset Mortgage Investments II, Inc. ("SAMI II"), served as the "Underwriter," "Seller" (also known as the "Sponsor"), and "Depositor," respectively, with respect to each of the securitizations at issue in this case, while Wells Fargo, which also originated the Mortgage Loans

---

[7]      *See* Ex. 3 (FCIC Report, Bear Stearns Chapter) at 280 ("In mortgage securitization, Bear followed a vertically integrated model that made money at every step, from loan origination through securitization and sale.").

in four of the five securitizations, served as the "Master Servicer," "Securities Administrator," and "Custodian."[8]

Bear Stearns affiliate EMC purchased loans for securitization, including the Mortgage Loans in the Covered Trusts, through a "bulk channel" and a "flow channel."[9]  The bulk channel involved the purchase of loans in bulk from large third-party originators.[10]  The flow channel involved smaller-scale purchases of loans, including on a loan-by-loan basis, from approved originators.[11]  The Mortgage Loans in each of the Covered Trusts at issue in this case were purchased by EMC, through both bulk and flow purchases, primarily from four third-party lenders – Wells Fargo, Bank of America, Countrywide, and National City (the "Originators") – with which it had close relationships.[12]  For example, between 2005 and 2007, Bear Stearns securitized more than $14 billion of Countrywide-originated loans.

The Mortgage Loans were sold to the Covered Trusts pursuant to their substantially identical Governing Agreements.  The Governing Agreements included an Indenture,[13] a Sale

---

[8]      *See*, *e.g.*, Prospectus Supplements attached as Exs. 4-8 to the Clark-Weintraub Declaration.

[9]      Ex. 9 (Testimony of Mary Haggerty in *Ambac Assurance Corp. v. EMC Mortgage Corp.*, Index No 650421/2011 (N.Y. Supreme Court), ECF No. 117, Ex. 30) at 86.

[10]     According to testimony provided to the Financial Crisis Inquiry Commission ("FCIC") by Mary Haggerty, co-head of Bear Stearns' securitization desk during the relevant period, with respect to bulk purchases, Originators would aggregate loans for sale and issue a term sheet seeking bids from interested investors.  In connection with the bidding process, the Originator would provide an Excel spreadsheet (also known as a loan tape) containing the purported attributes of the loans in the pool.  An audiotape of Ms. Haggerty's FCIC testimony is available at http://fcic.law.stanford.edu/interviews/view/162 ("Mary Haggerty FCIC Testimony") (last visited Aug. 1, 2014).

[11]     *See Id*.

[12]     The BSARM 2005-2, BSARM 2005-5, BSARM 2005-9, and BSARM 2006-1 Trusts consist entirely of loans originated by Wells Fargo.  *See* Ex. 4 (BSARM 2005-2 Prospectus Supplement) at S-23; Ex. 5 (BSARM 2005-5 Prospectus Supplement) at S-26; Ex. 7 (BSARM 2005-9 Prospectus Supplement) at 28; Ex. 8 (BSARM 2006-1 Prospectus Supplement) at 20-21.  More than 93% of the loans contained in the BSARM 2005-7 Trust were originated by just three originators – Bank of America, Countrywide, and National City.  *See* Ex. 6 (BSARM 2005-7 Prospectus Supplement) at S-30 – S-36.

[13]     The Indentures for the Covered Trusts are Exs. 10-14 to the Clark-Weintraub Declaration.  As this Court has observed, "the parties agree that the same form Indenture governs each of the Covered Trusts subject to an

and Servicing Agreement ("SSA"),[14] and a Mortgage Loan Purchase Agreement ("MLPA") which was incorporated into the SSA.[15]   Among other things, the Governing Agreements stated that the Mortgage Loan Files must be complete and may not have defective documents, such as imperfect assignments or endorsements.[16]   In addition, the MLPAs contained substantially identical representations and warranties of the Seller regarding the credit quality of the Mortgage Loans, including that they were originated in accordance with the Originator's loan origination guidelines.[17]   The Governing Agreements also contained the Seller's promise to cure or

---

Indenture."  *See Oklahoma Police Pension and Retirement Sys. v. U.S. Bank Nat'l Association*, 291 F.R.D. 47, 59 (S.D.N.Y. 2013).

[14]   The SSAs for the BSARM 2007-7, 2005-9, and 2006-1 trusts are attached as Exs. 15-18 to the Clark-Weintraub Declaration.  The BSARM 2005-2 and 2005-5 trusts have a Grantor Trust Agreement and Servicing Agreement rather than an SSA.  These documents are attached as Exs. 19-22 to the Clark-Weintraub Declaration.  Although separate documents, the provisions of the Grantor Trust Agreements and the Servicing Agreements for the BSARM 2005-2 and 2005 trusts are substantively identical to the provisions of the SSAs for the other three trusts.

[15]   The MLPAs for the Covered Trusts are attached as Exs. 23-29 to the Clark-Weintraub Declaration.

[16]   *See* Indenture §6.01(b)(i); SSA §§2.01(b), 2.02(a)).

[17]   In each instance, the underwriting guidelines of the Originators were falsely portrayed as intended to assess the borrower's creditworthiness and ability to repay the loan.  *See* Ex. 19 (Representations and Warranties for BSARM 2005-2, GTA, Ex. D at Section 7(xxi)) ("each Mortgage Loan was originated in accordance with the underwriting guidelines of the related originator"); Ex. 21 (Representations and Warranties for BSARM 2005-5, GRA, Ex. D at Section 7(xxi)) (same); Ex. 15 (Representations and Warranties for BSARM 2005-07, SSA, Ex. E at Section 7(xxi)) (same); Ex. 17 (Representations and Warranties for BSARM 2005-9, GTA, Ex. E at Section 7(xxi)) (same); and Ex. 18 (Representations and Warranties for BSARM 2006-1, SSA, Ex. E at Section 33(u)) (same).  *See also* Ex. 4 (BSARM 2005-2 Prospectus Supplement) at S-23 ("The Wells Fargo Underwriting Guidelines evaluate the applicant's credit standing and ability to repay the loan, as well as the value and adequacy of the mortgaged property as collateral."); Ex. 5 (BSARM 2005-5 Prospectus Supplement) at S-26 (same); Ex. 7 (BSARM 2005-9 Prospectus Supplement) at 28 (same); Ex. 8 (BSARM 2006-1 Prospectus Supplement) at 20-21 (same); Ex. 6 (BSARM 2005-7 Prospectus Supplement) at S-31 ("The Bank of America Underwriting Guidelines applied by Bank of America in originating or acquiring mortgage loans are intended to evaluate the applicants' repayment ability, credit standing and assets available for down payment, closing costs and cash reserves.  Additionally, the Bank of America Underwriting Guidelines establish the adequacy of the property as collateral for the loan requested."); at S-33 ("Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral."); and at S-37 ("[National City's] underwriting standards are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral.").

6

repurchase mortgages that did not comply with the representations and warranties, including, but not limited to, those that did not have a valid transfer of title.[18]

### B.   The Common Evidence with Respect to the Originators' Systemic Disregard of Their Underwriting Guidelines

In fact, however, a substantial number of the Mortgage Loans in the Covered Trusts breached their representations and warranties because the Originators systematically disregarded their underwriting guidelines during the relevant period.   As explained below, each of the Originators was engaged in highly risky and reckless lending for the purpose of meeting (and profiting from) the insatiable demand for Mortgage Loans from securitization sponsors, including Bear Stearns.

In this regard, Wells Fargo's defective underwriting has been documented in numerous lawsuits and government investigations.   For example, in denying in part a motion to dismiss an action brought by MBS investors against Wells Fargo for violations of the federal securities laws, a federal district court recently found that plaintiffs had adequately pled that "variance from the stated [underwriting] standards was essentially [Wells Fargo's] norm," and that such conduct "infected the entire underwriting process" including with respect to prime loans such as those contained in the securitizations at issue in that case.   *In re Wells Fargo Mortgage-Backed Certificates Litig.*, 712 F. Supp. 2d 958, 971-72 (N.D. Cal. Apr. 22, 2010).[19]   Wells Fargo's systemic deviations from its underwriting guidelines were also documented in the Report of the FCIC, based on interviews of former Wells Fargo employees.   Among others, the FCIC interviewed Darcy Parmer, a former Wells Fargo underwriter and quality assurance analyst, who confirmed that during her tenure Wells Fargo's underwriting standards were materially

---

[18]      *See* Indenture §§6.01(b)(i); SSA §§2.02(a), 2.02(b), 2.03(b).

[19]      This action was eventually settled for $125 million.

loosened.[20]   According to Ms. Parmer, 99% of the loans she reviewed each day were approved, and when she later worked as a fraud analyst at least half the loans she flagged for fraud were funded over her objections.[21]

Accounts of Wells Fargo's deficient underwriting practices have also been confirmed by other government inquiries.  For example, in July 2011 the Federal Reserve Board issued a cease and desist order and assessed an $85 million civil money penalty against Wells Fargo & Co. and Wells Fargo Financial, Inc. with respect to allegations that "Wells Fargo Financial sales personnel falsified information about borrowers' incomes to make it appear that the borrowers qualified for loans when they would not have qualified based on their actual incomes."[22]

The deficient origination practices of Bank of America, which originated mortgage loans either through its direct or wholesale channels, are also detailed in the FCIC Report.  According to the FCIC report, in 2005, examiners from the Federal Reserve and other agencies conducted a confidential "peer group" study of mortgage practices at six companies, including Bank of America, N.A. ("BANA") which revealed "a very rapid increase" in the volume of "irresponsible" and "very risky" loans. Ex. 3 (FCIC Report) at 172.  In addition, in recently settled litigation between American International Group, Inc. ("AIG") and BANA, AIG reported that a third-party review of a sample of loan files in a deal underwritten by BANA revealed violations of underwriting guidelines in 82% of the loans, including violations of guidelines relating to income, employment, and owner-occupancy.  *See* Complaint, *Am. Int'l Group, Inc. v. Bank of Am. Corp.*, Index No. 652199/2011 (N.Y. Sup. August 8, 2011) at 128-29.

---

[20]      An audio tape of Ms. Parmer's testimony is available at http://fcic.law.stanford.edu/interviews/view/20 (last visited Aug. 1, 2014).

[21]      *Id*.

[22]      Ex. 30 (available  at  http://www.federalreserve.gov/newsevents/press/enforcement/20110720a.htm  (last visited Aug. 1, 2014)).

Like Wells Fargo and BANA, between 2004 and the first half of 2007 Countrywide also systemically loosened its credit criteria for originating mortgage loans.  According to evidence developed in pending litigation against another RMBS Trustee, the Bank of New York Mellon, Countrywide created programs such as the "Extreme Alt A" programs pursuant to which it issued mortgage loans to non-prime borrowers with reduced documentation – *i.e.,* without verifying the accuracy of certain critical credit information the borrower supplied.[23]  Likewise, Countrywide allowed reduced documentation for other risky mortgage loans, such as PayOptions and Second Liens.[24]  Countrywide also routinely made "stated income" loans – in which the mortgagor could simply state his income without verification – to W2 wage earners, a tell-tale "red flag" for fraud given that the stated income loan cost the mortgagor significantly more than a full documentation loan.[25]  Countrywide also routinely made mortgage loans which its quality control group identified as "severely unsatisfactory" (or "SUS") due to their severe violations of Countrywide's underwriting standards.[26]

Indeed, Countrywide routinely granted "exceptions" to its underwriting guidelines that were not based upon "compensating factors" that offset the credit risk of the violated criteria, but were instead based on "matching" least common denominator mortgage loan criteria derived from Countrywide's competitors.  As Countrywide's chief risk officer, John McMurray, testified, Countrywide engaged in "composite matching" which selected the weakest credit requirements of multiple originators and loan products, so that in the end Countrywide's credit

---

[23]     Ex. 31 (Second Amended Complaint in BNYM Trustee case), ¶¶75-76.

[24]     *Id*.

[25]     *Id*., ¶80.

[26]     *Id*., ¶79.

criteria became the weakest in the industry.[27]   Indeed, Countrywide's four-step underwriting process approved a mortgage loan so long as Countrywide believed it could ultimately resell the loan.[28]

Finally, National City also had a well-known and long standing history of imprudent mortgage origination practices.   Indeed, as early as July 31, 2006, the Office of Inspector General found evidence that half of early default loans in a sample it reviewed had material underwriting deficiencies, including "errors and documentation omissions clearly contrary to prudent lending practices."  Ex. 32 at 2.  By 2008, however, National City was in dire straits.  In April 2008, regulators forced the company to secure approximately $7 billion in additional funding from investors in order to raise its liquidity and Tier 1 capital ratio in the wake of staggering losses on its residential mortgage loan portfolio.[29]  Then, on June 6, 2008, THE WALL STREET JOURNAL reported that National City had entered into a Memorandum of Understanding with the *Office* of the Comptroller of the Currency (OCC), a division of the Treasury Department that regulates national banks, to address serious financial problems at the company.[30]  Thereafter, in August 2008, National City announced that the *Securities and Exchange Commission* ("SEC") had opened an inquiry into the company and had requested documents concerning its loan underwriting.[31]  On October 24, 2008, National City announced that it had agreed to be acquired by PNC at the fire sale price of $2.23 per share.[32]

---

[27]      *Id.*, ¶¶77-78.

[28]      *Id.*

[29]      *See* Ex. 33 (Press Release date April 21, 2008 announcing National City's results for the first quarter ended March    31,    2008    available    at    http://www.sec.gov/Archives/edgar/data/69970/000095015208002886/ l30606ae8vk htm (last visited Aug.1, 2014)).

[30]      *See* Ex.34 (*National City Under U.S. Regulatory Scrutiny: Report*, REUTERS (June 6, 2008).

[31]      *See* Ex. 35 (National City Form 10-Q dated Aug. 8, 2008).

Thereafter, in December 2008, investors sued National City and its management for violations of the federal securities laws alleging that the company had falsely stated that it followed prudent and conservative lending practices when, in fact, it had loosened those practices and had made increasingly risky no documentation and stated income loans.[33]

In sum, the Covered Trusts were comprised of Mortgage Loans Bear Stearns acquired from four Originators who had all abandoned prudent underwriting practices.

### C.   The Common Evidence with Respect to Bear Stearns' Defective Securitizations

Like the Originators, Bear Stearns was also chasing securitization profits at almost any cost.  Since it did not originate loans itself, Bear Stearns was at the mercy of those that did, and its insatiable appetite for Mortgage Loans to feed its securitization pipeline led it to acquire and securitize huge quantities of toxic Mortgage Loans.

Thus, although the Originators' systemic deviations from underwriting guidelines were well known to Bear Stearns through its "due diligence," these deviations were nevertheless disregarded and it routinely acquired and securitized defective loans.  Bear Stearns utilized a number of third-party firms – Clayton Holdings ("Clayton"), Watterson Prime ("Watterson"), and Bohan Group ("Bohan") – to conduct "due diligence" reviews of its bulk loan purchases.[34]

---

[32]     *See* Ex. 36 (Press Release dated Oct. 24, 2008 announcing PNC's acquisition of National City available at http://www.sec.gov/Archives/edgar/data/69970/000095015208008192/l34219aexv99w1 htm (last visited Aug. 1, 2014)).

[33]     Ex. 37 (Complaint filed in *Argent Classic Convertible Aribtrage Fund (Bermuda) Ltd. v. National City Corp.*, No. 1:08-nc-70016 (N.D. Ohio)).

[34]     *See* Mary Haggerty FCIC Testimony.  In contrast to bulk loans, flow loans were reviewed by EMC for compliance with underwriting guidelines.  According to a complaint filed by the New York Attorney General, EMC underwriters had authority to approve flow loans for purchase but not to reject them.  This suit was settled as part of the $13 billion settlement of federal and state claims announced in November 2013 arising out of the packaging, marketing, sale, and issuance of RMBS by JPMorgan, Bear Stearns, and Washington Mutual prior to January 1, 2009.  Moreover, in an affidavit filed in *Ambac Assurance Corp. v. EMC Mortgage Corp.*, Index No. 650421/2011, ECF No. 153, a former EMC underwriter responsible for reviewing loans EMC acquired through the flow channel

Each of these firms followed substantially identical review procedures.   A sample of the mortgage loans being purchased was selected for review against the applicable underwriting guidelines.  Following this review, a grade of 1, 2, or 3 was assigned depending upon whether the loan complied with the relevant guidelines (grade 1), failed to meet the guidelines but had "compensating factors" (grade 2), or failed to meet the guidelines and lacked any acceptable compensating factors (grade 3).[35]

However, Bear Stearns, like other MBS sponsors hungry for mortgage loans to fill its lucrative securitization pipeline, limited the numbers of loans it would "kick out" of a given pool being offered and routinely "waived in" loans that violated underwriting guidelines, in order to maintain its relationships with the originators who were critical to fulfilling its demand for mortgage loans to securitize.[36]  Indeed, Clayton's data showed that for the 18 months that ended June 30, 2007, EMC waived in **50%** of the loans that failed to meet basic credit and compliance underwriting standards as "exceptions" – one of the highest waiver rates in the industry.[37]

Bear Stearn's willingness to waive exceptions was also confirmed in sworn statements provided by multiple former third-party due diligence underwriters in *Ambac Assurance Corp. v. EMC Mortgage Corp.*, Index No. 650421/2011 (N.Y. Supreme Court).  In one affidavit, a former due diligence underwriter at Watterson responsible for reviewing loans acquired by Bear Stearns

stated that she was told by EMC management not to check third-party sources, such as Salary.com, to assess the reasonableness of borrowers' income on stated loans or question the accuracy of any information on the loan application.  Ex. 38.

[35]     *See* Mary Haggerty FCIC Testimony; *see also* Ex. 39 (Clayton Trending Report).

[36]     Bear Stearns also limited the due diligence it performed with respect to originators, like Wells Fargo and Countrywide, which sold Bear Stearns large numbers of loans.  *See* Mary Haggerty FCIC Testimony.  Bear Stearns senior managing director and co-head of mortgage finance, Baron Silverstein, admitted in testimony in litigation brought by *Ambac* that Bear Stearns "evaluate[d] [its] due diligence strategy, depending on who the seller was . . . ." *See* Ex. 40 (Silverstein *Ambac* Testimony, ECF No. 117, Ex. 33) at 80.

[37]     Ex. 39 (Clayton Trending Report).

stated that she "learned that 'Bear took anything.'"  *Id*. at ECF No. 153.  Another former Clayton underwriter stated that he was present when representatives of Bear Stearns told his supervisors that "because Bear Stearns was willing to purchase loans that did not meet the underwriting guidelines," the Clayton underwriters "should try to find a compensating factor for every single loan that did not meet the underwriting guidelines."  *Id*. at ECF No. 167.  This underwriter described reviewing an application for a stated income loan for an assistant manager at a McDonald's restaurant who had reported a clearly fraudulent monthly income of $8,500 per month, and being directed to find a compensating factor to approve the loan.  *Id*.  According to this underwriter, who later worked at Watterson as well, Bear Stearns' reputation for accepting even the most obviously defective loans was such that underwriters used the slogan "Bear don't care" when working on Bear Stearns jobs.  *Id*.

Bear Stearns' grossly defective securitization practices infected each of the Covered Trusts, which have suffered substantial losses and high rates of delinquency as a result.  To date, the Covered Trusts have incurred realized losses in excess of $150 million, and an additional $120 million in loans in the Covered Trusts are seriously delinquent.  Ex. 44 (excel chart reflecting current losses and delinquencies).

### D.    The Common Duties Imposed on the Trustee by the TIA

The purpose of having a Trustee in an MBS securitization is to ensure that there is at least one independent party who is not constrained by collective action, or informational, or other limitations (such as conflicts of interest), and who can therefore effectively protect the trusts and the MBS holders.   CSAC, ¶3; *see also* Ex. 13 (Indenture, Appendix A definition of "independent").  Indeed, investors Blackrock and PIMCO recently filed a series of cases in New York Supreme Court against USB and other RMBS Trustees alleging violations of the Trust

Indenture Act, and citing systemic violations of the Trustees' duties to put back defective loans to MBS sponsors. *See*, *e.g.*, Ex. 45 (Blackrock complaint against USB).

Under the TIA, USB was required to exercise "such of the rights and powers vested in it by such indenture, and to use the same degree of care and skill in their exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs." 15 U.S.C. §77ooo(c).[38] Significantly, the Governing Agreements for the Covered Trusts provide "[t]he Indenture Trustee, as pledgee of the Mortgage Loans, has the benefit of the representations and warranties made by the Seller in . . . the Mortgage Loan Purchase Agreement" (*see* Ex. 12 (Indenture), §3.10), and the right to "enforce . . . the repurchase obligations of the Seller . . . in the Mortgage Loan Purchase Agreement . . . with respect to breaches of such representations, warranties, agreements and covenants" (*see* Exs. 15, 17-18 (SSA), §2.07).

Each of the Indentures provides that an Event of Default occurs upon "a default in the observance or performance of any covenant or agreement of the Issuer made in the Indenture" if "such default shall continue or not be cured . . . for a period of 90 days after there shall have been given, by registered or certified mail, to the Issuer by the Indenture Trustee . . . a written notice specifying such default . . . and stating that such notice is a notice of default hereunder." *See* Exs. 10-14 (Indenture) at Appendix A at 9.[39] As this Court has recognized, among the Issuer's many duties under the Indentures was its duty to require the Seller, EMC, "to abide by its representations and warranties with respect to the mortgage loans and to cure, substitute, or

---

[38]     This TIA duty was incorporated in each of the Indentures. *See* Ex. 12 (BSARM 2005-7 Indenture) at §6.01(a).

[39]     This Court has already held that "the defendant cannot escape liability for having failed to send out notices it was required to send out or to act as it was required to do with the excuse that it failed to send out notice that would have triggered an Event of Default." *See Oklahoma Police Pension and Retirement Sys. v. U.S. Bank Nat'l Association*, 291 F.R.D. 47, 67 (S.D.N.Y. 2013).

repurchase nonconforming mortgage loans." *See Oklahoma Police*, 291 F.R.D. at 66 (citing §§3.04(a) and 3.06 of the Indenture and §2.03(b) of the SSA).

The foregoing statutory and contractual duties were owed and breached by USB equally as to ***all*** Noteholders in each of the Covered Trusts, including Plaintiff and the Class.

### E.     The Common Evidence of USB's Actual Knowledge of Breaches of Representations and Warranties and an Event of Default

No later than March 14, 2008, by virtue of information from a variety of sources, USB possessed actual knowledge that neither the Issuer nor Wells Fargo (to the extent the Issuer's obligation to do so was delegated to the Securities Administrator pursuant to the Administration Agreement)[40] was discharging its obligation to put back defective loans in the Covered Trusts to the Seller, thereby triggering USB's obligation under the TIA and the Governing Agreements to: (i) declare an Event of Default based on the Issuer's failure to perform its obligations (*id.*, Appendix A); and (ii) act as a prudent person to enforce the Covered Trusts' repurchase rights (*id.* §6.01(a)).

Beyond the information set forth in the preceding sections, USB knew based on the publicly available Prospectus Supplements that the Covered Trusts contained large numbers of the very types of risky mortgage loans that were widely viewed as causing the financial crisis – *i.e.*, low or no documentation loans and "stated income" or "stated income stated asset" ("SISA") loans.[41]   In addition, USB, as Trustee, had access to monthly reports which reflected aberrant

---

[40]     In its Memorandum of Law in Support of Its Motion to Dismiss, USB argued that pursuant to the Administration Agreement, Wells Fargo, as Securities Administrator, agreed to perform ***all*** of the Issuer's duties under the various Governing Agreements. *See* ECF No. 26 at 6.

[41]     *See* Ex. 4 (BSARM 2005-2 Prospectus Supplement) at A-6 (reflecting that 30% of the loans in the pool were either no documentation or stated income loans); Ex. 5 (BSARM 2005-5 Prospectus Supplement) at A-6 (reflecting that 34% of the loans in the pool were reduced or no documentation loan); Ex. 6 (BSARM 2005-7 Prospectus Supplement) at A-5, A-12 (reflecting that 58% and 60% of the loans in Loan Groups I and II, respectively, were either stated income or SISA loans); Ex.7 (BSARM 2005-9 Prospectus Supplement) at p. 85 (reflecting that 51% of the loans in the pool were either reduced or no documentation loans); Ex. 8 ((BSARM 2006-

delinquency trends which worsened over time.  CSAC, ¶64.  Further, these delinquencies and losses coincided with public reports, lawsuits and investigations that highlighted Bear Stearns' improper securitization practices.  *E.g.,* Ex. 44.  In this regard, it was public knowledge that:

- On December 20, 2007, Bear Stearns had reported its first ever quarterly loss (for the fourth quarter of fiscal 2007) – a staggering $859 million – after writing down more than $2 billion in devalued mortgage securities.[42]

- In December 2007, THE WALL STREET JOURNAL had reported that Bear Stearns had been investigated by both the SEC and the New York Attorney General as early as 2005 for improperly valuing mortgage-related investments.[43]

- Bear Stearns was about to be sold in a fire sale to JPMorgan Chase after a year of steady decline that saw two of its hedge funds heavily invested in securities backed by the type of risky mortgage loans it was securitizing lose all or almost all of their value;[44]

- Prompted by the high rates of defaults in the trusts, beginning in 2008, monoline insurers that guaranteed payments for holders of certain Bear Stearns MBS trusts brought multiple lawsuits against Bear Stearns and its affiliates, which contained specific evidence of Bear Stearns' securitization abuses, including statements of knowledgeable Bear Stearns' insiders and documented breach rates as high as 90% based on loan files reviews that had been conducted; and[45]

- The FBI was investigating 19 companies, including Bear Stearns, with ties to the subprime mortgage crisis.[46]

---

1 Prospectus Supplement) at p. 81 (reflecting that 52% of the loans in the pool were either reduced or no documentation loans).

[42]    Ex. 55 (Bear Stearns 12/20/2007 press release).

[43]    *See* Michael Siconolfi, *Did Authorities Miss a Chance To Ease Crunch? --- SEC, Spitzer Probed Bear CDO Pricing in '05, Before Backing Away*, THE WALL STREET JOURNAL, D1 (Dec. 10, 2007).

[44]    *See* Ex. 47, Subprime Loans Kill Two Bear Stearns Funds, USA TODAY (Jul. 18, 2007) http://usatoday30.usatoday.com/money/markets/2007-07-18-bear-stearns-hedgefunds_n.htm (last visited Aug. 1, 2014).

[45]    *See, e.g., Ambac Assurance Corp. v. EMC Mortgage Corp.*, No. 1:08-cv-09464-RMB (S.D.N.Y.); *Syncora Guarantee Inc. v. EMC Mortgage Corp.*, No. 1:09-cv-03106-PAC (S.D.N.Y.); *Assured Guaranty Corp. v. EMC Mortgage Corp.*, No. 1:10-cv-05367-NRB (S.D.N.Y.).

[46]    *See* "FBI Cracks Down on Mortgage Fraud," CBS NEWS (June 19, 2008) (available at

Worse, at the same time that USB knew of widespread public reports of Bear Stearns' wrongdoing, it also knew, ████████████████████████,[47] that EMC was repurchasing virtually none of the defective loans from the Covered Trusts on its own, and that no other deal party, including the Issuer, was enforcing the Trusts' repurchase rights.  More specifically, an analysis of the publicly available monthly remittance reports detailing the Covered Trusts' performance reveals that only a single loan has been repurchased for breach of representations and warranties across all five Covered Trusts out of the many thousands of mortgage loans contained therein.  Ex. 42.

All of the foregoing information, which was indisputably known to USB, (a) provided USB with actual knowledge that the Issuer was not performing its duties under the Indenture to enforce the Covered Trusts' repurchase rights, and (b) gave rise to USB's duties, as Trustee, to give written notice to the Seller, declare an Event of Default, and enforce the Covered Trusts' repurchase rights itself.

      **F.**    **USB's Common Practices and Misconduct upon Obtaining Actual Knowledge of Breaches of Representations and Warranties and Events of Default**



---

http://www.cbsnews.com/news/fbi-cracks-down-on-mortgage-fraud/) (last visited Aug. 1, 2014).

[47]    Ex. ████████████████████████.  Repurchase information is also contained in publicly available monthly remittance reports.



██████████████████████████████████████████

██████████████████████████████████████████

████████████

**G.      Plaintiff and the Class Were Injured by USB's Failure to Act**

As set forth above, the Mortgage Loans underlying the Covered Trusts have experienced high levels of payment delinquencies, defaults and resulting credit losses which would not have occurred but for Defendant's failure to perform its responsibilities under the TIA.  *See* Ex. 44. Further, as described more fully in the Expert Report of Dr. Richard K. Green, Ph.D. (Ex. 2), Plaintiff will establish through commonly accepted statistical methodologies that a substantial component of the losses suffered by the Covered Trusts are due to defective Mortgage Loans that were not repurchased as a result of USB's failure to carry out its responsibilities under the TIA and the Governing Agreements.

In addition, Plaintiff's expert Dean Smith will explain how the removal of defective Mortgage Loans from the Covered Trusts' collateral pools would have reduced the Noteholders' investment losses, in a common manner, by avoiding collateral losses associated with the defective Mortgage Loans.   Defective Mortgage Loans that USB allowed to remain in the Covered Trusts have therefore caused a measurable loss in the value of the collateral in each of the Covered Trusts, and the value of the Notes themselves.

**H.      The Proposed Class Representative**

Plaintiff is a state governmental pension fund that purchased and sold Notes issued by BSARM 2005-9 at a loss during the Class Period.  CSAC, ¶13.  Plaintiff held these Notes while USB was in breach of its obligations under the TIA and has been injured as a result of USB's failure to act.  In its decision granting in part and denying in part USB's motion to dismiss the

CSAC, this Court held that Plaintiff had class standing to assert claims under the TIA on behalf

of the other four Indenture Trusts at issue on this motion.[48]

## III.    THE CLASS DEFINITION

Plaintiff seeks to represent a Class comprised of investors who have been damaged by

USB's misconduct.  With this motion, Plaintiff asks the Court to certify the following Class:

> All persons and entities that held the Notes identified in Appendix
> A at any time on or after March 14, 2008 and who were damaged
> thereby (the "Class").

Excluded from the proposed Class is USB and its respective officers, affiliates, and directors at

all relevant times, members of their immediate families and their legal representatives, heirs,

successors, or assigns, and any entity in which USB has or had a controlling interest.

## IV.    ARGUMENT

### A.    Class Certification: General Requirements and Standard of Review

Plaintiff's claims that USB systematically failed to perform its common statutory duties

owed to all class members are quintessential candidates for class certification under Rule 23.

Certification here will promote efficiency through the common adjudication of substantially

identical claims against USB held by each Class member.

Rule 23(a) sets forth the following requirements for certification: (1) numerosity;

(2) commonality; (3) typicality; and (4) adequacy.  *Brown v. Kelly*, 609 F.3d 467, 475 (2d Cir.

2010).  In addition, a class must be maintainable under one subdivision of Rule 23(b).  Here,

Plaintiff seeks certification of the Class pursuant to Fed. R. Civ. P. 23(b)(1) and 23(b)(3).

---

[48]     *See Oklahoma Police*, 291 F.R.D. at 58-61 ("It is sufficient that the plaintiff has pleaded that the defendant breached the same obligations in the same way in connection with the trusts in which the plaintiff invested and the trusts in which putative class members invested, that those trusts were substantially similar, and that those breaches by the defendant caused injury to the plaintiff and to the putative class in the same way.  Therefore, in this case, the plaintiff's claims raise a sufficiently similar set of concerns to permit it to have standing to purport to represent certificate holders who invested in Covered Trusts in which the plaintiff did not invest.").

On a motion for class certification, "the preponderance of the evidence standard applies to evidence proffered to establish Rule 23's requirements." *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc*., 546 F.3d 196, 202 (2d Cir. 2008).   Courts evaluate the proffered evidence to determine whether it satisfies Rule 23, but do not "engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194-95 (2013).   Instead, merits questions "may be considered to the extent— but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* at 1195.   Similarly, Rule 23(b) only "requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Id*. at 1191 (italics in original).[49]   As demonstrated below, Plaintiff readily satisfies the requirements for class certification.

### B.      The Class Meets the Requirements of Rule 23(a)

#### 1.      The Class Is Sufficiently Numerous that Joinder Would Be Impracticable

Rule 23(a)(1) requires that a certified class must be "'so numerous that joinder of all members is impracticable,'" or, put simply, is "needlessly complicated and inefficient." *Banyai v. Mazur*, 205 F.R.D. 160, 163 (S.D.N.Y. 2002).   Determining numerosity may depend upon "all the circumstances surrounding a case," *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993), but in the Second Circuit "numerosity is presumed at a level of 40 members." *Consol. Rail Corp. v. Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995).

The evidence easily establishes numerosity here.   As Dr. Hartzmark determined, the proposed Class has at least 1,800 unique investors who held or purchased Notes issued by the Covered Trusts on or after March 14, 2008.   Ex. 54 (Hartzmark Report).   As set forth in greater

---

[49]      Unless otherwise noted, all emphasis is added, and citations and quotation marks are omitted.

detail in the Hartzmark Report, these figures are based on extensive transaction data obtained from "market makers" relating to the trading in the Notes from their issuance to present.  By aggregating and processing data from these numerous market makers, Dr. Hartzmark was able to identify the number of unique investors who transacted in the Notes.  These investors comprise geographically dispersed institutions and individuals with a wide range of transaction sizes, which similarly weighs in favor of a finding of numerosity.  *See Robidoux*, 987 F.2d at 936.  With the large number of Class members at issue here, joinder is not just impractical, it is likely impossible.

### 2.    There Are Questions of Law and Fact Common to the Class

Rule 23(a)(2) further requires Plaintiff to establish that "there are questions of law or fact common to the class."  This commonality requirement poses a "low hurdle" (*In re NTL, Inc. Sec. Litig.*, No. 02 Civ. 3013 LAK AJP, 2006 WL 330113, at *6 (S.D.N.Y. Feb. 14, 2006)), such that "'[e]ven a single [common] question' will do."  *Wal-Mart Stores v. Dukes*, 131 S. Ct. 2541, 2556 (2011).  A question is common if its answer will resolve an issue relevant to the claims on a class-wide basis "in one stroke" (*id*. at 2551), regardless of whether it will "overshadow potential individual issues."  *In re U.S. Foodservice Inc. Pricing Litig.*, No. 3:07-md-1894 (CFD), 2011 WL 6013551, at *4 (D. Conn. Nov. 29, 2011), *aff'd* 729 F.3d 108 (2d Cir. 2013).  Given these permissive guidelines, courts routinely hold that commonality is satisfied in cases where, *e.g.* (a) a defendant has, through a common course of conduct, allegedly breached a duty that appears in its multiple (but substantively identical) contracts with the different class members (*U.S. Foodservice*, 2011 WL 6013551, at *5); (b) a defendant makes a statement in multiple MBS prospectus supplements that is allegedly untrue due to a common course of conduct (*Merrill Lynch*, 277 F.R.D. at 110); or (c) a defendant trustee has allegedly violated duties owed to all

22

class members under a provision of the TIA through a common course of conduct. *Cruden v. Bank of New York*, No. 85 Civ, 4170 (JFK), 1988 WL 9514, at \*3 (S.D.N.Y. Feb. 1, 1988).

The facts here are consistent with the foregoing cases which found that commonality existed. As discussed at greater length above, a single flawed process created the Covered Trusts and filled them with Mortgage Loans that breached representations and warranties; in addition, USB owed identical statutory duties to every Class member with respect to those defective mortgage loans, and USB developed a single, flawed set of policies and procedures in response to those duties which it employed with respect to each of the Trusts at issue. The many common questions that arise from these facts thus include, but are not limited to:

- whether USB had actual knowledge of the Issuer's failure to enforce the Covered Trusts' repurchase rights;

- whether USB violated its statutory duties by failing to declare an Event of Default and act prudently to enforce the Covered Trusts' repurchase rights with respect to mortgage loans that breached representations and warranties; and

- whether and to what extent members of the Class have suffered damages as a result of USB's breaches of its statutory duties, including the proper measure of damages.

Indeed, based on the foregoing facts, the answer to each question, whatever it is, will resolve that question for all Class members in one stroke.

### 3.    Plaintiff's Claims Are Typical of the Other Class Members' Claims

Rule 23(a)(3) additionally requires Plaintiff to establish that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The typicality prerequisite requires a showing that "'each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability.'" *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009). In assessing that showing, "[t]he focus of the typicality inquiry is not on the plaintiffs'

behavior, but rather on the defendant's actions." *Kottler v. Deutsche Bank AG*, No. 05 Civ. 7773 (PAC), 2010 WL 1221809, at *2 (S.D.N.Y. Mar. 29, 2010).  Moreover, "[w]hen it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Robidoux*, 987 F.2d at 936-37.  The possibility that damages may have to be determined on an individualized basis similarly "would not defeat typicality in light of the fact that a showing of the 'typicality requirement is not demanding.'"  *See N.J. Carpenters Health Fund v. Residential Capital, LLC,* 272 F.R.D. 160, 165 (S.D.N.Y. 2011), *aff'd* 477 Fed. Appx. 809 (2d Cir. 2012).

There is no question that Plaintiff's claims arise from the same course of events and failure to act as the other Class members' claims.  More specifically, (a) USB had a uniform practice across all the Covered Trusts of failing to declare or give notice of defaults under the Indenture, and (b) of failing to enforce the Trusts' repurchase rights, despite having actual knowledge of breaches of representations and warranties and the Issuer's failure act.  Moreover, this common practice adversely affected, and gave rise to, the claims of all Class members. Further, because USB had identical statutory duties across all of the Covered Trusts to provide notice and enforce repurchase rights, Plaintiff and all Class members advance the same legal arguments for violations of the TIA to vindicate their claims.  Courts have found that typicality exists under similar circumstances.  *See*, *e.g.*, *U.S. Foodservice*, 2011 WL 6013551, at *5; *Merrill Lynch*, 277 F.R.D. at 106; *Cruden*, 1988 WL 9514, at *4.  Typicality is therefore satisfied here as well.[50]

---

[50]     There are no unique defenses in this case.  In any event, while typicality may not exist "where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation," the unique-defense principle (i) "is not rigidly applied in this Circuit," (ii) is intended "to protect [the] plaintiff class – not to shield defendants from a potentially meritorious suit," and (iii) "has generally been applied only where a full

###### 4.        Plaintiff Will Fairly and Adequately Protect the Interests of the Class

Finally, Rule 23(a)(4) requires Plaintiff to establish that "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  Determining adequacy "entails inquiry as to whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation."  *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp*., 222 F.3d 52, 60 (2d Cir. 2000).  In determining whether Plaintiff's interests are antagonistic to those of the class, even the existence of opposing interests is not enough to render a plaintiff inadequate unless those opposing interests are "fundamental."  *See Flag Telecom*, 574 F.3d at 35.  Courts accordingly have often found that where plaintiffs satisfy the typicality requirement, they satisfy the adequacy requirement as well.  *Damassia v. Duane Reade, Inc*., 250 F.R.D. 152, 158 (S.D.N.Y. 2008).

Indeed, for the same reasons discussed above regarding commonality and typicality, Plaintiff's interests are plainly not antagonistic to the Class.  *Merrill Lynch*, 277 F.R.D. at 109 (quoting *Damassia*, 250 F.R.D. at 158) ("A finding that a proposed class representative satisfies the typicality inquiry constitutes 'strong evidence that [his] interests are not antagonistic to those of the class'").  Plaintiff is also committed to monitoring the prosecution of this action on behalf of the putative Class, and, to that end, has produced approximately 20,000 pages of documents to date,[51] participated in regular status updates with its counsel concerning the case, and reviewed submissions to the Court, among other involvement with this case.  Finally, Plaintiff has retained experienced counsel to represent it in this action.  Scott+Scott has a long history of success in

defense is available against an individual plaintiff's action." *In re Parmalat Sec. Litig*., No. 04 Civ. 0030, 2008 WL 3895539, at *5 (S.D.N.Y. Aug. 21, 2008) (Kaplan, J.).

[51]        In contrast, other than publicly available deal documents, USB has produced only about 150 documents to Plaintiff.

complex class action litigation, including MBS class actions; has acted to vigorously develop and aggressively prosecute the claims on behalf of the Class; and has the resources to prosecute this litigation.  (*See* Ex. 56 (firm résumé)).

###    C.    The Class Meets the Requirements of Rule 23(b)(1)

As Judge Mukasey has explained, "certification of a class under Rule 23(b)(1) is appropriate when the defendant is required by law or necessity to treat all members of the class alike."  *Novella v. Westchester County*, No. 02-cv-2192, 2004 WL 3035405, at *8 (S.D.N.Y. Dec. 29, 2004).  The proposed Class satisfies that standard and falls within both subsections of Rule 23(b)(1) – though it need only satisfy one.  Indeed, quoting the Advisory Committee Notes to the F.R.C.P., the Supreme Court has stated that Rule 23(b)(1) is designed for the type of circumstance at issue in this case, where "'a breach of trust by an indenture trustee or other fiduciary similarly affecting the members of a large class' of beneficiaries, require[es] an accounting or similar procedure 'to restore the subject of the trust[.]'"  *See Ortiz v. Fibreboard Corp.* 527 U.S. 815, 834 (1999).

The first subsection states that the court may certify a class if the prosecution of separate actions by or against individual members of the class would create a risk of:

> (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class . . . .

This covers circumstances where class members "suffered the same statutory violations and are therefore entitled to similar forms of relief[.]"  *See In re Citigroup Plan ERISA Litigation*, 241 F.R.D. 172, 180 (S.D.N.Y. 2006).  Just so here, Defendant's failure to comply with the same provision of the TIA, in the same manner, have damaged Plaintiff and each Class member.  More specifically, because Defendant's responsibility to enforce repurchase claims in an Event of

Default under TIA §315(c) simultaneously affects each of the five Covered Trusts (which are governed by identical Indentures) and their noteholders, Defendant is required by law to embrace the Trusts' repurchase rights on behalf of all members of the Class alike.  For the same reason, varying adjudications of that responsibility under the circumstances at issue would create incompatible standards of conduct for Defendant.

Similarly, the second subsection of Rule 23(b)(1) applies to situations where separate actions would create a risk of:

> (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests [.]

This subsection typically applies to "limited fund" cases.  *See Ortiz* 527 U.S. at 834-35.  Plaintiff anticipates that Defendant will argue that, irrespective of the Class' actual damages, the amount of money that Plaintiff can recover should be limited to the value of the Covered Trusts' mortgage loans that breached representation and warranties – which amount Defendant could have restored to the Trusts had it enforced the Trusts' repurchase claims.  That argument would make this a limited fund case.

Thus the proposed Class is maintainable under both Rule 23(b)(1)(A) and 23(b)(1)(B).

### D.     The Class Meets the Requirements of Rule 23(b)(3)

#### 1.     Common Questions of Law and Fact Predominate over Any Potential Individual Questions

Certification pursuant to Fed. R. Civ. P. 23(b)(3) requires a showing that common issues of law and fact predominate over individual issues, and that the class action device is superior to alternative means of adjudicating the relevant claims.  *See Brown*, 609 F.3d at 476.  "'Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class

member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than issues subject only to individualized proof.'" *N.J. Carpenters Health Fund v. Residential Capital, LLC ("RALI I")*, No. 08 CV 8781 (HB), 2012 WL 4865174, at *2 (S.D.N.Y. Oct. 15, 2012) (quoting *UFCW Local 1776 v. Eli Lilly and Co.*, 620 F.3d 121, 131 (2d Cir. 2010)).   This requirement seeks, through the class action device, to "achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *See In re Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d 229, 240 (2d Cir. 2012). Predominance entails a qualitative assessment that looks beyond the mere existence of individual issues or simply "determining whether there are more common issues or more individual issues, regardless of relative importance." *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013) (Posner, J.).   It thus assesses the cohesiveness of the class, under the principle that "[a]n issue 'central to the validity of each one of the claims' in a class action, if it can be resolved 'in one stroke,' can justify class treatment." *Id.* (quoting *Wal-Mart*, 131 S. Ct. at 2551).   This standard is easily satisfied here.

For example, the Class claims under TIA §315(c) require them to establish that (a) an Event of Default occurred under the Indentures, (b) USB failed to act as a prudent person would under the circumstances in response, and (c) those failures resulted in damages to the Class.  15 U.S.C. §77ooo(c).  Given that the TIA applies to all of the Covered Trusts, and so to all Class members, §315(c) imposes uniform duties on USB across all of the Covered Trusts as well.[52] The default at issue is, once again, the existence of mortgage loans that breached representations and warranties and the Issuer's failure to put them back in the first instance.   Accordingly,

---

[52]     To the extent that TIA §315(c) incorporates certain provisions of the Governing Agreements, as discussed above, the  relevant provisions of each Governing Agreement are identical or substantially similar, which reinforces that the TIA imposes uniform obligations on USB.

whether USB fulfilled its uniform obligations to enforce repurchase claims is the central, and predominant, issue in the case.

Not only is that issue predominant, Plaintiff will also prove it with common evidence. The evidence of USB's knowledge that the Covered Trusts contained substantial numbers of mortgage loans that should have been (but were not) repurchased is common. This evidence – in particular, aberrant delinquency and loss rates in the Covered Trusts and widely disseminated reports of Bear Stearns' deficient and reckless securitization practices – simply will not vary from Trust to Trust. Common evidence will likewise establish USB's uniform failures, in breach of its objections under the TIA, to notify the Issuer of its obligations or to take any other actions to ensure that the Trusts' repurchase rights were enforced. Finally, as described below, damages can be calculated using a common methodology based on publicly available data with respect to the Covered Trusts.

Courts have found that common issues predominate under similar circumstances. For example, in *In re U.S. Foodservice, Inc. Pricing Litigation*, 729 F.3d 108 (2nd Cir. 2013), the Second Circuit recently affirmed the District Court's certification of a class of more than 75,000 cost-plus customers of U.S. Foodservice asserting breach of contract claims. Although U.S. Foodservice argued that the relevant contracts had material differences and variations that precluded resolving the issue of breach through generalized proof, thereby defeating predominance, the Second Circuit disagreed based on evidence that "the contracts essentially all [said] the same thing." *Id*. at 124. In addition, the Second Circuit found no basis to disturb the District Court's conclusion that individual issues with respect to damages did not defeat predominance because plaintiffs had presented a common methodology for calculating damages based on common evidence. *Id*. at 129-30. Likewise, in *In re Medical Capital Securities*

*Litigation*, No. SACV–09–1048, 2011 WL 5067208 (C.D. Cal. July 26, 2011), the court certified a class of investors bringing claims against trustees Wells Fargo and Bank of New York Mellon for breaching their duties under substantially identical security agreements governing six separate note offerings.

In addition, courts have consistently found that common issues predominate in cases involving MBS.  Judge Rakoff's reasoning in *Merrill Lynch* is on point.  There, defendants argued that individual issues predominated because (a) "the supplements to the 18 prospectuses did not contain the same statements and . . . the various Offerings were backed by loans issued by different originators using varied underwriting guidelines and exceptions," and (b) "each prospectus supplement was issued at a different point during a 17-month period from February 2006 to September 2007, while the mortgage finance market was undergoing dramatic changes." *Merrill Lynch*, 277 F.R.D. at 113.  Thus, defendants asserted, "the falsity of the alleged misrepresentations must be determined on an individual basis."  *Id*.  Judge Rakoff, however, disagreed.  While analyzing the alleged falsity of the statements in the offering documents would "of course entail some individualized inquiry," the common issues "overwhelm[ed] the individual ones."  *Id.*  The Court also emphasized that "'[e]ach of the Certificates purchased by the Plaintiffs and the Class were created and issued pursuant to [the] same process by the same Defendants,'" and that the alleged flaws "common to that process, which resulted in the misstatements" would "be the subject of common proof."  *Id.*

While this case, like virtually every other investor class action, will entail at least some discovery and analysis relating to details specific to each offering or Note, particularly in applying a common damages formula, the common questions pertaining to whether the underlying mortgages breached the representations and warranties and whether USB failed to act

when it knew of such defects and the Issuer's failure to take action tightly cohere Class members' claims and warrant class certification.  For these reasons, the class action mechanism "promises an enormous savings in judicial resources."  *Id.* at 101.[53]

Furthermore, as demonstrated by the declaration of Plaintiff's expert, Dean Smith, damages in the instant matter will be established using common evidence and a common methodology widely accepted in the industry and by the courts.  *See* Ex. 1 (Smith Decl.). Mr. Smith will calculate the extent to which USB's actions reduced the value of Plaintiff's and the Class members' Notes by performing discounted cash flow calculations, because, as Mr. Smith explains, the price of RMBS is primarily a function of the expected cash flows from the mortgage collateral.  Thus, Mr. Smith will use an industry-accepted Cash Flow Model that incorporates the status of the Covered Trusts, as well as the market conditions, which existed at (and after) the time USB first injured Plaintiff and the Class.  That model will also incorporate the results of the re-underwriting of a statistically significant sample of loans from the Covered Trusts.  Plaintiff's statistical expert, Dr. Richard K. Green, will draw the sample using commonly accepted techniques and the sample loans will be re-underwritten in accordance with the relevant underwriting guidelines to determine how many of them breached representations and warranties and the losses to the Covered Trusts from those loans.  Dr. Green will then be able to extrapolate the results of this re-underwriting exercise to the Covered Trusts as a whole.  With the foregoing data, Mr. Smith will adjust the Covered Trusts' cash flows and determine the prices at which the

---

[53]     This result is fully in accord with every other mortgage-backed securities class certification decision in this District, all of which have found predominance satisfied.  *See Tsereteli*, 283 F.R.D. at 216 (case raises "sufficiently general issues to predominate over any individual inquiries that may arise"); *IndyMac*, 286 F.R.D. at 242 ("The Court is convinced that issues subject to generalized proof significantly predominate over any individualized considerations that are likely to arise in this case."); *Goldman Sachs Grp., Inc.*, 280 F.R.D. at 141 ("Plaintiffs have met their burden to show that common issues predominate.  The potential individual issues raised by Defendants do not undermine this finding."); *DLJ Mortgage*, 2011 WL 3874821, at *8 ("the Court finds that issues common to the potential class members predominate over potentially individual issues").

Notes would have traded had USB performed its duties – *i.e.*, had the defective loans been removed from the Covered Trusts.  Those prices will form the basis of Class members' damages.

Although the specific ***amount*** of each Class member's damages may vary, this "does not defeat certification if the ***method*** of calculating damages is common to the class."  *Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 181 (S.D.N.Y. 2008).  "The fact that damages require individual computations according to each Plaintiff's particular facts, does not justify failing to certify a class action."  *See*, *e.g.*, *Levinson v. About.com, Inc.*, No. 02 Civ. 2222 (DAB), 2009 WL 1026021, at *5 (S.D.N.Y. Apr. 13, 2009) (certifying breach of contract claims as a class action despite defendants' argument regarding individualized nature of plaintiffs' damages); *Butler*, 727 F.3d at 801 ("It would drive a stake through the heart of the class action device, in cases in which damages were sought rather than an injunction or a declaratory judgment, to require that every member of the class have identical damages.").  Indeed, "[i]t is a rare case where computation of each individual's damages is so complex, fact-specific, and difficult that the burden on the court is intolerable."  *See U.S. Foodservice Inc.*, 2011 WL 6013551, at *16.

Because Plaintiff can demonstrate USB's liability ***and*** Class-wide damages using generalized proof and a common methodology, and because these core issues outweigh any hypothetical individual ones, Rule 23(b)(3)'s predominance requirement is satisfied.

### 2.     A Class Action Is a Superior Method for Resolving This Dispute

In addition to predominance, Rule 23(b)(3) requires a showing that a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

Rule 23(b)(3) provides four factors pertinent to the superiority requirement:

(A)     The class members' interests in individually controlling the prosecution or defense of separate actions;

      (B)     The extent and nature of any litigation concerning the controversy already begun by or against class members;

      (C)     The desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

      (D)     The likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).  This list is non-exhaustive and should be considered in light of the stated purposes of Rule 23.  *In re Vivendi Universal S.A. Sec. Litig.*, 242 F.R.D. 76, 91 (S.D.N.Y. 2007).  These factors, as well as consideration of the purposes of Rule 23, weigh in favor of certifying the Class.

Here, only the Plaintiff has expressed an interest in controlling the prosecution of this case.  *In re Revco Sec. Litig.*, 142 F.R.D. 659, 669 (N.D. Ohio 1992).  *See also Torres v. Gristede's Operating Corp.*, No. 04 Civ. 3316 (PAC), 2006 WL 2819730, at *16 (S.D.N.Y. Sept. 29, 2006) (finding minimal interest by class members in controlling the prosecution where there was a lack of individual actions).  Moreover, this particular action has been pending in this forum since November 9, 2011, and the Court has already ruled on motions to dismiss and for partial summary judgment, thus making it familiar with the relevant facts, claims, and defenses. In addition, given the large and geographically dispersed Class, multiple lawsuits would simply increase the costs of litigation for all parties, pose an unnecessary burden on the court system, and create a risk of inconsistent adjudications with respect to USB's uniform obligations, the propriety of its actions in light of those uniform obligations, and the meaning of the substantially identical language contained in the Trusts' Governing Agreements.  *See IndyMac*, 286 F.R.D. at 243; *see also In re Marsh & McLennan Cos., Inc. Sec. Litig.*, No. 04 Civ. 8144 (CM), 2009 WL 5178546, at *12 (S.D.N.Y. Dec. 23, 2009) ("concentrating litigation in a single forum plainly has a number of benefits, including eliminating the risk of inconsistent adjudications and promoting the fair and efficient use of the judicial system").

Thus, adjudicating this case as a class action "is clearly desirable" and superior to any other method. *In re EVCI Career Colleges Holding Corp. Sec. Litig.*, Master File No. 05 Civ. 10240 (CM), 2007 WL 2230177, at *14 (S.D.N.Y. July 27, 2007).

## V.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court: (i) certify this Action as a class action pursuant to Rule 23(a), 23(b)(1), and 23(b)(3); (ii) appoint Plaintiff as representative of the proposed Class; and (iii) appoint Scott+Scott as Class Counsel.

Dated:  August 1, 2014                                        **SCOTT+SCOTT, ATTORNEYS AT LAW, LLP**

\s\ *Deborah Clark-Weintraub*
Deborah Clark-Weintraub
Beth A. Kaswan
William C. Fredericks
Max Schwartz
Donald Broggi
The Chrysler Building
405 Lexington Avenue, 40th Floor
New York, NY 10174
Tel.:  (212) 223-6444
Fax:  (212) 223-6334
Email: dweintraub@scott-scott.com
        bkaswan@scott-scott.com
        wfredericks@scott-scott.com
        mschwartz@scott-scott.com
        dbroggi@scott-scott.com

*Counsel for Plaintiff*